# EXHIBIT A

ADR-106

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| FARYAN ANDREW AFIFI (sbn 167344)<br>AFIFI LAW GROUP<br>1801 Century Park E, Suite 1100<br>Los Angeles, CA 90067<br>  TELEPHONE NO.: (310) 4-7-3000  FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: faryan@afifilaw.com<br>ATTORNEY FOR *(Name)*: Petitioners, ELIAS SHIBER and CANA Inc. | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | |
|---|---|
| STREET ADDRESS: 111 N. Hill Sreet | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: Los Angeles, CA 90012 | |
| BRANCH NAME: Stanley Mosk Courthouse | |

PETITIONER: ELIAS SHIBER; CANA INC.

RESPONDENT: Have a Heart Compassion Care Inc.; Ryan Kunkel

| PETITION TO ☐ CONFIRM   ☐ CORRECT   ☑ VACATE<br>CONTRACTUAL ARBITRATION AWARD | |
|---|---|
| **Jurisdiction** *(check all that apply)*:<br>  ☐ Action is a limited civil case<br>    Amount demanded  ☐ does not exceed $10,000<br>                  ☐ exceeds $10,000, but does not exceed $25,000<br>  ☑ Action is an unlimited civil case (exceeds $25,000) | CASE NUMBER:<br>**20STCP01632** |

NOTICE: You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105, *Information Regarding Rights After Attorney-Client Fee Arbitration*.

1. **Petitioner and respondent.** Petitioner *(name each)*:

ELIAS SHIBER, an individual; CANA INC., a California Corporation

alleges and requests relief against respondent *(name each)*:

HAVE A HEART COMPASSION CARE, INC., A Washington corporation ("HAVE A HEART"); RYAN KUNKEL, an individual.

2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. **Pending or new action.**
   a. ☐ A court case is already pending, and this is a petition filed in that action. *(If so, proceed to item 4.)*
   b. ☑ This petition commences a new action. *(If so, complete items 3b(1) through 3b(4).)*
       (1) **Petitioner's capacity.** Each petitioner named in Item 1 is an individual,
           ☑ except petitioner *(state name and complete one or more of the following)*: CANA, INC.,
           (a) ☑ is a corporation qualified to do business in California.
           (b) ☐ is an unincorporated entity *(specify)*:
           (c) ☐ is a representative *(specify)*:
           (d) ☐ is *(specify other capacity)*:

       (2) **Respondent's capacity.** Each respondent named in Item 1 is an individual,
           ☑ except respondent *(state name and complete one or more of the following)*: HAVE A HEART
           (a) ☐ is a business organization, form unknown.
           (b) ☑ is a corporation.
           (c) ☐ is an unincorporated entity *(specify)*:
           (d) ☐ is a representative *(specify)*:
           (e) ☑ is *(specify other capacity)*: A Washington Corporation

Page 1 of 3

| PETITIONER: SHIBER | CASE NUMBER: |
|---|---|
| RESPONDENT HAVE A HEART et al. | |

3. b.    (3) **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*:

       (a) ☑ the following amount of money *(specify amount)*: $ 5 Million

       (b) ☑ property *(if the dispute involves property, complete both of the following)*:

          (i) consisting of *(identify property in dispute)*: 4027 E. 52nd Street, Maywood, CA 90270

          (ii) having a value of *(specify value of property in dispute)*: $ $2 Million

    (4) ☑ **Venue.** This court is the proper court because *(check (a) or (b))*:

       (a) ☑ this is the court in the county in which the arbitration was held.

       (b) ☐ the arbitration was not held exclusively in any county of California, or was held outside of California, **and** *(check one or more of the following)*:

          (i) ☐ this is the court in the county where the agreement was made.

          (ii) ☐ this is the court in the county where the agreement is to be performed.

          (iii) ☐ the agreement does not specify a county where it is to be performed and was not made in any county in California, and the following party resides or has a place of business in this county *(name of party)*:

          (iv) ☐ the agreement does not specify a county where it is to be performed and was not made in any county in California, and no party to this action resides or has a place of business in California.

4. **Agreement to arbitrate.**

  a. **Date.** Petitioner and respondent entered into a written agreement on or about *(date)*: February 1, 2018 (SHIBER only)

  b. ☑ **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.

  c. **Arbitration provision.** Paragraph __6.2__ of the agreement provides for arbitration of disputes arising out of the agreement as follows *(either copy the arbitration provision in full or summarize the provision)*:
Disputes arising out of the agreement shall be decided in Los Angeles County before one arbitrator, administered, by JAMS pursuant to its comprehensive arbitration rules, and judgment may be entered in any court of competetent jdxn, and arbitrator determine prevailing party attorneys fees.

5. **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the agreement to arbitrate *(summarize the dispute)*:
Respondent, after holding the property and licenses for almost a year, sought to rescind both agreements based on the rescission clause in each agreememt. via a letter dated January 15, 2019.

6. **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator)*:
Zela G. Claiborne - appointed by JAMS

7. **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:

  a. **Date** *(each date of arbitration)*: November 18-22, 2019

  b. **Location** *(city and state where arbitration was conducted)*.

  JAMS Century City - 1925 Century Park E, Suite 1400, Los Angeles, CA 90067

8. **Arbitration award.**

  a. **Date of award.** The arbitration award was made on *(date)*: February 5, 2020

  b. **Terms of award.** The arbitration award *(check one or more of the following)*:

    (1) ☑ requires   ☑ petitioner   ☐ respondent   to pay the other party this amount: $ 1,831,034.70

    (2) ☐ requires neither party to pay the other anything.

    (3) ☐ is different as to different petitioners and respondents.

    (4) ☑ provides *(specify other terms or check item 8(c) and attach a copy of the award)*:
Rescission of the two agreements between SHIBER and HAVE A HEART and the guarantees signed by KUNKEL

  c. ☑ **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**

  a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date)*: 2-7-20

  b. ☑ Petitioner alleges that a signed copy of the award was actually served on *(date)*: 2-7-20 via email only

**PETITION TO CONFIRM, CORRECT, OR VACATE
CONTRACTUAL ARBITRATION AWARD
(Alternative Dispute Resolution)**

| PETITIONER: SHIBER | CASE NUMBER: |
|---|---|
| RESPONDENT: HAVE A HEART et al. | |

10. Petitioner requests that the court *(check all that apply)*:
  a. ☐ **Confirm the award, and enter judgment according to it.**
  b. ☐ **Correct the award and enter judgment according to the corrected award, as follows:**
    (1) The award should be corrected because *(check all that apply)*:
      (a) ☐ the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.
      (b) ☐ the arbitrator exceeded his or her authority.
      (c) ☐ the award is imperfect as a matter of form.
    (2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here ☐ and submit facts on an attachment labeled 10b(2))*:

    (3) The award should be corrected as follows *(if additional space is required, check here ☐ and describe requested correction on an attachment labeled 10b(3))*:

  c. ☑ **Vacate (cancel) the award.**
    (1) The award should be vacated because *(check all that apply)*:
      (a) ☐ the award was obtained by corruption, fraud, or other unfair means.
      (b) ☐ an arbitrator was corrupt.
      (c) ☑ the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.
      (d) ☑ the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.
      (e) ☐ the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.
      (f) ☐ an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.
      (g) ☐ an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.
    (2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here ☑ and submit facts on an attachment labeled 10c(2))*:

    (3) Petitioner ☑ does ☐ does not request a new arbitration hearing.
  d. ☐ **Award petitioner interest from** *(date)*:
    (1) ☐ at the statutory rate.
    (2) ☐ at rate of ____ % per year.
  e. ☐ **Award petitioner costs of suit:**
    (1) ☐ in the amount of: $
    (2) ☐ according to proof.
  f. ☑ **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement)*:
    (1) ☐ in the amount of: $
    (2) ☑ according to proof.
  g. ☐ **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here ☐ and describe relief on an attachment labeled 10g)*:

11. **Pages and attachments.** Number of pages attached: **58**

Date: May 4, 2020

FARYAN ANDREW AFIFI
  (TYPE OR PRINT NAME)　　　　　　　　　　　　　(SIGNATURE OF PETITIONER OR ATTORNEY)

**ATTACHMENT 4(b)**

Copies of the Arbitration Agreements –   License Agreement

Lease Agreement

(Arbitration Clause in Section 6.2 of Both Agreements)

## CANNABIS LICENSE ASSIGNMENT AGREEMENT
## By and between Elias Shiber and "Have a Heart Compassion Care, Inc."

This **CANNABIS LICENSE ASSIGNMENT AGREEMENT** (hereinafter this "Assignment") is effective on the Effective Date as defined below, and shall remain in full force and effect subject to the terms and conditions contained in this Assignment. This Assignment is made by and between **ELIAS SHIBER**, a natural person ("Assignor") and **HAVE A HEART COMPASSION CARE, INC.,** a State of Washington corporation ("Assignee"). Assignor and Assignee are individually referred to herein as a "Party" and collectively referred to as the "Parties."

### RECITALS

A.      Assignor owns the commercial real property located at 4027 E. 52nd Street, Maywood, CA 90270 (the "Premises"). Assignor also holds title and ownership in four (4) separate cannabis business licenses (the "Licenses"). The Assignor's Licenses authorize the holder of the Licenses to conduct four separate categories of cannabis operations at the Premises, and these are: cannabis producer/cultivator, cannabis processor, cannabis distributor, and cannabis retailer;

B.      The Assignor seeks to lease the Premises to the Assignee (the "Lease") and also assign to Assignee all rights available under the Licenses for the life of the Assignment. Assignee seeks to pay a monthly fee for the Lease, as well as a separate monthly fee as the transferee and assignee and user of the Licenses for the life of the Assignment;

C.      Assignor shall continue to hold all ownership interest in the Licenses, and Assignee shall have no claim of title or ownership in the Licenses. Assignee's rights are limited to using the Licenses at the Premises, and the Assignee holds no title or ownership interest in the Licenses;

D.      Assignee's interest in entering into this Assignment, and paying monthly rent for the Premises, and also paying an additional monthly fee for the privilege of using the Licenses is expressly subject to, and dependent on, the Assignee's requirements that (1) the Assignor's Licenses as well as the rights to conduct cannabis business operations as described in each of the Licenses must be fully transferable and/or assignable from Assignor to Assignee, and (2) the Licenses must provide Assignee with legal approval to conduct the cannabis businesses described in the Licenses, including conducting sales of "adult use" cannabis (commonly known as "recreational" cannabis), and (3) in the event of the death or incapacity of the Assignor, the Licenses must remain in full force and effect and allow the Assignee to continue conducting the cannabis businesses as authorized in the Licenses for the life of the Assignment.

HAH000001
**ARBITRATION EX. 1.1**

E.     The Parties understand and agree that in the event that (1) one or more of the Assignor's four (4) cannabis Licenses and the rights specified in the Licenses cannot be effectively transferred or assigned from Assignor to Assignee, or (2) the License authorizing sales of cannabis does not authorize the sale of "adult use" cannabis, or (3) the death or incapacity of the Assignor shall result in the Assignee being unable to continue to use the Licenses as contemplated in this Assignment, then under these circumstances, both Parties shall mutually terminate the Assignment and this Assignment, and the Assignor shall return to Assignee the monetary sums previously prepaid by Assignee subject to the Assignor's right to retain a portion of said sums to setoff or defray Assignor's repair costs and other expenses arising out of Assignee's occupancy of the Premises.

NOW, THEREFORE, in consideration of the agreements, promises, obligations, conditions, limitations, and covenants contained herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged by the parties, Assignor hereby agrees to transfer and assign the Licenses to Assignee, and Assignee hereby agrees to pay Assignor a monthly user fee for the privilege of using the Licenses, as follows:

1.     **DEFINED TERMS**

1.1     "Assignee" shall mean HAVE A HEART COMPASSION CARE, INC., a State of Washington corporation, with a primary address listed on Washington's Secretary of State's website as 300 NW 85th Street Seattle, WA 98117. Assignee's owner and/or executive officer and/or governor is Ryan Kunkel, an individual.

1.2.     "Assignment" shall mean this contract and its attachments and exhibits, which is signed by Assignor and Assignee and which transfers and assigns to Assignee the right to use Assignor's 4 separate cannabis licenses.

1.3     "Assignor" shall mean ELIAS SHIBER, a natural person, who holds title to and ownership in the Licenses, and who also owns the commercial real property which is located at: 4027 E. 52nd St., Maywood CA 90270.

1.4     "Effective Date" shall mean the date that all Parties have signed this Assignment. If the Parties sign this Assignment on different dates, then the Effective Date shall be the date of the last party-signature on this Assignment.

1.5     "Licenses" shall mean and refer to the four (4) separate cannabis business licenses which are owned and held by the Assignor, Elias Shiber (the "Licenses"). The Assignor's Licenses authorize the holder of the Licenses (the Assignee) to conduct business at the Premises as a cannabis producer, cannabis processor, cannabis distributor, and cannabis retailer;

HAH000002

**ARBITRATION EX. 1.2**

1.6    "Premises" shall mean the real property and all structures located at 4027 E. 52nd Street, Maywood  CA  90270.

1.7    "Rent" shall mean the amount payable to Assignor by Assignee for use of the Premises, under the Commercial Real Property Assignment Agreement.

1.8    "Term" shall mean the duration of this Assignment as described in Section 2.3, including any additional term pursuant to Section 2.3.1.

1.9    "User Fee" shall mean the monthly fee paid by Assignee to Assignor for the privilege of the Assignee's ability to use the Licenses.

2.    **KEY PROVISIONS re CANNABIS LICENSES, USER FEE, DEPOSIT, GUARANTEE**

2.1    Assignor's Assignment of Licenses to Assignee. By the signature of the Assignor as set forth at the last page of this Assignment, the Assignor hereby expressly confirms that it transfers and assigns to the Assignee the complete right to use the Licenses in support of the Assignor's business operations conducted at the Premises and for the life of this Assignment. Assignor shall undertake all reasonable actions and measures and shall execute all reasonable documents to assure that the purpose and intent of this Assignment is satisfied. True and correct copies of the four (4) specific Licenses are appended as exhibits to this Assignment.

2.2    Rights under this Assignment are Contingent on Effective Assignment of Licenses. The scope and effect of the Parties' rights and duties under this Assignment are subject to and contingent upon the Assignor's assignment, transfer, and delivery to Assignee of 4 cannabis Licenses, all of which must satisfy the following 3 criteria : (A) the rights and privileges available under the Licenses must be fully transferable and assignable from Assignor to Assignee, and (B) the Licenses must provide Assignee with approval and legal authority to conduct the cannabis businesses described in the Licenses, including conducting sales of "adult use" cannabis (commonly known as "recreational" cannabis), and (C) in the event of the death or incapacity of the Assignor, the Licenses must remain in full force and effect and allow the Assignee to continue conducting the cannabis businesses as authorized in the Licenses for the life of the Assignment.

2.2.1    Contemporaneously with the Parties' signing of this Assignment authorizing Assignee's use of the Licenses, the Parties shall also sign a separate agreement pursuant to which Assignor shall Assignment the Premises to the Assignee.

HAH000003

**ARBITRATION EX. 1.3**

2.2.2    The separate agreement described in the immediately preceding section constitutes an important component of this Assignment, and the parties agree that the force and effect and terms of the separate agreement must be evaluated and considered in connection with any performance or interpretation of this Assignment, or in connection with any dispute arising under this Assignment. The parties agree that all terms and provisions of the separate agreement are incorporated into this Assignment as an exhibit, as if set forth in full.

2.2.3    In the event that the Licenses described in Section 2.2 fail to satisfy one or more of the 3 criteria set forth in Section 2.2 at (A), (B), (C), both Parties shall mutually and promptly declare that this Assignment is terminated and/or mutually rescinded, and the Parties shall cooperate in reducing the costs associated with termination or rescission of this Assignment. Upon the termination of this Assignment, Assignee shall have no further right or authority to use or rely on the rights available under the Licenses for any purpose. The Assignee shall immediately perform all acts and responsibilities (if any) necessary or appropriate to assure the Assignee is no longer using the Licenses.  Assignor shall refund to Assignee the monetary sums previously prepaid by Assignee (as described in Sections 2.5 and 2.6 below) subject to the Assignor's right to retain a portion of said sums for the purpose of satisfying and defraying Assignor's repair costs and other expenses arising out of Assignee's use of the Licenses.

2.3    Initial 1-Year Term, Subject to Renewal for Successive 1-Year Terms.  Subject to the provisions addressing "termination or rescission" of this Assignment as described in the immediately preceding section, this Assignment shall continue in effect without interruption on a month-to-month basis for one (1) year, commencing on the Effective Date.

2.3.1    Additional 1-Year Term(s) - - 95 Years in Aggregate. So long as this Assignment is in full force and effect (and has not terminated for any reason) and so long as the Assignee is also not otherwise in default under this Assignment, Assignee shall be entitled to exercise options to extend the term of this Assignment. Specifically, following the initial 1-year Term, the Assignee shall have the right and privilege to exercise ninety-five (95) separate and successive options which shall each be one (1) year in length and shall each extend the Term of this Assignment by 1 year. In order to exercise Assignee's option to extend the Term, Assignee must give Assignor written notice at least ninety (90) days prior to expiration of the Term or, if the first option to extend has been exercised, ninety (90) days prior to the expiration of the first renewal term. Except as otherwise set forth herein, all other terms of this Assignment shall apply to any extension of the Term pursuant to this Section 2.3.1. If Assignee is in material breach of this Assignment on the date of

HAH000004

**ARBITRATION EX. 1.4**

giving the option notice, the option notice shall be totally ineffective and of no force or effect, or if Assignee is in material breach of the Assignment on the date the extended Term is to commence, the extended Term shall not commence, and this Assignment shall expire promptly upon the expiration of the immediately preceding Term.

2.4    Use of Licenses. Assignee warrants and promises that the Licenses shall be relied upon and used by Assignee to conduct cannabis businesses in compliance with and subject to the authorizations provided by the Licenses. Assignee warrants and promises that the Assignee's cannabis business(es) that are able to operate as a result of the Licenses shall be in full compliance with applicable California state law (as promulgated by the California legislature and appropriate California law-making entities) and the applicable laws, if any, promulgated or issued by the City of Maywood, CA. Assignee agrees and promises that it shall not use the Licenses in a manner inconsistent with or contrary to the above stated purpose. Further, Assignee warrants and promises that Assignee's use of the Licenses shall not be for any illegal purpose as determined under California state law, and Assignee's use of the Licenses shall be in full compliance with the Licenses and all applicable regulations and laws applicable to the Licenses, municipal rules and regulations and ordinances, California state laws and the municipal law of the City of Maywood, CA.

2.5    User Fee and Annual Increase. Commencing on the Effective Date of this Assignment, and continuing thereafter until the expiration of the Term or the termination or conclusion of this Assignment for any reason, Assignee covenants and agrees to pay to Assignor the full amount of the monthly User Fee, and Assignee shall make such payment without requiring the Assignor to make a demand for payment. Assignee shall be obligated to pay Assignor the full amount of the monthly User Fee throughout the original Term of this Assignment as well as throughout any extension of the Term of this Assignment.

   2.5.1    User Fee = $25,000.00 Per Month, During 1st Year of Assignment. Upon the inception of this Assignment (on the Effective Date) and for the subsequent 12 months, the User Fee shall be due and immediately payable by Assignee to Assignor (or Assignor's designee) in the amount of Twenty-Five Thousand Dollars ($25,000.00) each month. Assignee shall pay Assignor the full amount of the monthly User Fee on the first day of each month, without deduction or set off. Throughout the original Term of this Assignment as well as throughout any extension of the Term of this Assignment, Assignee shall pay Assignor the applicable User Fee on the first day of each month.

   2.5.2    Annual User Fee Increase Not to Exceed 10%. Commencing on the first anniversary of the Assignment (which shall be 365 days after the Effective Date), and continuing throughout each successive anniversary of the Effective Date,

**Cannabis License Assignment      ELIAS SHIBER & RYAN KUNKEL re "Have a Heart CC"      Page 5 of 13**

Assignor has the unilateral and complete right and option to increase by an amount *not to exceed* ten percent (10%), the User Fee due and payable each month from Assignee to Assignor. Assignor shall notify Assignee of any increases in the User Fee at least thirty (30) days prior to the next anniversary of the Effective Date on which Assignor wishes to increase the User Fee.

2.6     <u>Deposit Paid By Assignee Upon Assignment Inception</u>. Within three (3) calendar days after the Parties sign this Assignment, the Assignee shall tender and pay to Assignor a deposit in the amount of One-Hundred Fifty Thousand Dollars ($150,000.00) (the "Deposit"). The Assignee's Deposit of $150,000.00 shall constitute Assignor's partial security for Assignee's performance of the Assignee's promises and obligations as stated herein. The parties understand and agree that the $150,000.00 Deposit paid by Assignee to Assignor shall NOT reduce or mitigate Assignee's obligation to pay Assignor the full amount of the User Fee described in section 2.5, above. Assignee is obligated to pay the Assignor the full amount of the User Fee, each month, beginning upon the parties' signing this Assignment, and continuing for the life of this Assignment.

2.6.1.   The Deposit shall be retained in an escrow administered by a third party, and the administrator of the escrow shall bear <u>no</u> duty or obligation to invest the $150,000.00.  The $150,000.00 shall be held by the administrator of the escrow as security for the performance by Assignee of the Assignee's obligations to pay the User Fee as well as the Assignee's other obligations, duties, and liabilities under this Assignment. The escrow agreement shall be appended to this Assignment.

2.6.2    Assignor may, from time to time, and without prejudice to any other remedy, request that the escrow release funds to the Assignor to the extent necessary for Assignor to be fully compensated for any of Assignee's arrearages of the User Fee or to satisfy any other obligation, duty or liability of Assignee which the Assignee has not satisfied ("Compensation Funds"). The escrow shall be obligated to release Compensation Funds to the Assignor.  Following any expenditure or release of any amount of the Deposit in escrow, Assignee shall be and is required to tender to Assignor an amount roughly equal to the amount expended in order to restore the Deposit to its original amount.

2.7.    <u>Assignor Retains All Ownership and Control Over Licenses</u>.  Except as provided in section 2.12 (describing Tenant's right to negotiate to purchase a percentage ownership interest in the Licenses) Assignor and Assignee expressly understand and agree that at all times described and contemplated in this Assignment, Assignor shall hold complete title and complete ownership and control in the Licenses, and Assignee does <u>not</u> hold any title or ownership interest or control over the Licenses.  Assignee is <u>not</u> an owner of the Licenses, and Assignee's interest in the Licenses is limited to being able to use the Licenses (subject

HAH000006

**ARBITRATION EX. 1.6**

to Assignee's payment of the monthly User Fee) as a means of operating cannabis enterprises.

2.8     Insurance. Assignee shall, at all times during the Term of this Assignment, maintain the following insurance coverage, and shall name and identity Assignor as a named insured under each of the policies required below:

2.8.1   Property Insurance. Property insurance fully insuring any improvements constructed on the Premises as well as all of Assignee's personal property and trade fixtures located on the Property against loss or damage by fire and lightning, and insurance against risks customarily covered by extended coverage endorsement in amounts sufficient to prevent Assignor or Assignee from becoming a co-insurer of any loss under the applicable policies, but in any event in amounts not less than the full replacement cost of all buildings, equipment, and other improvements to the Premises, including the cost of debris removal.

2.8.2   General Liability Insurance. Commercial liability insurance, covering the legal liability of Assignor and Assignee against claims for bodily injury, death, or property damage, occurring on, in, or about the Premises, or as a result of the Assignee's business operations occurring anywhere in the United States, with minimum coverage of One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

2.8.3.  Financially Responsible Insurers. All insurance obtained under this Section 2.8 shall be written by companies that are legally qualified to issue such insurance, and shall name Assignor as an additional named insured. Assignor shall be given forty-five (45) days advance notice of any termination, or intent to terminate or cancel, any policy referred to in this Section 2.8.

2.8.4.  Waiver of Subrogation. Every insurance policy maintained pursuant to this Section 2.8 shall provide that the insurer waives all rights of subrogation against a named insured and any successor to a named insured's interest in the Premises.

2.8.5.  Protection of Assignor and Indemnity. Assignee shall make best efforts to prevent the Premises from being exposed to, or incur liability as a result of, judgments, liens, or claims arising out of Assignee's business operations and Assignee's conduct on the Premises. Assignee shall fully indemnify, defend, and hold harmless Assignor against any and all losses, damages, liabilities, judgments, liens, or claims in connection therewith.

HAH000007
**ARBITRATION EX. 1.7**

2.9    Personal Guarantee Provided by Assignee's Owner/Officer/Corporate Governor. This Assignment is entered into and agreed upon by Assignor in reliance on the Assignee's promises and agreements as set forth both in this Assignment as well as in the promises and agreements set forth in the written "Personal Guarantee" that has been signed by Ryan Kunkel contemporaneously with the parties' signing of this Assignment. Ryan Kunkel is the owner and/or officer or corporate governor of the Assignee. Assignor would not have entered into this Assignment if the Personal Guarantee was not provided by Kunkel. The Personal Guarantee constitutes an important component of this Assignment, and the parties agree that the force and effect and terms of the Personal Guarantee must be evaluated and considered in connection with any performance or interpretation of this Assignment, or in connection with any dispute arising under this Assignment. The parties agree that all terms and provisions of the Personal Guarantee are incorporated into this Assignment as an exhibit, as if set forth in full.

2.10    Assignment and Subletting. Assignee shall neither assign this Assignment nor sublet or transfer the right to use the Licenses or the Licenses themselves or any part thereof, nor shall Assignee voluntarily or by operation of law assign, transfer, mortgage, encumber, or sublet all or any part of the Licenses without the prior written consent of the Assignor.

2.11    Successors and Assigns. The obligations and responsibilities herein shall be binding upon, and the rights and benefits shall inure to, the Parties hereto and their respective successors and assigns.

2.12    Option for Equity Ownership in Licenses. Upon the conclusion of the initial 5-year term of the parties' Lease and if the Tenant is not otherwise in default or breach under the Lease, Tenant shall have the right to negotiate with Landlord for the purpose of purchasing and obtaining an equity interest in the Licenses. The Landlord and Tenant shall bargain in good faith, but notwithstanding any other term or provision in this Agreement, Landlord has no duty or obligation to accept any offer or proposal made by Tenant for the purpose of purchasing and obtaining an equity interest in the Licenses, and Landlord has the unilateral right to accept or reject any of the Tenant's offers or proposals for any reason or for no reason.

3.    **REPRESENTATIONS AND WARRANTIES**

3.1 Compliance with Laws. Assignee shall faithfully observe and comply with, all municipal, county, state, and other applicable governmental entities' laws, requirements, and regulations, or which may hereafter be in force. Notwithstanding the foregoing, Assignee shall not be required to comply with federal law as it applies to the cultivation, processing, refining, modifying, packaging, distribution, sale and/or use of cannabis/marijuana.

Cannabis License Assignment    **ELIAS SHIBER & RYAN KUNKEL re "Have a Heart CC"**    Page 8 of 13

3.2   No Conduct or Circumstance Which Jeopardizes the Licenses. Assignee expressly promises and agrees that it will not do anything, will not say anything, and will not conduct business in a manner jeopardizes Assignor's valuable ownership interest in the Licenses and right to use the Licenses and/or expose the Licenses to the risk of, or the actual fact of, being withdrawn, suspended, canceled, or rendered ineffective by government authorities.

3.3   Waste and Nuisance. Assignee shall not create any unnecessary waste or create, engage in, participate in, encourage, or promote any public or private nuisance in the conduct and management of the Assignee's business(es) which use the Licenses.

3.4   Assignee Confirms its Careful Evaluation and Approval of Licenses.  Assignee expressly acknowledges that Assignor has provided Assignee with reasonable opportunity to carefully evaluate the Licenses and Assignor has provided a reasonable opportunity for Assignee's consultants (including lawyers and business persons) to evaluate the Licenses and their appropriateness for this Assignment. Assignee further expressly confirms that based on the Assignee's evaluation and analysis of the Licenses, and the consultants' evaluation and analysis of the Licenses, the Assignee is satisfied that the Licenses are appropriate for Assignee's intended purpose and the Licenses may be transferred and assigned from Assignor to Assignee as contemplated in this Assignment.

4.   **GOVERNING LAW**
The construction, interpretation, performance, and enforcement of this Assignment shall be governed by the laws of the State of California.

5.   **BREACH of ASSIGNMENT**

5.1   Breach. The parties agree that a breach of this Assignment shall occur in the event that a Party fails to properly or reasonably comply with or perform any term, provision, duty, obligation (including payment obligations), covenant, agreement or promise which that Party agreed to comply with or perform under the terms of this Assignment.

5.2.   Notice of Breach.  Either Party may place the other Party on notice that the Party is in breach of this Assignment, or risks liability for breach of this Assignment. Any such notice may be sent  via email or other appropriate written communication method.

5.3   Termination. In the event of a breach by Assignee that is not cured within ten (10) days of Assignee receiving written notice of the breach and demand for cure from the Assignor or, if it is not possible to cure the breach within ten (10) days and Assignee's efforts to cure have not begun within ten (10) days from the inception of the breach, then Assignor may, upon fifteen (15) days' written notice to Assignee, terminate this Assignment.

HAH000009

**ARBITRATION EX. 1.9**

5.4 <u>Waiver of Breaches</u>. Each Party to this Assignment may waive any breach committed by the other Party in performance of its obligations hereunder and its consequences. No such waiver shall be deemed to have been given by the waiving Party unless given in writing signed by the waiving Party. Upon any such waiver of a past breach, such breach shall cease to exist, and any event of breach arising therefrom shall be deemed to have been remedied for every purpose of this Assignment. The waiver by either Party of a breach of any term or provision or duty in this Assignment shall NOT be interpreted or determined or held to constitute a waiver of any subsequent breach of the same term, provision, or duty or any other term, provision, or duty.

6.     **DISPUTE RESOLUTION**

6.1.  <u>Mediation</u>.  The Parties agree that any and all disputes, claims, or controversies arising out of or relating to this Assignment shall be submitted to JAMS (formerly known as Judicial Arbitration and Mediation Services), or its successor, for mediation in Los Angeles County, CA, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to Section 6.2.  Either Party may commence mediation by providing to JAMS and the other Party or Parties a written request for mediation, setting forth the subject of the dispute and the relief requested. The Parties will cooperate with JAMS and each other in selecting a neutral mediator from the JAMS panel of neutral mediators and in scheduling the mediation proceedings. The Parties agree that they will participate in the mediation in good faith and that they will share equally in its costs; each Party shall bear its own costs and expenses related to the mediation.  All offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the Parties (including any Party's Advisers or Representatives), experts, and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the Parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

6.2.   <u>Arbitration</u>. Any dispute, claim, or controversy arising out of or related to this Assignment or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Assignment to arbitrate, that is not resolved as part of mediation as required by Section 6.1 of this Assignment, shall be determined by arbitration in Los Angeles County, CA, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court of competent jurisdiction. The Parties agree that the prevailing party shall be awarded its reasonable attorneys' fees and litigation costs, and the parties further agree that the Parties shall jointly

HAH000010
**ARBITRATION EX. 1.10**

request that the arbitrator determine the prevailing party as well as the prevailing party's reasonable attorneys' fees and litigation costs. This clause shall not preclude the Parties from pursuing any provisional remedies in aid of arbitration from a court of competent jurisdiction.

6.3   No Defense of Illegality. The Parties hereby acknowledge and agree that cannabis cultivation, processing, packaging, distribution, transportation, possession, use, and the sale of cannabis remains illegal under federal law.  Subject to limitations and restrictions, the same conduct is not illegal under California law. Accordingly, the Parties jointly, severally, and individually expressly agree that no Party shall raise any claim or argument asserting that this Assignment is unenforceable as this Assignment promotes an "illegal purpose." This Assignment expressly contemplates that the Assignee shall conduct a cannabis business at the Premises.

7.   **NO WAIVER or MODIFICATION OF ASSIGNMENT WITHOUT BOTH PARTIES' SIGNATURES**

7.1   No Waiver or Modification Without Signature.   No term or provision of this Assignment may be waived, deleted, disregarded, modified or amended unless such waiver, deletion, disregard, modification or amendment is in writing and signed by both Parties.

7.2   No Implied Waiver. The failure of either Party at any time to require performance by the other Party of any term or provision herein shall <u>not</u> affect in any way the right of either Party to require such performance at any time thereafter. Further, the actual waiver by either Party of a breach of any term or provision herein, shall not constitute an implied waiver of any subsequent breach of the same provision or any other provision.

8.   **NOTICE**
Any notice required or permitted under the Assignment shall be in writing and signed by the Party providing such notice. A notice under this Assignment shall be deemed to have been given:

8.1. Overnight Express Mail. On the date of delivery, if personally delivered to the Party to whom notice is to be give or if personally delivered by overnight delivery service;

8.2 U.S. Postal Service.  The 3rd day after mailing, if mailed to the Party to whom notice is to be given, by U.S. postal service certified mail, return receipt requested, postage prepaid; or

8.3 E-Mail. On the date of electronic transmission, if sent via e-mail. In cases of a failure to deliver such notice via e-mail, as evidenced by a message to that effect received by the sender's e-mail program, such message shall not constitute giving notice to the other Party

Cannabis License Assignment     ELIAS SHIBER & RYAN KUNKEL re "Have a Heart CC"     Page 11 of 13

until the other Party is otherwise notified in writing. Upon the sender's receipt of a message that delivery by e-mail has failed, notice must be given by personal delivery, mailing via standard first-class U.S. Mail, or overnight delivery as outlined above under Section 8.1 and Section 8.2.

Any notice to Assignee or Assignor shall be sent to the following e-mail or street addresses:

**Address for Assignee:**

    **Address Line #1:**     **Ryan Kunkel,** in care of "Have a Heart Compassion Care, Inc."

    Address Line 2: 3958 6th Ave NW #3, Seattle WA 98107

    Phone: 425-268-4391 Email: ryan@ haveaheartcc.com

**Address for Assignor:**

    **Address Line #1**     **Elias Shriber**

    Address Line #2: 5421 Round Meadow Rd, Hidden Hill CA 91302

    Phone: 818-321-3131 Email: eshiber@Live.com

## 9. BINDING EFFECT

This Assignment shall inure to the benefit of and be binding upon the Parties, and their heirs, successors, and assigns.

## 10. ENTIRE AGREEMENT

This Assignment contains the entire understanding between the Parties and supersedes any prior understandings and agreements between them with respect to the subject matter of this Assignment as described herein. There are no promises, assurances, representations, agreements, arrangements or inducements between the Parties, oral or written, relating to the content or subject matter of this Assignment which are not fully expressed herein. Any statements, agreements, promises, or inducements, whether made by either Party or an agent of a Party, that are not contained or described in this Assignment are not valid or binding. This Assignment may not be modified, amended, added to, superseded, or altered except by a written agreement signed by all the Parties herein.

## 11. MISCELLANEOUS

11.1 <u>Severability</u>. Any part, provision, term, requirement, obligation, option, right, liability, representation, or warranty contained in this Assignment which is prohibited or unenforceable or is held to be void or unenforceable in an arbitration or in a court of

Cannabis License Assignment     **ELIAS SHIBER & RYAN KUNKEL re "Have a Heart CC"**     Page 12 of 13

competent jurisdiction, shall be ineffective as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

11.2    No Amendment. This Assignment shall not be altered, waived, modified, or canceled in any respect except in writing, duly executed by all of the Parties hereto, and no oral agreement or course of conduct to the contrary, shall be deemed an alteration, amendment, modification, or cancellation.

11.3    Recitals.    The recitals appearing at the beginning of this Assignment are incorporated in full into this Assignment, and may be considered and used in interpreting this Assignment and determining its force and effect.

11.4    Title and Subtitles. The titles of the Sections and subsections of this Assignment and any exhibits are for the convenience of reference only and are not to be considered in construing this Assignment.

11.5    Counterparts. This Assignment may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument. Photocopies, facsimile, or electronic transmissions of counterpart signatures of this Assignment may be used with the same force and effect as originals.

11.6    Authority. Each Party is duly authorized and holds the legal right to enter into this Assignment.

11.7    Legal Representation. By executing and delivering this Assignment, each Party expressly acknowledges that it has had the opportunity to consult with legal counsel and to have such legal counsel review this Assignment.

IN WITNESS WHEREOF, the Parties hereto have caused this Assignment to be duly executed as of the day and year written below.

Date: January 24, 2018          **Have a Heart Compassion Care, Inc.**

By: _____
     **Ryan Kunkel**
     Owner, Officer, Corporate Governor

**Cannabis License Assignment      ELIAS SHIBER & RYAN KUNKEL re "Have a Heart CC"      Page 13 of 13**

HAH000013
**ARBITRATION EX. 1.13**

Feb

Date: January _____, 2018

_____
**Elias Shiber**

HAH000014
**ARBITRATION EX. 1.14**

# Commercial Property Lease Agreement
## Real Property located at : 4027 E. 52nd Street  Maywood, CA  90270

This **COMMERCIAL PROPERTY LEASE AGREEMENT** (hereinafter this "Agreement" or this "Lease") is effective on the Effective Date as defined below, and shall remain in continuous full force and effect subject to the terms contained in this Lease. This Lease is made by and between **ELIAS SHIBER**, a natural person ("Landlord") and **HAVE A HEART COMPASSION CARE, INC.**, a State of Washington corporation ("Tenant"). Landlord and Tenant are individually referred to herein as a "Party" and collectively referred to as the "Parties."

### RECITALS

A.    Landlord owns the commercial real property located at 4027 E. 52nd Street, Maywood, CA  90270 which is the subject of this Lease (the "Premises"). Landlord also holds title to and ownership of four (4) separate cannabis business licenses (the "Licenses"). The Landlord's Licenses authorize the holder of the Licenses to conduct business at the Premises as a cannabis producer/cultivator, cannabis processor, cannabis distributor, and cannabis retailer;

B.    The Landlord seeks to lease the Premises to the Tenant, and also seeks to assign or transfer to Tenant the rights available under the Licenses for the life of this Lease. Tenant seeks to pay a monthly fee for the Lease, as well as a separate monthly fee as the assignee and user of the Licenses for the life of this Lease;

C.    Tenant's interest in signing this Lease, paying monthly rent, and also paying an additional substantial fee for obtaining use of the Licenses is expressly subject to, and dependent on, the Tenant's requirements that (1) the Landlord's Licenses must be fully assignable and/or transferable from Landlord to Tenant, and (2) the Licenses must provide Tenant with legal approval to conduct the cannabis businesses described in the Licenses, including conducting sales of "adult use" cannabis (commonly known as "recreational" cannabis), and (3) in the event of the death or incapacity of the Landlord, the Licenses must remain in full force and effect and allow the Tenant to continue conducting the cannabis businesses as authorized in the Licenses for the life of the Lease.

D.    The Parties understand and agree that in the event that (1) one or more of the Landlord's 4 cannabis Licenses are not effective, or (2) the license authorizing sales of cannabis does not authorize the sale of "adult use" cannabis, or (3) upon the death or incapacity of the Landlord the Licenses shall cease to be effective and will not authorize their continued use, both Parties shall mutually terminate this Lease, and the Landlord shall return to Tenant the monetary sums previously prepaid by Tenant subject to the Landlord's right to retain a portion of said sums

Commercial Prop. Lease Agreement    **ELIAS SHIBER & RYAN KUNKEL, Have a Heart CC**    Page 1 of 17

HAH000017

**ARBITRATION EX. 2.1**

to setoff or defray Tenant's Rent obligations and defray Landlord's repair costs and other expenses arising out of Tenant's occupancy of the Premises.

NOW, THEREFORE, in consideration of the agreements, promises, obligations, conditions, limitations, and covenants contained herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged by the parties, Landlord hereby agrees to lease the Premises to Tenant, and Tenant hereby agrees to rent the Premises from Landlord, subject to all terms and provisions set forth below:

1.    **DEFINED TERMS**

1.1    "Effective Date" shall mean the date that all Parties have signed the Lease. If the Parties sign the Lease on different dates, then the Effective Date shall be the date that the last Party to sign the Lease has signed the Lease.

1.2    "Landlord" shall mean ELIAS SHIBER, a natural person, who holds title to the commercial property which is the subject of this Lease and is located at : 4027 E. 52nd St., Maywood CA 90270.

1.3    "Lease" shall mean this Commercial Lease Agreement.

1.4    "Licenses" shall mean and refer to the four (4) separate cannabis business licenses which are owned and held by Elias Shiber (the "Licenses"). The Landlord's Licenses authorize the holder of the Licenses to conduct business at the Premises as a cannabis producer, cannabis processor, cannabis distributor, and cannabis retailer;

1.5    "Premises" shall mean the real property and all structures located at 4027 E. 52nd Street, Maywood CA 90270.

1.6    "Rent" shall mean the amount payable to Landlord by Tenant for use of the Premises, under the terms of Section 2.5 and its subsections.

1.7    "Tenant" shall mean HAVE A HEART COMPASSION CARE, INC., a State of Washington corporation, with a primary address listed on Washington's Secretary of State's website as 300 NW 85th Street Seattle, WA 98117. Tenant's owner and/or executive officer and/or governor is Ryan Kunkel, an individual.

1.8    "Term" shall mean the duration of this Lease as described in Section 2.3, including any additional term pursuant to Section 2.3.1.

HAH000018

**ARBITRATION EX. 2.2**

2.    **KEY PROVISIONS re CANNABIS LICENSES, TERM, RENT, DEPOSIT, GUARANTEE**

2.1    Conveyance of Premises to Tenant. Promptly following Landlord's receipt of the funds described in Sections 2.5 and 2.6 below, Landlord shall convey the Premises to Tenant, and Tenant shall have full access to, and use of the Premises subject to the conditions and limitations set forth in this Lease.

2.2    The Parties' Obligations Under This Lease Are Contingent on 4 Cannabis Licenses The scope and effect of the Parties' rights and duties under this Lease are subject to and contingent upon the Landlord's assignment, transfer, and delivery to Tenant of 4 cannabis Licenses, all of which must satisfy the following 3 criteria : (A) the Licenses must be fully assignable and transferable from Landlord to Tenant, and (B) the Licenses must provide Tenant with approval and legal authority to conduct the cannabis businesses described in the Licenses, including conducting sales of "adult use" cannabis (commonly known as "recreational" cannabis), and (C) in the event of the death or incapacity of the Landlord, the Licenses must remain in full force and effect and allow the Tenant to continue conducting the cannabis businesses as authorized in the Licenses for the life of the Lease.

2.2.1    Contemporaneously with the Parties' signing of this Lease authorizing Tenant's use of the Premises, the Parties shall also sign a separate agreement pursuant to which Landlord shall transfer, assign, and convey to Tenant the right to enjoy exclusive use of the Landlord's Licenses for the life of the Lease.

2.2.2    The separate agreement described in the immediately preceding section constitutes an important component of this Lease, and the parties agree that the force and effect and terms of the separate agreement must be evaluated and considered in connection with any performance or interpretation of this Lease, or in connection with any dispute arising under this Lease. The parties agree that all terms and provisions of the separate agreement are incorporated into this Lease as an exhibit, as if set forth in full.

2.2.3    In the event that the Licenses described in Section 2.2 fail to satisfy one or more of the 3 criteria set forth in Section 2.2 at A, B, C, both Parties shall mutually and promptly declare that this Lease is terminated and/or mutually rescinded, and the Parties shall cooperate in reducing the costs associated with termination or rescission of this Lease. In connection with any termination or rescission, the Tenant shall immediately vacate the Premises, and Landlord shall refund to Tenant the monetary sums previously prepaid by Tenant (as described in Sections 2.5 and 2.6 below) subject to the Landlord's right to retain a portion of said sums for the purpose of satisfying Tenant's Rent obligations (if any) and defraying Landlord's repair costs and other expenses arising out of Tenant's occupancy of the Premises.

HAH000019

**ARBITRATION EX. 2.3**

2.3    Term – Initial 5-Year Term.  Subject to the provisions addressing "termination or rescission" of this Lease as described in the immediately preceding section, this Lease shall continue in effect without interruption for five (5) years, commencing on the Effective Date. Tenant acknowledges and agrees that it has examined and knows the physical condition of the Premises and accepts the Premises in its present condition.

2.3.1    Additional 5-Year Term(s) - - 95 Years in Aggregate. So long as this Lease is in full force and effect (and has not terminated for any reason) and so long as the Tenant is also not otherwise in default under this Lease, Tenant shall be entitled to exercise options to extend the term of this Lease.  Specifically, following the initial 5 year Lease Term, the Tenant shall have the right and privilege to exercise eighteen (18) separate and successive options which shall each be five (5) years in length and shall each extend the Term of this Lease by 5 years. In addition to the initial 5-year Term, if all 18 options are exercised, the total Term of this Lease shall be 95 years. In order to exercise Tenant's option to extend the Term, Tenant must give Landlord written notice at least ninety (90) days prior to expiration of the Term or, if the first option to extend has been exercised, ninety (90) days prior to the expiration of the first renewal term. Except as otherwise set forth herein, all other terms of this Lease shall apply to any extension of the Term pursuant to this Section 2.3.1. If Tenant is in material breach of this Lease on the date of giving the option notice, the option notice shall be totally ineffective and of no force or effect, or if Tenant is in material breach of the Lease on the date the extended Term is to commence, the extended Term shall not commence, and this Lease shall expire promptly upon the expiration of the immediately preceding Term.

2.4    Use of Premises. Tenant warrants and promises that the Premises shall be used by Tenant to conduct cannabis businesses in compliance with and subject to the authorizations provided by the 4 Licenses. Tenant warrants and promises that the Tenant's business(es) that are conducted at the Premises shall be in full compliance with applicable California state law (as promulgated by the California legislature and appropriate California law-making entities) and the applicable laws, if any, promulgated or issued by the City of Maywood, CA. Tenant agrees and promises that it shall not use the Premises in a manner inconsistent with or contrary to the above stated purpose. Further, Tenant warrants and promises that Tenant's use of the Premises shall not be for any illegal purpose as determined under California state law, and Tenant's use of the Premises shall be in full compliance with the Licenses and all applicable covenants and restrictions of record, applicable building codes, municipal rules and regulations and ordinances, California state laws and the municipal law of the City of Maywood, CA.

2.5    Rent, Annual Increase, and Common Area Maintenance Costs. Commencing on the Effective Date of this Lease, and continuing thereafter until the expiration of the Term or

**ARBITRATION EX. 2.4**

the termination or conclusion of this Lease for any reason, Tenant covenants and agrees to pay to Landlord the full amount of the monthly Rent, and Tenant shall make such payment without requiring the Landlord to make a demand for payment. Tenant shall be obligated to pay Landlord the full amount of monthly Rent throughout the original Term of this Lease as well as throughout any extension of the Term of this Lease.

2.5.1   Rent = $26,000.00 Per Month, During 1st Year of Lease. Upon the inception of this Lease (on the Effective Date) and for the next 12 consecutive months, Rent shall be due and immediately payable by Tenant to Landlord (or Landlord's designee) in the amount of Twenty-Six Thousand Dollars ($26,000.00) each month. Tenant shall pay Landlord the full amount of monthly Rent on the first day of each month, without deduction or set off. Throughout the original Term of this Lease as well as throughout any extension of the Term of this Lease, Tenant shall pay Landlord the applicable Rent on the first day of each month.

2.5.2   Annual Rent Increase of 2.5%. Commencing on the first anniversary of the Lease (which shall be 365 days after the Effective Date), and continuing throughout each successive anniversary of the Effective Date, Landlord has the unilateral and complete right and option to increase by the amount of two-and-half percent (2.5%), the Rent due and payable each month from Tenant to Landlord. Landlord shall notify Tenant of any increases in Rent at least thirty (30) days prior to the next anniversary of the Effective Date on which Landlord wishes to increase Rent.

2.5.3   Common Area Maintenance Costs (CAM). In addition to Tenant's obligation to pay monthly Rent, Tenant shall also pay to Landlord, without notice, demand, deduction, or set off, additional Rent which shall be attributable to Common Area Maintenance costs expended by, incurred by, billed to, or paid by Landlord. "Common Area Maintenance costs" (hereinafter referred to as "CAM") shall include, but not be limited to: The maintenance, repair and replacement, if necessary or appropriate, of any portion of the interior and exterior of the Premises including the roof, parking facilities, driveways, passageways, plumbing, and costs and expenses for common utilities and exterior lighting, waste management and waste disposal, landscaping, fire protection, exterior and interior painting of common areas of the Premises, and general upkeep (vacuuming, sweeping, polishing, and general cleaning) of any portion of the Premises.

2.5.4   Tenant's Payment of Common Area Maintenance Costs (CAM). On the first day of each month during the Term of this Lease including any extension of the original Term of this Lease, and without notice or demand, Tenant shall pay Landlord (without offset or deduction) an additional Rent equal to the full amount of CAM expended by, incurred by, paid by, or billed to Landlord during the preceding 30 to

HAH000021

**ARBITRATION EX. 2.5**

120 days. Tenant understands and agrees that the costs attributable to CAM may vary from month to month, and therefore the specific amount payable by Tenant to Landlord in satisfaction of CAM shall vary from month to month. Tenant agrees to pay Landlord for all CAM that Landlord has incurred, and tenant shall make such payment to Landlord on the first day of each month. At the request of Tenant, the Landlord shall provide Tenant with copies of records or receipts in a timely manner and in a reasonable format which shall provide Tenant information supporting the amount of CAM which Tenant must pay (or which Tenant paid in the past) on the first day of each month. Tenant shall not be required to pay Landlord a specific component included in CAM to the extent that Tenant previously paid and satisfied the costs and expenses for that specific component; Landlord shall not "double-bill" the Tenant for CAM expenses.

2.6     Deposit Paid By Tenant Upon Lease Inception. Within three (3) calendar days after the Parties sign this Lease, the Tenant shall tender and pay to Landlord a deposit in the amount of One-Hundred Fifty-Six Thousand Dollars ($156,000.00) (the "Deposit"). The Tenant's Deposit of $156,000.00 shall constitute Landlord's partial security for Tenant's performance of the Tenant's promises and obligations as stated herein. The parties understand and agree that the $156,000.00 Deposit paid by Tenant to Landlord shall NOT reduce or mitigate Tenant's obligation to pay Landlord the full amount of Rent described in section 2.5, above. Tenant is obligated to pay the Landlord the full amount of Rent, each month, beginning upon the parties' signing this Lease, and continuing for the life of this Lease.

2.6.1.  The Deposit shall be retained in an escrow administered by a third party, and the administrator of the escrow shall bear no duty or obligation to invest the $156,000.00. The $156,000.00 shall be held by the administrator of the escrow as security for the performance by Tenant of the Tenant's obligations to pay Rent as well as the Tenant's other obligations, duties, and liabilities under this Lease. The escrow agreement shall be appended to this Lease.

2.6.2   Landlord may, from time to time, and without prejudice to any other remedy, request that the escrow release funds to the Landlord to the extent necessary for Landlord to be fully compensated for any of Tenant's arrearages of the User Fee or to satisfy any other obligation, duty or liability of Tenant which the Tenant has not satisfied ("Compensation Funds"). The escrow shall be obligated to release Compensation Funds to the Landlord. Following any expenditure or release of any amount of the Deposit in escrow, Assignee shall be and is required to tender to Assignor an amount roughly equal to the amount expended in order to restore the Deposit to its original amount.

HAH000022

ARBITRATION EX. 2.6

2.7    Tenant Pays Utility Services.  Tenant shall pay in full within seven (7) calendar days of presentment by Landlord to Tenant, the amount due under any and all invoices, bills, and statements of expense for water, sewer, gas, electricity, waste disposal, internet and broadband and satellite services, telephone and communication services, and other services and utilities used by Tenant on the Premises during the term of this Lease. Alternatively, Landlord and Tenant may agree that Tenant shall be billed directly by utility service providers for the aforesaid utilities and services, with copies of all invoices and bills sent to Landlord at Landlord's selected address, and Tenant shall directly pay and fully and promptly pay and satisfy all such bills and invoices as they come due. In the event that any utility or service provided to the Premises is not separately metered, Landlord shall pay the amount due and separately invoice Tenant for Tenant's pro rata share of the charges. Tenant shall pay such amounts within fifteen (15) days of invoice.  Unless and until Tenant receives approval in writing provided and signed by the Landlord, Tenant shall not install or use any equipment or device which utilize excessive water or electrical energy or which excessively utilize any other utility service. Tenant shall not use any equipment or devices which may, in Landlord's reasonable opinion (which Landlord shall provide to Tenant in writing), damage, adversely affect, or overload the water service, plumbing, or electrical wiring which provide utility service for the Premises, or interfere with water service, plumbing, or electrical services to other tenants (if any).

2.8    Insurance. Tenant shall, at all times during the Term of this Lease, maintain the following insurance coverage, and shall name and identity Landlord as a named insured under each of the policies required below:

2.8.1   Property Insurance. Property insurance fully insuring any improvements constructed on the Premises as well as all of Tenant's personal property and trade fixtures located on the Property against loss or damage by fire and lightning, and insurance against risks customarily covered by extended coverage endorsement in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer of any loss under the applicable policies, but in any event in amounts not less than the full replacement cost of all buildings, equipment, and other improvements to the Premises, including the cost of debris removal.

2.8.2   General Liability Insurance. Commercial liability insurance, covering the legal liability of Landlord and Tenant against claims for bodily injury, death, or property damage, occurring on, in, or about the Premises, or as a result of the Tenant's business operations occurring anywhere in the United States, with minimum coverage of One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

HAH000023

**ARBITRATION EX. 2.7**

2.8.3. Financially Responsible Insurers. All insurance obtained under this Section 2.8 shall be written by companies that are legally qualified to issue such insurance, and shall name Landlord as an additional named insured. Landlord shall be given forty-five (45) days advance notice of any termination, or intent to terminate or cancel, any policy referred to in this Section 2.8.

2.8.4. Waiver of Subrogation. Every insurance policy maintained pursuant to this Section 2.8 shall provide that the insurer waives all rights of subrogation against a named insured and any successor to a named insured's interest in the Premises.

2.8.5. Protection of Landlord and Indemnity. Tenant shall make reasonable efforts to prevent the Premises from being exposed to, or incur liability as a result of, judgments, liens, or claims arising out of Tenant's business operations and Tenant's conduct on the Premises. Tenant shall fully indemnify, defend, and hold harmless Landlord against any and all losses, damages, liabilities, judgments, liens, or claims in connection therewith.

2.9    Tenant Improvements. Tenant shall not perform or authorize any modifications, additions, demolition, or alterations of any kind in or on the Premises, nor perform or authorize utility installations of any kind in or on the Premises, without first obtaining Landlord's fully informed written consent. Further, unless and until Tenant obtains Landlord's fully informed written consent, Tenant shall not undertake or authorize or make structural or non-structural alterations or utility installations to the interior or exterior of the Premises (including the interior of the roof and exterior of the roof). Any alteration, addition, demolition, or modification or work performed on the Premises by or on behalf of Tenant shall not involve puncturing, relocating, or removing the roof, components of the roof, or any portion of the walls or floors, and shall not affect, change, relocate, modify or damage the electrical, plumbing, ventilation, HVAC, and/or life safety systems located in or on the Premises, unless and until Landlord provides Tenant with prior express and fully informed consent regarding same. Landlord may, as a precondition to granting approval for Tenant's proposed changes, require Tenant to utilize a contractor chosen and/or approved by Landlord, and Landlord may require tenant to obtain appropriate builders or construction insurance which includes coverage for and indemnifies the Premises and Landlord. Any modifications, additions, alterations or utility installations that Tenant desires to make and which require the consent of the Landlord shall be presented to Landlord in written form with detailed plans. Consent by Landlord shall be deemed conditioned upon Tenant (i) acquiring all applicable governmental permits, (ii) furnishing Landlord with copies of both its permits and the plans and specifications prior to commencement of the work, (iii) compliance with all conditions of said permits and other applicable requirements in a prompt and expeditious manner, and (iv) proof of necessary insurance coverage. Any alterations, changes, modifications, additions, demolition, or

HAH000024
**ARBITRATION EX. 2.8**

utility installations shall be performed in a workmanlike manner with good and sufficient materials. Tenant shall promptly upon completion, furnish Landlord with as-built plans and specifications.

2.10   Signage and Advertising.   Tenant must obtain Landlord's express written consent which must be signed by the Landlord before Tenant may place on the Premises any signs or advertising which are in compliance with applicable zoning ordinances and private restrictions. Before Tenant may place signs or advertising on the Premises, Tenant must provide Landlord with diagrams, drawing, mock-ups, schematics, photographs and depictions of the signs and advertising proposed by Tenant, and must establish to the Landlord's satisfaction that the signs or advertising shall not damage the Premises or the interests of Landlord. Landlord may refuse consent to any proposed signage that is in Landlord's opinion too large, inappropriately sized, inappropriately illuminated, deceptive, presents a nuisance, unattractive or otherwise inconsistent with or inappropriate to the Premises, the Landlord's interests, or the use of any other tenant. Upon the expiration or conclusion of this Lease for any reason, Tenant shall promptly remove all signs and advertising associated or installed by Tenant at Tenant's own expense. Tenant shall promptly repair all damage to the Premises resulting from the removal of signs and advertising associated with or installed by Tenant.

2.11   Ownership of Tenant-Installed Alterations, Additions, Utility and Equipment.   Subject to Sections 2.12 and 2.13, all alterations, additions, changes, and utility and equipment installations performed or authorized by Tenant shall constitute the property of Tenant, but shall be considered a part of the Premises. Landlord may, at any time, elect in writing to be the owner of all or any specified part of the aforesaid alterations, additions, changes, and utility and equipment installations performed or authorized by Tenant. Unless otherwise stated in this Lease, all alterations, additions, changes, and utility and equipment installations performed or authorized by Tenant shall, at the expiration or termination of this Lease, become the property of Landlord and be surrendered by Tenant with the Premises, and Tenant shall provide Landlord with full, unconditional, unburdened and clear title to all such alterations, additions, changes, and utility and equipment.

2.12   Removal.   By delivery to Tenant of written notice from Landlord not earlier than ninety (90) and not later than thirty (30) days prior to the end of the Term of this Lease, Landlord may require that any or all Tenant-created alterations, additions, modifications, or utility or equipment installations be removed by the expiration or termination of this Lease. Landlord may require the removal at any time of all or any part of any Tenant-created alterations, additions, demolitions, modifications, or utility or equipment installations made without the required consent of the Landlord and Landlord has the unilateral and complete right and option of requiring Tenant to promptly pay all fees, expenses, and costs and undertake all necessary and appropriate actions in order to restore and return the

HAH000025

ARBITRATION EX. 2.9

Premises to the same condition and state of appearance, construction, and functionality which the Premises enjoyed immediately prior to the Tenant's alterations, additions, demolitions, modifications, or utility or equipment installations made without the consent of the Landlord.

2.13   Surrender. Unless otherwise instructed or authorized or waived by Landlord and confirmed in a writing signed by the Landlord, the Tenant shall surrender the Premises before or at the end of the Term, or any earlier termination date, and the entire interior and exterior of the Premises, including but not limited to improvements, parts, and surfaces thereof must present a broom-clean and vacuumed appearance, free of debris, and in good operating order, condition, and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damages or deterioration that could or would have been prevented by good maintenance practices. Tenant shall repair any damage occasioned by the installation, maintenance, or removal of trade fixtures, Tenant-created or Tenant-owned alterations, and/or utility installations, furnishings, and equipment, as well as the removal of any storage tanks, ventilation equipment and HVAC equipment and ducting, lighting, utilities, safes, storage lockers, and any other equipment installed by or for Tenant. Tenant shall completely remove from the Premises any and all hazardous substances brought onto the Premises by or for Tenant or any third party, even if such removal would require Tenant to perform or pay for work that exceeds statutory requirements.

2.14   Trade Fixtures. The Tenant must receive prior written approval provided by the Landlord before the Tenant shall have the right to install and/or affix on the Premises various equipment and items for use in Tenant's business, which Tenant, in Tenant's sole discretion, deems necessary or advisable (collectively the "Trade Fixtures"). Trade Fixtures installed on or in the Premises by Tenant shall constitute the property of Landlord, and all title and interest to any Trade Fixtures shall be held exclusively by Landlord, to the exclusion of Tenant notwithstanding the fact that Tenant purchased, installed and affixed in or on the Premises the aforesaid Trade Fixtures. Notwithstanding any provisions to the contrary set forth in this Lease, Landlord may elect not to retain or claim ownership or title in any specific Trade Fixture, and in such event, the specific Trade Fixture may be removed by the Tenant at the expiration of the Term and Tenant shall hold all title and interest to such Trade Fixture, provided that any damage to the Premises caused by the removal of the Trade Fixtures shall be immediately repaired by Tenant, or Tenant shall immediately compensate Landlord in full for any necessary or appropriate repair. In the event that Landlord elects not to retain or claim ownership or title in any specific Trade Fixture but the Tenant subsequently abandons the Trade Fixture, Landlord shall have the right to keep any such Trade Fixtures or require Tenant to remove any Trade Fixtures that Tenant has elected to abandon.

**Commercial Prop. Lease Agreement     ELIAS SHIBER & RYAN KUNKEL, Have a Heart CC     Page 10 of 17**

HAH000026
**ARBITRATION EX. 2.10**

2.15   Landlord Owns Trade Fixtures.   Subject to Section 2.14 which describes the Landlord's option and right to elect <u>not</u> to retain or claim ownership or title in any specific Trade Fixture, any fixtures affixed or attached to any part of the Premises, including but not limited to fixtures which may be considered or claimed to be Trade Fixtures (as that term is defined in the section above), shall constitute the wholly-owned property of Landlord, and Landlord shall hold complete and exclusive title to all such fixtures and Trade Fixtures and Landlord shall be entitled to own and use and modify or remove and sell the fixtures or Trade Fixtures without any restriction, and Tenant shall not be entitled to claim any ownership interest or any other interest in the fixtures and Trade Fixtures.   Any personal property of Tenant not removed on or before the end of Term, or any earlier termination date, shall be deemed to have been abandoned by Tenant and may be disposed of or retained or used or sold by Landlord and Tenant shall not interfere with Landlord's aforesaid disposal, retention, use, or sale, and Tenant shall not be entitled to claim any ownership interest or any other interest in the personal property.

2.16   Option for Equity Ownership. Upon the conclusion of the initial 5-year term of this Lease and if the Tenant is not otherwise in default or breach under this Lease, Tenant shall have the right to negotiate with Landlord for the purpose of purchasing and obtaining an equity interest in the Licenses. The Landlord and Tenant shall bargain in good faith, but notwithstanding any other term or provision in this Agreement, Landlord has no duty or obligation to accept any offer or proposal made by Tenant for the purpose of purchasing and obtaining an equity interest in the Licenses, and Landlord has the unilateral right to accept or reject any of the Tenant's offers or proposals for any reason or for no reason.

2.17   Personal Guarantee Provided by Tenant's Owner/Officer/Governor.  This Lease is entered into and agreed upon by Landlord in reliance on the Tenant's promises and agreements as set forth both in this Lease as well as in the promises and agreements set forth in the written "Personal Guarantee" that has been signed by Ryan Kunkel contemporaneously with the parties' signing of this Lease. Ryan Kunkel is the owner and/or officer or governor of the Tenant. Landlord would not have entered into this Lease if the Personal Guarantee was not provided by Kunkel. The Personal Guarantee constitutes an important component of this Lease, and the parties agree that the force and effect and terms of the Personal Guarantee must be evaluated and considered in connection with any performance or interpretation of this Lease, or in connection with any dispute arising under this Lease. The parties agree that all terms and provisions of the Personal Guarantee are incorporated into this Lease as an exhibit, as if set forth in full.

2.18   Entry. Tenant shall permit Landlord or Landlord's employees, affiliates, agents, representatives, attorneys, lenders, contractors, or successors, or any of their employees, affiliates, agents, representatives, lenders, or contractors, to enter the Premises without notice and at all reasonable times for the purpose of inspecting the Premises and

HAH000027

**ARBITRATION EX. 2.11**

determining whether or to what extent the Tenant is complying with the terms of this Lease, to perform other lawful acts under this Lease that may be necessary to protect Landlord's interest in the Premises, or to perform Landlord's duties under this Lease.

2.19    Holding Over. Any holding over after the expiration of the Term of this Lease shall, with Landlord's consent, be treated as a tenancy from month to month, at Rent equal to One Hundred Fifty Percent (150%) of the then-current Rent (written notice of which shall be given to Tenant) and shall otherwise be on the same terms and conditions specified in this Lease.

2.20    Assignment and Subletting. Tenant shall neither assign this Lease nor sublet or transfer the Premises or any part thereof, nor shall Tenant voluntarily or by operation of law assign, transfer, mortgage, encumber, or sublet all or any part of Landlord's interest in the Premises, without the prior written consent of the Landlord.

2.21    Successors and Assigns. The obligations and responsibilities herein shall be binding upon, and the rights and benefits shall inure to, the Parties hereto and their respective successors and assigns.

**3.      REPRESENTATIONS AND WARRANTIES**

3.1 Compliance with Laws. Tenant shall faithfully observe and comply with, all municipal, county, state, and other applicable governmental entities' laws, requirements, and regulations, or which may hereafter be in force.  Notwithstanding the foregoing, Tenant shall not be required to comply with federal law as it applies to the cultivation, processing, refining, modifying, packaging, distribution, sale and/or use of cannabis/marijuana.

3.2 Insurance Company Requirements. Tenant shall not commit any acts on the Premises, nor use the Premises in any manner that will increase the existing rates for, or cause the cancellation of, any fire, liability, or other insurance policy insuring the Premises, or the improvements on the Premises, or the business conducted on the Premises. Tenant shall, at Tenant's own cost and expense, comply with all requirements of insurance carriers that are necessary for the continued maintenance of fire and liability and business insurance policies on the Premises and the improvements on the Premises.

3.3 Waste and Nuisance. Tenant shall not create any unnecessary waste or create, engage in, participate in, encourage, or promote any public or private nuisance upon the Premises.

3.4 Exclusive Use. Tenant shall have at all times exclusive use of the Premises during the Term. Landlord covenants that Tenant, upon payment of Rent and all financial obligations,

HAH000028
**ARBITRATION EX. 2.12**

and performance of all obligations and covenants described herein, shall and may peacefully and quietly have, hold, and enjoy the Premises for the Term.

4.   **GOVERNING LAW**

The construction, interpretation, performance, and enforcement of this Lease shall be by the governed by the laws of the State of California.

5.   **BREACH of LEASE**

5.1   Breach. The parties agree that a breach of this Lease shall occur in the event that a Party fails to properly or reasonably comply with or perform any term, provision, duty, obligation (including payment obligations), covenant, agreement or promise which that Party agreed to comply with or perform under the terms of this Lease.

5.2.   Notice of Breach. Either Party may place the other Party on notice that the Party is in breach of this Lease, or risks liability for breach of this Lease. Any such notice may be sent via email or other appropriate written communication method.

5.3   Termination. In the event of a breach by Tenant that is not cured within ten (10) days of Tenant receiving written notice of the breach and demand for cure from the Landlord or, if it is not possible to cure the breach within ten (10) days and Tenant's efforts to cure have not begun within ten (10) days from the inception of the breach, then Landlord may, upon fifteen (15) days' written notice to Tenant, terminate this Lease.

5.4   Waiver of Breaches. Each Party to this Lease may waive any breach committed by the other Party in performance of its obligations hereunder and its consequences. No such waiver shall be deemed to have been given by the waiving Party unless given in writing signed by the waiving Party. Upon any such waiver of a past breach, such breach shall cease to exist, and any event of breach arising therefrom shall be deemed to have been remedied for every purpose of this Lease. The waiver by either Party of a breach of any term or provision or duty in this Lease shall NOT be interpreted or determined or held to constitute a waiver of any subsequent breach of the same term, provision, or duty or any other term, provision, or duty.

6.   **DISPUTE RESOLUTION**

6.1.   Mediation. The Parties agree that any and all disputes, claims, or controversies arising out of or relating to this Lease shall be submitted to JAMS (formerly known as Judicial Arbitration and Mediation Services), or its successor, for mediation in Los Angeles County, CA, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to Section 6.2. Either Party may

HAH000029
**ARBITRATION EX. 2.13**

commence mediation by providing to JAMS and the other Party or Parties a written request for mediation, setting forth the subject of the dispute and the relief requested. The Parties will cooperate with JAMS and each other in selecting a neutral mediator from the JAMS panel of neutral mediators and in scheduling the mediation proceedings. The Parties agree that they will participate in the mediation in good faith and that they will share equally in its costs; each Party shall bear its own costs and expenses related to the mediation.  All offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the Parties (including any Party's Advisers or Representatives), experts, and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the Parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

6.2.  Arbitration. Any dispute, claim, or controversy arising out of or related to this Lease or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Lease to arbitrate, that is not resolved as part of mediation as required by Section 6.1 of this Lease, shall be determined by arbitration in Los Angeles County, CA, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court of competent jurisdiction. The Parties agree that the prevailing party shall be awarded its reasonable attorneys' fees and litigation costs, and the parties further agree that the Parties shall jointly request that the arbitrator determine the prevailing party as well as the prevailing party's reasonable attorneys' fees and litigation costs. This clause shall not preclude the Parties from pursuing any provisional remedies in aid of arbitration from a court of competent jurisdiction.

6.3   No Defense of Illegality. The Parties hereby acknowledge and agree that cannabis cultivation, processing, packaging, distribution, transportation, possession, use, and the sale of cannabis remains illegal under federal law. Subject to limitations and restrictions, the same conduct is not illegal under California law. Accordingly, the Parties jointly, severally, and individually expressly agree that no Party shall raise any claim or argument asserting that this Lease is unenforceable as this Lease promotes an "illegal purpose." This Lease expressly contemplates that the Tenant shall conduct a cannabis business at the Premises.

7.    **NO WAIVER or MODIFICATION OF LEASE WITHOUT BOTH PARTIES' SIGNATURES**

7.1   No Waiver or Modification Without Signature.  No term or provision of this Lease may be waived, deleted, disregarded, modified or amended unless such waiver, deletion, disregard, modification or amendment is in writing and signed by both Parties.

HAH000030

**ARBITRATION EX. 2.14**

7.2   No Implied Waiver. The failure of either Party at any time to require performance by the other Party of any term or provision herein shall not affect in any way the right of either Party to require such performance at any time thereafter. Further, the actual waiver by either Party of a breach of any term or provision herein, shall not constitute an implied waiver of any subsequent breach of the same provision or any other provision.

**8.   NOTICE**
Any notice required or permitted under the Lease shall be in writing and signed by the Party providing such notice. A notice under this Lease shall be deemed to have been given:

8.1. Overnight Express Mail. On the date of delivery, if personally delivered to the Party to whom notice is to be give or if personally delivered by overnight delivery service;

8.2 U.S. Postal Service. The 3rd day after mailing, if mailed to the Party to whom notice is to be given, by U.S. postal service certified mail, return receipt requested, postage prepaid; or

8.3 E-Mail. On the date of electronic transmission, if sent via e-mail. In cases of a failure to deliver such notice via e-mail, as evidenced by a message to that effect received by the sender's e-mail program, such message shall not constitute giving notice to the other Party until the other Party is otherwise notified in writing. Upon the sender's receipt of a message that delivery by e-mail has failed, notice must be given by personal delivery, mailing via standard first-class U.S. Mail, or overnight delivery as outlined above under Section 8.1 and Section 8.2.

Any notice to Tenant or Landlord shall be sent to the following e-mail or street addresses:

**Address for Tenant:**
   **Address Line #1:**   **Ryan Kunkel**, in care of "Have a Heart Compassion Care, Inc."

   Address Line 2: 3958  6ᵗʰ Ave NW  #3, Seattle WA 98107

   Phone: 425-268-4391

   Email: ryan@haveaheartcc.com

**Address for Landlord:**
   **Address Line #1**   **Elias Shriber**

Commercial Prop. Lease Agreement   **ELIAS SHIBER & RYAN KUNKEL**, Have a Heart CC   **Page 15 of 17**

HAH000031
**ARBITRATION EX. 2.15**

Address Line #2: _5421 Round Meadow Rd._
_Hidden Hills, CA 91302_

Phone: _818-326-3131_

Email: _eshiber@live.com_

## 9.   BINDING EFFECT

This Lease shall inure to the benefit of and be binding upon the Parties, and their heirs, successors, and assigns.

## 10.   ENTIRE AGREEMENT

This Lease contains the entire understanding between the Parties and supersedes any prior understandings and agreements between them with respect to the subject matter of this Lease as described herein. There are no promises, assurances, representations, agreements, arrangements or inducements between the Parties, oral or written, relating to the content or subject matter of this Lease which are not fully expressed herein.  Any statements, agreements, promises, or inducements, whether made by either Party or an agent of a Party, that are not contained or described in this Lease are not valid or binding. This Lease may <u>not</u> be modified, amended, added to, superseded, or altered except by a written agreement signed by all the parties herein.

## 11.   MISCELLANEOUS

11.1   <u>Severability</u>.  Any part, provision, term, requirement, obligation, option, right, liability, representation, or warranty contained in this Lease which is prohibited or unenforceable or is held to be void or unenforceable in an arbitration or in a court of competent jurisdiction, shall be ineffective as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

11.2   <u>No Amendment</u>. This Lease shall not be altered, waived, modified, or canceled in any respect except in writing, duly executed by all of the Parties hereto, and no oral agreement or course of conduct to the contrary, shall be deemed an alteration, amendment, modification, or cancellation.

11.3   <u>Recitals</u>.  The recitals appearing at the beginning of this Lease are incorporated in full into this Lease, and may be considered and used in interpreting this Lease and determining its force and effect.

11.4   <u>Title and Subtitles</u>. The titles of the Sections and subsections of this Lease and any exhibits are for the convenience of reference only and are not to be considered in construing this Lease.

HAH000032
**ARBITRATION EX. 2.16**

11.5   Counterparts. This Lease may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument. Photocopies, facsimile, or electronic transmissions of counterpart signatures of this Lease may be used with the same force and effect as originals.

11.6   Authority. Each Party is duly authorized and holds the legal right to enter into this Lease.

11.7   Legal Representation. By executing and delivering this Lease, each Party expressly acknowledges that it has had the opportunity to consult with legal counsel and to have such legal counsel review this Lease.

IN WITNESS WHEREOF, the Parties hereto have caused this Lease to be duly executed as of the day and year written below.

Date: January _24_, 2018          **Have a Heart Compassion Care, Inc.**

                                 By: _____

                                 **Ryan Kunkel**
                                 Owner, Officer, Corporate Governor

Date: January _____, 2018     _____

                                 **Elias Shiber**

**Commercial Prop. Lease Agreement     ELIAS SHIBER & RYAN KUNKEL, Have a Heart CC     Page 17 of 17**

HAH000033
**ARBITRATION EX. 2.17**

## PERSONAL GUARANTEE of RYAN KUNKEL
### Re *CANNABIS LICENSE* ASSIGNMENT AGREEMENT for "Have a Heart Compassion Care, Inc."

**I, RYAN KUNKEL** ("Guarantor"), hereby personally guarantee payment and performance of the promises, liabilities, and obligations owed by "**Have a Heart Compassion Care, Inc.**", a Washington corporation ("Assignee"), to **ELIAS SHIBER**, an individual ("Assignor"), under the **CANNABIS LICENSE ASSIGNMENT AGREEMENT** which Assignor and Assignee signed contemporaneously herewith and which provides for the assignment of cannabis business licenses ("Assignment").

1.      Any notice given to Assignee under the Assignment shall also constitute notice to Guarantor. Guarantor agrees that notice of default or notice of breach given to Assignee under the Assignment also constitutes sufficient notice to Guarantor. Guarantor shall remain bound as indicated above, notwithstanding any extensions of contract term, or amendments to the Assignment, or any part thereof.

2.      Consent is hereby given to Assignor to make such renewals, extensions or modifications as it may choose to accept, and to compromise and settle with Assignee and surrender any collateral which it now has or hereafter may have, all without notice to the Guarantor, and without affecting in any way the obligations of the Guarantor to Assignor or any assignees thereof.

3.      Guarantor's liability hereunder shall <u>not</u> be affected by the existence of any security for the Assignment, or any other circumstance, or any defense of the Assignee and/or the Guarantor which might otherwise constitute a legal or equitable defense of a surety or guarantor.

4.      This Personal Guarantee is unconditional, and the liability of the Guarantor and Assignee is joint and several.

5.      Guarantor waives the right to require Assignor to proceed against the Assignee or any other party prior to proceeding again this Guarantor, and Guarantor confirms and agrees that Assignor may proceed against the Guarantor directly and independently of any other liable party, and the cessation of the liability of any other party for any reason other than full payment shall not in any way affect the liability of this Guarantor.

6.      Default by Guarantor shall entitle the Assignor to recover its reasonable attorney's fees, costs and litigation-related expenses, regardless of whether suit is actually commenced, and including all such fees, costs and expenses which may be incurred on account of the bankruptcy or reorganization proceedings of the Assignee or Guarantor.

7.      Guarantor acknowledges that Guarantor has reviewed the Assignment. Guarantor acknowledges that Guarantor has a direct financial interest in the Assignee, and the Assignment would not have been entered into by Assignor but for this Personal Guarantee, and that this Personal Guarantee is therefore supported by good and adequate consideration.

HAH000034

**ARBITRATION EX. 3.1**

8.      This Personal Guarantee contains the entire understanding between the Parties and supersedes any prior understandings and agreements between them with respect to the subject matter of this Personal Guarantee as described herein. There are no promises, assurances, representations, agreements, arrangements or inducements between the Parties, oral or written, relating to the content or subject matter of this Personal Guarantee which are not fully expressed herein.  Any statements, agreements, promises, or inducements, whether made by either Party or an agent of a Party, that are not contained or described in this Personal Guarantee are not valid or binding. This Guarantee may <u>not</u> be modified, amended, added to, superseded, or altered except by a written agreement signed by all the parties herein.

9.      The entire content of the Assignment and all exhibits are incorporated here by this reference.

10.     Any part, provision, term, requirement, obligation, option, right, liability, representation, or warranty contained in this Personal Guarantee which is prohibited or unenforceable or is held to be void or unenforceable in an arbitration or in a court of competent jurisdiction, shall be ineffective as to such jurisdiction to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof.

11.     The construction, interpretation, performance, and enforcement of this Personal Guarantee shall be governed by the laws of the State of California.

12.     Any dispute, claim, or controversy arising out of or related to this Personal Guarantee or the breach, termination, enforcement, interpretation, or validity hereof, including the determination of the scope or applicability of this Guarantee to arbitrate shall be determined by arbitration in Los Angeles County, CA, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court of competent jurisdiction. The Parties agree that the prevailing party shall be awarded its reasonable attorneys' fees and litigation costs, and the parties further agree that the Parties shall jointly request that the arbitrator determine the prevailing party as well as determine the prevailing party's reasonable attorneys' fees and litigation costs. This clause shall not preclude the Parties from pursuing any provisional remedies in aid of arbitration from a court of competent jurisdiction.

This Personal Guarantee was duly executed as of the day and year written below.


Date: January __24__ , 2018      By: _Ryan Kunkel_____

                                 **Ryan Kunkel (GUARANTOR)**

HAH000035

**ARBITRATION EX. 3.2**

# PERSONAL GUARANTEE of <u>RYAN KUNKEL</u>
## Re COMMERCIAL PROPERTY LEASE AGREEMENT for "Have a Heart Compassion Care, Inc."

I, **RYAN KUNKEL** ("Guarantor"), hereby personally guarantees payment and performance of the promises, duties, liabilities, and obligations of **"Have a Heart Compassion Care, Inc."**, a Washington state corporation ("Tenant") to **ELIAS SHIBER**, an individual ("Landlord") under that certain Commercial Property Lease Agreement made by Landlord and Tenant contemporaneously herewith for the real property identified as **4027 E. 52nd Street, Maywood, CA 90270** (the "Lease").

1.      Any notice given to Tenant under the Lease shall also constitute notice to Guarantor. Guarantor agrees that notice of default or notice of breach given to Tenant under the Lease also constitutes sufficient notice to Guarantor. Guarantor shall remain bound as indicated above, notwithstanding any extensions of lease term, or amendments of the Lease, or any part thereof.

2.      Consent is hereby given to Landlord to make such renewals, extensions or modifications as it may choose to accept, and to compromise and settle with Tenant and surrender any collateral which it now has or hereafter may have, all without notice to the Guarantor, and without affecting in any way the obligations of the Guarantor to Landlord or any assignees thereof.

3.      Guarantor's liability hereunder shall <u>not</u> be affected by the existence of any security for the Lease, or any other circumstance, or any defense of the Tenant and/or the Guarantor which might otherwise constitute a legal or equitable defense of a surety or guarantor.

4.      This Personal Guarantee is unconditional, and the liability of the Guarantor and Tenant is joint and several.

5.      Guarantor waives the right to require Landlord to proceed against the Tenant or any other party prior to proceeding again this Guarantor, and Guarantor confirms and agrees that Landlord may proceed against the Guarantor directly and independently of any other party liable and the cessation of the liability of any other party for any reason other than full payment, shall not in any way affect the liability of this Guarantor.

6.      Default by a Guarantor shall entitle the Landlord to recover his reasonable attorney's fees, costs and litigation-related expenses, regardless of whether suit is actually commenced, and including all such fees, costs and expenses which may be incurred on account of the bankruptcy or reorganization proceedings of the Tenant or Guarantor.

7.      Guarantor acknowledges that Guarantor has reviewed the Lease. Guarantor acknowledges that Guarantor has a direct financial interest in the Tenant, and the Lease would not have been entered into by Landlord but for this Personal Guarantee, and that this Personal Guarantee is therefore supported by good and adequate consideration.

8.      This Personal Guarantee contains the entire understanding between the Parties and supersedes any prior understandings and agreements between them with respect to the subject

HAH000036

**ARBITRATION EX. 4.1**

matter of this Personal Guarantee as described herein. There are no promises, assurances, representations, agreements, arrangements or inducements between the Parties, oral or written, relating to the content or subject matter of this Personal Guarantee which are not fully expressed herein.  Any statements, agreements, promises, or inducements, whether made by either Party or an agent of a Party, that are not contained or described in this Personal Guarantee are not valid or binding. This Guarantee may not be modified, amended, added to, superseded, or altered except by a written agreement signed by all the parties herein.

9.      The entire content of the Lease and all exhibits are incorporated here by this reference.

10.      Any part, provision, term, requirement, obligation, option, right, liability, representation, or warranty contained in this Personal Guarantee which is prohibited or unenforceable or is held to be void or unenforceable in an arbitration or in a court of competent jurisdiction, shall be ineffective as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

11.      The construction, interpretation, performance, and enforcement of this Personal Guarantee shall be governed by the laws of the State of California.

12.      Any dispute, claim, or controversy arising out of or related to this Personal Guarantee or the breach, termination, enforcement, interpretation, or validity hereof, including the determination of the scope or applicability of this Guarantee to arbitrate shall be determined by arbitration in Los Angeles County, CA, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court of competent jurisdiction. The Parties agree that the prevailing party shall be awarded its reasonable attorneys' fees and litigation costs, and the parties further agree that the Parties shall jointly request that the arbitrator determine the prevailing party as well as determine the prevailing party's reasonable attorneys' fees and litigation costs. This clause shall not preclude the Parties from pursuing any provisional remedies in aid of arbitration from a court of competent jurisdiction.

This Personal Guarantee was duly executed as of the day and year written below.


Date: January __24__, 2018        By: _Ryan Kunkel_____

                                **Ryan Kunkel (GUARANTOR)**




**PERSONAL GUARANTEE of RYAN KUNKEL        Re Commercial Property Lease (Elias Shiber)        Page 2 of 2**

HAH000037

**ARBITRATION EX. 4.2**

**ATTACHMENT 8(c)**

- Copy of Final Award Dated February 5, 2020

JAMS ARBITRATION

CASE No.  1210036053

———————————————————

Have a Heart Compassion Care, Inc. and
Ryan Kunkel

Claimants and Cross-Respondents

and

Elias Shiber and CANA, Inc.

Respondents and Cross-Claimants

———————————————————

FINAL AWARD

Michael D. Murphy
Kenneth P. Hsu
Ervin Cohen & Jessup LLC
9401 Wilshire Blvd., Ninth Floor
Beverly Hills, CA 90212
P:      310.273.6333
E:      mmurphy@ecjlaw.com
        khsu@ecjlaw.com

Counsel for Claimants and Cross-Respondents

Faryan Andrew Afifi
Afifi Law Group
1801 Century Park East, Ste. 1100
Los Angeles, CA 90067
P:     310.407.3000
E:     faryan@afifilaw.com

Counsel for Respondents and Cross-Claimants

The undersigned Arbitrator, having been designated in accordance with section 6.2 of the four Cannabis License Agreements as well as section 6.2 of the Lease and Paragraph 12 of the License Guarantee in addition to the Procedural and Scheduling Order dated May 7, 2019, and having examined the submissions, proof and allegations  presented, and having received and considered the oral testimony of witnesses, hereby renders this Final Award as follows:

I.        INTRODUCTION AND PROCEDURAL STATEMENT

This arbitration arises out of the efforts of Mr. Kunkel, the CEO of Have a Heart ("HAH"), to establish a cannabis dispensary in Maywood, California.   Working with a local attorney, Mr. Welch, Kunkel learned of an opportunity to obtain the assignment of four cannabis licenses as well as a lease for a dilapidated building from one of Mr. Welch's longtime clients, Mr. Shiber, who held the licenses in the name of CANA, Inc.[1]  After working with Welch and Shiber and paying substantial fees and construction costs, Kunkel learned that, in fact, the assignment of the licenses was not possible and the building could not legally

---

[1] As shown at the hearings, Cana is the alter-ego of Shiber.  A few documents in the case incorrectly identified Kunkel as an operator of Cana because Welch hoped that these documents would help him accomplish the assignment of the licenses.  The existence of these false documents erroneously identifying Kunkel as an officer of Cana does not make it so (Ex. 221).

be renovated as a cannabis dispensary pursuant to the regulations of the City of Maywood.  As a result, Kunkel and HAH claim that the entire transaction should be rescinded pursuant to the language of the contracts.[2]

In response, counsel for Shiber asserts that his client has dyslexia and therefore depended on Welch, his long-time attorney, for the interpretation of the documents and an understanding of the transaction.  He asserts claims for breach of contract, breach of fiduciary duties, and fraud in addition to various claims for damages.

This arbitration is governed by the JAMS Comprehensive Arbitration Rules and Procedures, effective July 1, 2014, and JAMS is administering the case.  The merits are to be decided pursuant to California law.

Hearings in this case were held in the Century City JAMS office for five days, November 18-22, 2019.  The following witnesses testified at the hearings in this order:  Ryan Kunkel, DR Welch, Charlie Wells, Jose Davila, Joe Garcia, Elias Shiber, Michael Murphy, Michael Raquiza, Felipe Velarde, Vince DeLuca, David Mango, and Yelena Katchko.

Both parties offered documentary evidence at the hearings and that evidence was admitted.  At the end of the last hearing day, both sides stated that they had no further evidence to offer.

The parties submitted simultaneous closing briefs on December 5 and counsel presented closing arguments via ZOOM on December 16, 2019.

---

[2] The contracts contain a condition precedent requiring the effective assignment of the cannabis licenses to HAH and, failing that, rescission of the entire transaction (Exs. 1 and 2, section 2.2).

## II.   FACTS

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award.  To the extent that this recitation differs from any party's position, that is the result of determinations regarding credibility and relevance, considerations of burdens of proof, and the weighing of evidence, both oral and written.

Kunkel is CEO of HAH, a Seattle based business that operates several legal cannabis dispensaries in five states.  When looking for new locations, it is his practice to find a local attorney to help locate opportunities and handle the requirements of the local laws.  While looking for locations for new HAH dispensaries in California, Kunkel was introduced to Welch, an attorney known in the industry for initiating and handling cannabis business deals.  Welch introduced Kunkel to Shiber, who owned four cannabis licenses and a very run-down warehouse in the City of Maywood, California.[3]

Kunkel signed an Engagement Agreement with Welch that included a broad scope of legal services (Ex. 7). Then, on February 1, 2018, Shiber and HAH entered into the transaction at the heart of this dispute (Exs. 1-5).[4] The parties entered four agreements and an addendum through which Cana and Shiber were to assign the cannabis licenses to HAH in exchange for a licensing fee of $25,000 per month and also lease the warehouse for $26,000 per month along

---

[3] This dispute deals with licenses issued by the City of Maywood, not the State of California.  The four licenses issued to Cana are for the cultivation, distribution, manufacturing, and retail dispensing of cannabis.
The warehouse property is located at 4027 E. 52nd Street, Maywood, CA.  Shiber also has rights to a nearby property to use for parking.
[4] Legalization of cannabis for recreational use in California became effective on January 1, 2018, pursuant to Proposition 64.

with a $950 maintenance fee (Exs. 1-5).  Kunkel agreed to personally guarantee payment.[5]

Significantly, the entire transaction was conditioned upon the effective assignment of the licenses to HAH.  As set forth in section 2.2 of the agreements, the licenses must be "fully transferable and/or assignable" from Cana to HAH and the licenses must provide HAH with "legal approval" to conduct the cannabis businesses described in the licenses (Exs. 1 and 2).  Further, if these conditions are not met, the agreements state that both parties shall declare the transaction "terminated and/or mutually rescinded" (Exs. 1 and 2, section2.2.3).

During the negotiation of the contract terms, Welch orchestrated the deal and, remarkably, purported to represent both parties.   He had both Kunkel and Shiber sign a conflicts waiver on January 25, 2018 (Ex. 8 ), and then proceeded to advance the deal with the approval and cooperation of his friend and long-time client, Mr. Shiber.[6]  When dealing with Kunkel, Welch reassured him by stating that he knew and had influence with those in charge of such developments in the City of Maywood.   Therefore, he claimed that he could turn the plan to create a new HAH dispensary into reality.

When dealing with Shiber, he held out the possibility of a huge payout, including hefty monthly payments for the use of the licenses in addition to rent for the warehouse.  At one time, he even promised Shiber a 99-year deal,

---

[5] After some negotiation, Shiber agreed to give HAH three months free rent while renovations were underway (Ex. 5).
[6] Mr. Welch is not a party to this arbitration and so this award does not make a finding about the legitimacy of the conflicts waiver and/or the ethics of Welch's actions.  Both parties have separate claims against Welch.   For years, Welch represented Shiber on multiple matters.

although it turned out that there was only a one-year deal on the licenses and a five-year lease on the warehouse.  What Welch and Shiber hid from Kunkel was the fact that Welch was getting a cut of both the $300,000 security deposit and also a portion of the monthly license fees.[7] While pretending to represent both parties, it appears that Welch worked with Shiber to take advantage of HAH, the company from out of state.  Apparently, both Welch and Shiber saw HAH as a "cash cow."

Counsel for Shiber attempted to defend him on the ground that he has dyslexia and was unable to review and understand the license agreements and lease.  Shiber testified that he had for years depended on Welch to explain legal documents to him and expected that Welch would do so here.  But this testimony is not credible in light of the fact that Shiber owns and manages several properties and has been involved in numerous business deals where Welch served as his attorney.  Even if Shiber can truthfully claim that, initially, he did not understand all of the terms of the deal with HAH, the underhanded situation was brought into clear focus for Shiber within only weeks of signing the contracts when, on February 26, 2018,  he received a check for $264,000, part of the $300,000 security deposit Kunkel had made for the licenses and the lease of the warehouse:  Welch had kept a portion of that money and sent the rest to Shiber (Ex. 29).  Kunkel was not aware that, in addition to the charge to HAH for the HAH attorney fees, Welch was taking a cut.  Kunkel also was not aware that Shiber did not keep the security deposit in Welch's trust account or in an escrow account administered by a third party as required by section 2.6

---

[7] Welch kept $30,000 that was part of the security deposit and sent the rest to Shiber even though all of the money was supposed to be kept in Welch's trust account. He also kept $6,000 from each monthly payment.

of the Assignment Agreement and Lease, but instead deposited it in Shiber's personal account.  At the time of the hearings, Shiber admitted that he had spent the security deposit and had nothing left.[8]

Meanwhile, Kunkel was making the promised payments to Shiber and moving forward with an elaborate renovation of the dilapidated warehouse to create a very attractive cannabis dispensary that featured the best in lighting, display cases, and other materials.[9]  When issues were raised about the assignability of the licenses or the permits to proceed with construction, Welch assured Kunkel that all was well and that he could and would successfully handle any issues raised by the City of Maywood.  Shiber claims not to have been informed of the details.  He simply stood by and collected the money.

As HAH proceeded with the ambitious work of turning the old warehouse into a modern dispensary, Kunkel believed that Welch was handling all of the legal obstacles as he promised to do.  That belief was shattered when the City building authorities visited the project and issued a stop order to shut down construction, asserting that HAH had no building permits and that the construction failed to conform with the Conditional Use Permit.  That CUP had been issued to Shiber but it was never disclosed to Kunkel and HAH.[10]  In addition, Kunkel learned that the City claimed that Shiber's four cannabis licenses were held by Cana and were not transferable to HAH.

---

[8] The evidence showed that Shiber and Welch were working together. Counsel for Shiber tried to show that Welch was working with Kunkel and HAH to Shiber's detriment, an assertion not supported by the evidence.
[9] Cannabis businesses cannot use the banking system.  HAH had a system under which its payments were made by an entity called InterUrban.
[10] Not only was the CUP undisclosed, it was limited to a cannabis "grow" operation, not the dispensary planned by Kunkel and HAH (Ex. 28).

The entire deal had been conditioned upon the effective transfer of the licenses from Shiber/Cana to Have A Heart, as set forth in section 2.2 of the License Assignment and Lease.[11]  In a Letter dated November 7, 2018, the City of Maywood refused to allow an assignment and extend the rights arising out of those licenses to HAH (Ex. 37).   Therefore, Kunkel and HAH demanded rescission on January 15, 2019 (Ex. 40).  California Civil Code section 1689.  After rescission, Kunkel and HAH claim damages as set forth below.

In response, counsel for Shiber remarkably makes claims for breach of contract, breach of fiduciary duty, and fraud.  Though those claims are confusing, it appears that Shiber believes that HAH should make additional payments for the licenses and for the rent of the warehouse, exceeding $1 million, and also reimburse him for the value of the cannabis licenses in the neighborhood of $5 million.  Even more remarkably, he claims another $460,000 to bring the dilapidated warehouse back to its original condition (Ex. 206).[12] These claims are surprising, both because of the facts recounted above and because they are unsupported by any persuasive evidence.[13]

III.   DETERMINATIONS ON THE CLAIMS

A.  Rescission is the appropriate remedy

---

[11] The evidence was clear that there was never an effective assignment to HAH of the Maywood licenses and that HAH could not receive approval to conduct business in the City of Maywood (Ex. 37).
[12] The question of how the newly modernized building could be restored to its former disastrous and crumbling condition was not clear.  In any event, the City's Mr. Mango testified that the City would not require Shiber to demolish or remove any of HAH's improvements and the property could be used for other commercial purposes.
[13] The testimony of Ms. Katchko, an accomplished attorney familiar with cannabis transactions, was interesting but not helpful because it was just a look at what might have been, not what actually happened here.

Pursuant to the language of section 2.2 of both the assignments and the lease, rescission is the appropriate remedy.  Both conditions for rescission occurred: the licenses could not be assigned and HAH did not get legal approval to conduct a cannabis business.  Civ. Code, section 1692.  TIG Ins. Co. of Michigan v. Homestore, Inc. (2006) 137 Cal.App.4[th] 749, 759.  Therefore, Shiber is to refund all of the money paid by Kunkel and HAH under the rescinded agreement in the amount of $716,714.53 plus interest.[14]

### B.   Unjust Enrichment

In addition to paying the licensing fees and rent, Kunkel also invested $651,049.55 to rehabilitate Mr. Shiber's building.  Unjust enrichment involves "receipt of a benefit and unjust retention of the benefit at the expense of another."  Lectrodryer v. SeoleBank (2000) 77 Cal. App. 4th 723,726.  Shiber has retained this property and can either sell it or rent it for some kind of commercial use.  Shiber has been unjustly enriched and is to reimburse Kunkel and HAH for the entire amount invested in Shiber's property.

### C.  Shiber's claims are denied

As set forth above, Shiber has not met his burden of proof to support his claims for breach of contract, breach of fiduciary duty, and fraud.  Those claims are denied.  After the notice of rescission, no additional payments had to be made by HAH so there was no breach of contract.  Further, Kunkel had no

---

[14] The Guarantees executed by Kunkel personally guaranteeing the Assignment Agreement and Lease are rescinded and no longer have any force and effect per Civ. Code section 1689(a). Exs. 3 and 4.

fiduciary duty to Shiber and Shiber's counsel presented no basis for that claim. Finally, under these facts, a claim for fraud is not supported by the evidence.[15]

IV.   Award of Attorneys' Fees and Costs and Prejudgment Interest to Claimants Kunkel and Have a Heart

1. Attorneys' Fees and Costs

The scope of the attorneys' fees and costs provisions in section 6.2 of the Assignment Agreements and Lease and section 12 of the Personal Guarantees is very broad.  Claimants Kunkel and HAH are the prevailing parties and are entitled to an award of reasonable fees and costs incurred.  The Arbitrator has reviewed the submissions from the parties regarding fees and costs, including the Application for Fees and Costs and Prejudgment Interest and the supporting Declaration of Michael D. Murphy as well as copies of invoices and receipts.  Careful consideration of the factual and legal arguments has led to the following award to Kunkel and HAH pursuant to JAMS Rule 24 and California law:

The fees claimed by the Ervin Cohen & Jessup firm appear reasonable, both in terms of the rates charged and the number of hours expended.  In addition, the rates charged are within the prevailing rates in the Los Angeles area for this type of case.  In fact, the rates ordinarily charged for both Mr. Murphy and Mr. Hsu were reduced for the purposes of this arbitration (Murphy Declaration and

---

[15] The claim for sanctions advanced by counsel for Shiber is denied.

the Laffey Matrix, pp. 3-5).[16]  Therefore, Claimants Kunkel and HAH
are awarded reasonable attorneys' fees and costs in the amount of
$279,106 for fees and $90,257.49 for costs, a total of $369,363.49.[17]

2.  Prejudgment Interest

On January 15, 2019, Mr. Murphy sent a letter entitled "Notice of
Rescission" to Mr. Shiber's prior counsel.  Therefore, prejudgment
interest runs from that date to January 8, 2020, at the rate of 7% per
annum. Claimants Kunkel and HAH are awarded prejudgment
interest in the amount of $93,907.31.

V.  Final Award

1.   Kunkel and HAH are awarded $716,714.53 on their claim for
rescission.

2.  Kunkel and HAH are awarded $651,049.55 on their claim for unjust
enrichment.

3.  Therefore, Kunkel and HAH are awarded a total amount of
$1,367,764.08 plus $93,907.31 in prejudgment interest.

4.  Kunkel and HAH are the prevailing parties.  Pursuant to the language
of the contracts, section 6.2 of the Assignment Agreements and
Lease and section 12 of the Guarantees, they are entitled to
reasonable attorneys' fees and costs in the amount of $369,363.49.

---

[16] Besides Mr. Murphy and Mr. Hsu, the invoices include work done by two paralegals, Ms. Emerson and Ms. Castelli.
[17] Pursuant to Rule 31 (c), the amount of fees awarded to Claimants has been increased by $8,568.  A portion of that amount was paid by Claimants on behalf of Respondent.

5.  The total amount awarded to Claimants Kunkel and HAH is $1,831,034.70.

This Final Award is in full and complete settlement and satisfaction of any and all claims submitted in this arbitration.  Any other claim not specifically addressed herein is deemed denied.

February 5, 2020

Zela G. Claiborne, Arbitrator

**ATTACHMENT 9(b)**

- Email Service Confirmation– February 7, 2020 (**Petition Section 9(b))**

| | |
|---|---|
| **From:** | service@caseanywhere.com |
| **To:** | Faryan Andrew Afifi |
| **Subject:** | Document - Final Award - Uploaded in Have a Heart Compassion Care, Inc et al. v. Shiber, Elias et al., Case No. 1210036053 |
| **Date:** | Friday, February 7, 2020 2:25:06 PM |



The following document has been uploaded in **Have a Heart Compassion Care, Inc et al. v. Shiber, Elias et al.**, Case No. 1210036053:

    **Document Uploaded By:** JAMS
    **Number of Documents in Transaction:** 1
    **Upload Date:** 2/7/20
    **Time of Upload:** 2:20 PM (PST)
    **Document Title:** Final Award
    **Page Range:** 11 - 30

To access this record, click on the document link. You will be directed to the JAMS Electronic Filing System log in page. After entering your username and password, you will be taken to the requested document. If you have saved your log in information by selecting the "Remember me at this computer" option, you will be automatically logged in and directed to the record. Please allow time for larger documents to open.

If your organization is no longer involved in the above-referenced matter, or if there is any other reason your organization's subscription should be terminated, please contact us immediately. It is your organization's responsibility to request removal from the case site and conclusion of your subscription for this matter.

Please contact Case Anywhere by phone at (800) 884-3163 or (818) 650-1040 or by email at support@caseanywhere.com if you have any questions.

<div align="center">

**ATTACHMENT 10(c)(2)**

</div>

**FACTS SHOWING NEED TO VACATE AWARD:  The following facts will be presented to the court in a noticed motion with reference to exhibits, the arbitration transcript, declarations and a memorandum of points and authorities in support of this Petition.**

### A.  <u>Misconduct of Neutral Arbitrator</u>

The facts demonstrate that the arbitrator, from the beginning of the 5 – day hearing, and indeed from the opening statement by Have A Heart (Petitioner in the Arbitration Proceeding, hereinafter "HAH") exhibited favoritism toward Have a Heart and Ryan Kunkel, demonstrated a lack of neutrality, revealed that she had already reached conclusions on factual issues in dispute before Respondent Shiber had even presented his case,  and repeatedly demonstrated to any person aware of the facts to reasonably entertain a doubt that the arbitrator was able to be impartial.  The facts of the arbitrator's conduct toward Shiber, Shiber's counsel, and throughout the proceedings, including in comments the arbitrator made during the presentation of evidence and examination of witnesses, create an impression of serious bias in the eyes of a reasonable person.


The facts leading to these conclusions include, without limitation:

Opening Statement – During opening statement, the Arbitrator expressed how she was enamored with petitioner in the arbitration, Ryan Kunkel, and his multiple stores and cannabis dispensaries in multiple states, including northern California where the arbitrator lives.  The arbitrator used multiple opportunities to share her experience with similar dispensaries to Have a Heart and Kunkel in order to make a connection with Ryan Kunkel and HAH during the opening statement and thereafter throughout the arbitration hearing.  By contrast, during Shiber's opening statement, rather than listen or accept the proffer, the arbitrator began contesting facts being presented by Shiber's counsel, interrupting the opening statement, and even questioning them if they conflicted with statements made by HAH and Kunkel's counsel in their opening.  She had already accepted as true, HAH's counsel's proffer of facts in opening statement, even though no evidence had been presented yet, favoring Kunkel and HAH and disregarding Shiber's proffer and thereafter evidence addressing issues and the execution of documents central to the case.

Chronic Favoritism toward Kunkel and HAH. The arbitrator not only made no effort to hide her clear favoritism toward Ryan Kunkel, but during his testimony as the first witness in the case, the arbitrator made comments revealing she was enamored with his opening stores, and growing his business and complemented him repeatedly. In addition, in a puzzling attempt to make a connection with Kunkel, the arbitrator would repeatedly share her prior cases and experience with cannabis related matters that matched Kunkel's, but which had nothing to do with the case she was there to decide. The conversations were noticeable to any reasonable observer, and Shiber immediately perceived a bias and favoritism toward Kunkel and HAH.

Treatment of Objections. When Shiber's counsel objected to improper questions by HAH's counsel on grounds such as lacking foundation, attorney-client privilege and other fundamental errors, the arbitrator repeatedly overruled them, some inexplicably. By contrast, there were objections to questions posed by Shiber's counsel on much lighter grounds, some objected to by the Arbitrator, and she would sustain those objections repeatedly, all in an obviously disparate manner, and readily apparent to any reasonable person.

Disparate Treatment of Counsel. The arbitrator repeatedly made comments supporting counsel for HAH and Kunkel's interpretation of facts and evidence, even allowing HAH's counsel to effectively testify through his questions. By contrast, she made comments only to Shiber's counsel in a disrespectful manner, telling him to "Be quiet" as an example.

Texting and Distracted by Other Matters. The arbitrator would be paying attention during questioning of witnesses by counsel for HAH. However, on multiple occasions, when Shiber's counsel would question a witness, beginning with the first witness to testify, Ryan Kunkel, the arbitrator would not even listen to the questioning or answers, and was engaged in sending and receiving personal texts or emails. This behavior continued multiple times, to the point that a frustrated Shiber's counsel asked if the arbitrator was ready to proceed, and the arbitrator was forced to apologize for doing so.

Treatment of Witnesses. The arbitrator's conduct and comments were diametrically different when addressing witnesses in favor of HAH, as opposed to those presented by Shiber. When witnesses testified in a manner that was contrary to the interests of HAH, the arbitrator would herself cross-examine the witnesses, and try to find holes in their testimony as an advocate would. By contrast, she was very courteous and accommodating to witnesses who testified in favor of HAH. On some occasions, with independent witnesses, in spite of their testimony on a subject, she tried to elicit

different testimony from them that would be advantageous to or vindicate HAH, in a clearly bias manner that would be obvious to any reasonable observer.

Substantial Prejudice to Shiber.  As a result of the foregoing, the prejudice is visible in the way in which the administration of justice is completely undermined, such that Shiber believed the arbitrator was biased against him from the first and second day of the proceedings and daily thereafter.  These concerns were only cemented by the ultimate decision which confirmed the conduct and statements that gave the appearance of bias and non-neutrality, sealed into an award that was divergent from the actual evidence, ignored the law and the agreement of the parties.  The Final Award confirmed that the arbitrator had not listened to or considered much of the evidence presented by Shiber or witnesses whose testimony supported his case, hence prejudicing Shiber.

## B. __The Arbitrator Exceeded her Authority In Multiple Ways;__

a. CANA, Inc. is not a party to the Arbitration Agreements.  It never signed agreements to arbitrate, and the fact that it was named by HAH as a respondent does not give the arbitrator a right to impose jurisdiction over CANA.  CANA asserted the lack of jurisdiction in its pleading as a defense to the arbitration process, and yet the arbitrator disregarded this reality in ruling against CANA without in any way addressing the fact that CANA was not a signatory to the agreements, and had not agreed to arbitrate its case.

b. The arbitrator's right to order rescission exceeded that which was expressly provided in the agreements, with details and language as to the mechanism and manner of rescission, if applicable.  The agreements have specific language pertaining to the conditions under which rescission can be granted.  As noted above the agreements are between Shiber and HAH.  Cana Inc., is not a party to any of the agreements.  Yet it was undisputed that the 4 licenses described in the agreements were issued in the name of CANA Inc.  Accordingly, the language in the agreements pertaining to assignability of the licenses from *Shiber to HAH*, necessarily meant an assignment of Shiber's 100% ownership stake in CANA Inc. if the time to transfer or assign ever came.  This was corroborated by the expert testimony of Shiber's expert and no experts refuted that testimony from HAH nor any witness.

    i. The Undisputed evidence pertaining to Rescission included:

1. The Rescission clause of the lease agreement provided for rescission as follows:

"2.2.3  In the event that the Licenses described in Section 2.2 fail to satisfy one or more of the 3 criteria set forth in Section 2.2 at A, B, C, both Parties shall mutually and promptly declare that this Lease is terminated and/or mutually rescinded, and the Parties shall cooperate in reducing the costs associated with termination or rescission of this Lease. In connection with any termination or rescission, the Tenant shall immediately vacate the Premises, and Landlord shall refund to Tenant the monetary sums previously prepaid by Tenant (as described in Sections 2.5 and 2.6 below) subject to the Landlord's right to retain a portion of said sums for the purpose of satisfying Tenant's Rent obligations (if any) and defraying Landlord's repair costs and other expenses arising out of Tenant's occupancy of the premises."[1]

In light of this, there was undisputed evidence that the licenses were assignable, they allowed HAH the authority to conduct cannabis businesses, and in the event of death of Shiber, they remain in full force and effect because they were in the name of CANA Inc, not Shiber personally.   The undisputed evidence showed that all parties were aware that the licenses were in the name of CANA Inc.. before signing the agreements, and that the licenses were assignable such that Shiber's ownership of shares in CANA Inc,, could be transferred to HAH.  It was also undisputed that the licenses could be assigned to HAH pursuant to an application, if and when the time came for HAH to exercise its right to acquire the licenses.  The licenses allowed the adult use of cannabis by HAH, and Shiber's death did not impact them.  Accordingly, the undisputed evidence was that none of the conditions of rescission, as limited by the scope of the agreements existed.  The evidence showed that HAH took over control of, and began using the licenses for its construction, and to prepare its operations, and in fact, from February 1, 2018 through January 2019, it had exclusive use of

---

[1] Similar language exists in the Assignment Agreement Section 2.2.3, but envision return of the licenses and the costs associated with the use of such licenses.

the licenses, which was only impeded because of HAH's illegal and unpermitted construction. This evidence was undisputed.

Separately, HAH did not promptly seek to rescind as the agreement required, in fact, it waited a year after using the premises exclusively and using the licenses exclusively to do so. The conditions it complained of, were all in existence as of the signing of the agreements, and yet, assuming those conditions entitled HAH to rescind, it failed to act promptly, which was an express condition of rescission in the agreement. The undisputed evidence showed that HAH did not act at all, until the City shut down their illegal unpermitted construction in November 2018, and even then, HAH waited another two months, until January 2019 to attempt to rescind. Further as required by the agreements, HAH's duty was to vacate the premises promptly, which it did not do, and instead continued to occupy the premises for a year, during which it made significant changes to the building. The undisputed evidence showed that all the construction performed by HAH was illegal, without permits and was significant, all without any inspections, and the City of Maywood requires all of it to be removed and put back to the original conditions, providing no value or benefit to Shiber whatsoever. By contrast, the costs Shiber will incur, which were specifically enumerated to be reimbursed as conditions of rescission, were ignored by the arbitrator and not included in the Award. These included the roughly $400,000 required to return the property back to its original condition, the loss of use of the property for a year, and loss of use of 4 licenses for a year, valued at $5 Million. Since these were specific conditions of the right to rescind in the agreement, the arbitrator exceeded her powers given HAH's entire case sought rescission under the contracts, which was the Final Award.

2. HAH was in Breach of the Lease Agreement as of February 1, 2018, and further breached in March 2018 and April 2018, when it indisputably failed to make the lease payments HAH cannot seek rescission when it had already breached the agreement in early 2018, long before it served a notice of intent to rescind, sent on January 15, 2019, almost a year later. This evidence was undisputed, and the breach was never cured. In

addition, it was undisputed that the payment of the security deposit was incomplete as of February 1, 2018, where the agreement called for payment of $306,000, and only $300,000 was paid.  A party in breach cannot enforce the agreement or its provisions.

3. HAH engaged in unpermitted construction which caused the City of Maywood to void the licenses and Conditional Use Permit which were entrusted to HAH.  HAH's witnesses and the Director of Maywood Building and Safety confirmed that construction was without permits, no permitted set of drawings existed at the job site, and the City shut down the construction due to the significant unpermitted work being performed on nights and weekends by HAH and its contractors.  This was a breach of the agreements as well, and negated the ability of the arbitrator to order rescission, because the property could not be returned to Shiber with the Conditional Use Permit which carried with the property, and the licenses could not be returned to Shiber since their use was only approved under the Conditional Use Permit, and they were conditioned on compliance with laws  As a result, the contractual rescission contemplated in the agreements, and which authorized rescission provided certain conditions were met, could not be met, since the licenses could not be returned to Shiber, and in fact were never returned.  The unrefuted and undisputed testimony of the City of Maywood Director was that the licenses and the CUP were void and could not be revived.  Rescission, because of these delays and HAH's acts became impossible under the agreement terms, and the arbitrator exceeded her authority in awarding rescission which exceeded the authority provided her under the agreements.

c. The rescission ordered was not as provided by law or as contemplated by the agreements.

Rescission by law must return the parties to the position they were in before the contract, and the undisputed evidence showed that it was impossible to return Shiber to such a position as described above.  The agreements, if nothing more, provided for rescission as allowed by law, and the arbitrator exceeded her authority in ordering a different remedy than legal rescission,

which was the only remedy authorized by the agreement, and by law.  Nothing in the award returned Shiber to the place he was before the contract, and instead, the award simply seeks to unilaterally restore HAH to the place it was in before the contracts were signed, and nothing more.  This type of remedy was not rescission as provided by law, and which the contract, at a minimum required if the arbitrator were to exercise any powers of rescission.

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| FARYAN ANDREW AFIFI                    SBN:  167344<br>AFIFI LAW GROUP<br>1801 CENTURY PARK EAST, SUITE 1100, LOS ANGELES, CA 90067<br>TELEPHONE NO.: 310.407.3000           FAX NO.: 310.407.3004<br>ATTORNEY FOR *(Name):* Petitioner, ELIAS SHIBER and CANA, INC. | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: ELIAS SHIBER and CANA, INC.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] **Unlimited** [ ] **Limited**<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | [ ] **Counter** [ ] **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 20STCP01632<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [X] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel      e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve          in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence      f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):* 1 - Petition to Vacate Award
5. This case [ ] is [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 8, 2020

FARYAN ANDREW AFIFI                                                          //s//
(TYPE OR PRINT NAME)                                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov*<br>Westlaw Doc & Form Builder |

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
　Damage/Wrongful Death
Uninsured Motorist (46) *(if the
　case involves an uninsured
　motorist claim subject to
　arbitration, check this item
　instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/
　　Wrongful Death
Product Liability *(not asbestos or
　toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice–
　　Physicians & Surgeons
　Other Professional Health Care
　　Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip
　　and fall)
　Intentional Bodily Injury/PD/WD
　　(e.g., assault, vandalism)
　Intentional Infliction of
　　Emotional Distress
　Negligent Infliction of
　　Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
　Practice (07)
Civil Rights (e.g., discrimination,
　false arrest) *(not civil
　harassment)* (08)
Defamation (e.g., slander, libel)
　(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice
　　*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease
　　Contract *(not unlawful detainer
　　or wrongful eviction)*
　Contract/Warranty Breach—Seller
　　Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/
　　Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open
　book accounts) (09)
　Collection Case—Seller Plaintiff
　Other Promissory Note/Collections
　　Case
Insurance Coverage *(not provisionally
　complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
　Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent
　　domain, landlord/tenant, or
　　foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
　drugs, check this item; otherwise,
　report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court
　　Case Matter
　Writ–Other Limited Court Case
　　Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor
　　Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
　*(arising from provisionally complex
　case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of
　　County)
　Confession of Judgment *(non-
　　domestic relations)*
　Sister State Judgment
　Administrative Agency Award
　　*(not unpaid taxes)*
　Petition/Certification of Entry of
　　Judgment on Unpaid Taxes
　Other Enforcement of Judgment
　　Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
　above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-
　　harassment)*
　Mechanics Lien
　Other Commercial Complaint
　　Case *(non-tort/non-complex)*
　Other Civil Complaint
　　*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
　Governance (21)
Other Petition *(not specified
　above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult
　　Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief from Late
　　Claim
　Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Item I**. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? YES     CLASS ACTION? YES  LIMITED CASE? YES  TIME ESTIMATED FOR TRIAL     2     ×HOURS/ DAYS

**Item II**. **Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.3.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office
11. Mandatory Filing Location (Hub Case)

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

LACIV 109 (Rev 3/15)
LASC Approved 03-04
**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**
Local Rule 2.3
Page 1 of 4

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 2 of 4

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | xx☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>‾ 1. X 2. ‾ 3. ‾ 4. ‾ 5. ‾ 6. ‾ 7. ‾ 8.   9.   10.   11. | ADDRESS:<br><br>111 N. Hill Street |
|---|---|

| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90012 |
|---|---|---|

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> courthouse in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.3, subd.(a).

Dated: <u>May 8, 2020</u>

//s//

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/15).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )     FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING         )
FOR CIVIL                              )
                                       )
                                       )
                                       )
_____)

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

2019-GEN-014-00

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2019-GEN-014-00

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) **EXEMPT LITIGANTS**

   a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

   b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) **EXEMPT FILINGS**

   a) The following documents shall not be filed electronically:

      i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

      ii) Bonds/Undertaking documents;

      iii) Trial and Evidentiary Hearing Exhibits

      iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

      v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

   b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

   i)   Depositions;

   ii)  Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv)  Transcripts (including excerpts within transcripts);

   v)   Points and Authorities;

   vi)  Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

   Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

   Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

2019-GEN-014-00

    b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

    a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

    b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

        i)    Any printed document required pursuant to a Standing or General Order;

        ii)   Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

        iii)  Pleadings and motions that include points and authorities;

        iv)  Demurrers;

        v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

        vi)  Motions for Summary Judgment/Adjudication; and

        vii)  Motions to Compel Further Discovery.

    c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

    a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

    b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆Los Angeles County Bar Association Litigation Section◆

◆ Los Angeles County Bar Association
Labor and Employment Law Section◆

◆Consumer Attorneys Association of Los Angeles◆

◆Southern California Defense Counsel◆

◆Association of Business Trial Lawyers◆

◆California Employment Lawyers Association◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| STIPULATION – DISCOVERY RESOLUTION | | CASE NUMBER: |

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

The parties agree that:

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

    i.   File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department,

    ii.  Include a brief summary of the dispute and specify the relief requested; and

    iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

    i.   Also be filed on the approved form (copy attached);

    ii.  Include a brief summary of why the requested relief should be denied;

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

    It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ (ATTORNEY FOR _____ )

Date: _____

_____
(TYPE OR PRINT NAME)

➢ (ATTORNEY FOR _____ )

Date: _____

_____
(TYPE OR PRINT NAME)

➢ (ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:             FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.

The parties agree that:

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

    h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

    i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lscourt.org* under "*Civil*" and then under "*General Information*").

2.    The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
              (INSERT DATE)                                (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.    The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.    References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____     > _____
       (TYPE OR PRINT NAME)                      (ATTORNEY FOR PLAINTIFF)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR DEFENDANT)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR DEFENDANT)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR DEFENDANT)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR _____)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR _____)
Date:

_____     > _____
       (TYPE OR PRINT NAME)                    (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
|---|
| COURTHOUSE ADDRESS: |
| PLAINTIFF: |
| DEFENDANT. |

| INFORMAL DISCOVERY CONFERENCE <br> (pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER |
|---|---|

1.  This document relates to:

    ☐   Request for Informal Discovery Conference
    ☐   Answer to Request for Informal Discovery Conference

2.  Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request)

3.  Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4.  For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

INFORMAL DISCOVERY CONFERENCE
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:         FAX NO (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER |
|---|---|

This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.

The parties agree that:

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR _____ )

➢ _____
(ATTORNEY FOR _____ )

➢ _____
(ATTORNEY FOR _____ )

**THE COURT SO ORDERS.**

Date:   _____

_____
JUDICIAL OFFICER

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

**What is ADR?**

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

**Advantages of ADR**
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

**Disadvantages of ADR**
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

**Main Types of ADR:**

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

    **Mediation may be appropriate when the parties**
    - want to work out a solution but need help from a neutral person.
    - have communication problems or strong emotions that interfere with resolution.

    **Mediation may not be appropriate when the parties**
    - want a public trial and want a judge or jury to decide the outcome.
    - lack equal bargaining power or have a history of physical/emotional abuse.

### How to arrange mediation in Los Angeles County

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

   a.  **The Civil Mediation Vendor Resource List**
      If all parties agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases):

      • **ADR Services, Inc.** Case Manager patricia@adrservices.com (310) 201-0010 (Ext. 261)
      • **JAMS, Inc.** Senior Case Manager mbinder@jamsadr.com (310) 309-6204
      • **Mediation Center of Los Angeles (MCLA)** Program Manager info@mediationLA.org (833) 476-9145
         o  Only MCLA provides mediation in person, by phone and by videoconference.

      **These organizations cannot accept every case and they may decline cases at their discretion.**
      Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
      NOTE: This program does not accept family law, probate, or small claims cases.

   b.  **Los Angeles County Dispute Resolution Programs**
      https://wdacs.lacounty.gov/programs/drp/
      • Small claims, unlawful detainers (evictions) and, at the Spring Street Courthouse, limited civil:
         o  Free, day- of- trial mediations at the courthouse. No appointment needed.
         o  Free or low-cost mediations before the day of trial.
         o  For free or low-cost Online Dispute Resolution (ODR) by phone or computer before the day of trial visit
           http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

   c.  **Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit **http://www.courts.ca.gov/programs-adr.htm**

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit **http://www.lacourt.org/division/civil/CI0047.aspx**

**Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/CI0109.aspx**
**For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm**

LASC CIV 271 Rev. 01/20
For Mandatory Use

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS: Stanley Mosk Courthouse 111 North Hill Street, Los Angeles, CA 90012 | **FILED** Superior Court of California County of Los Angeles 05/11/2020 Sherri R. Carter, Executive Officer / Clerk of Court By: _____ N. Alvarez _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT** **UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER: 20STCP01632 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Stuart M. Rice | 49 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 05/11/2020
    (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By N. Alvarez_____, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

### INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

#### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

#### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

#### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

#### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

#### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

#### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

#### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

#### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

#### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

#### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

#### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

**EXHIBIT B**

1  FARYAN ANDREW AFIFI (SBN 167344)
AFIFI LAW GROUP
2  1801 Century Park E, Suite 1100
Los Angeles, CA 90067
3  Tel: (310) 407-3000
Fax: (310) 407-3004
4  Email: faryan@afifilaw.com

5  Attorneys for Petitioners
**ELIAS SHIBER and CANA INC.**
6

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                       **COUNTY OF LOS ANGELES**

9

10  ELIAS SHIBER, an individual; CANA INC.,          **CASE NO.  20STCP01632**
    A California Corporation
11                                                   *Unlimited Jurisdiction*
                                                     *Assigned for all Purposes to The Honorable*
12                    Petitioners,                   *Stuart M. Rice, Judge Presiding, Department 49*

13        v.                                         **NOTICE OF MOTION AND MOTION TO**
                                                     **VACATE ARBITRAITON AWARD IN**
14                                                   **CONJUNCTION WITH PETITOIN TO**
    HAVE A HEART COMPASSION CARE,                    **VACATE ARBITRATION AWARD;**
15  INC., a Washington corporation; RYAN             **DECLATRATIONS OF ELIAS SHIBER,**
    KUNKEL, an individual,                           **FARYAN ANDREW AFIFI, ESQ., AND**
16                                                   **MEMORANDUM OF POINTS AND**
                                                     **AUTHORITIES IN SUPPORT THEREOF.**
17
                    Respondents
18
                                                     **Date:  TBD**
19                                                   **Time: TBD**
                                                     **Dept.: 49**
20  _____

21              TO ALL PARTIES, AND THEIR ATTORNEYS OF RECORD HEREIN:

22

23        PLEASE TAKE NOTICE THAT  on _____ at _____ or as soon

24  thereafter as the matter may be heard by the above entitled court, Department 49, located at

25  111 N. Hill Street, Los Angeles, CA 90012, Petitioners, SHIBER and CANA, INC., will

26  move the court for an order vacating the arbitration award rendered in the arbitration

27

28  between Petitioners and Respondents.  This motion shall be based on the Petition to Vacate

                                        1
                ────────────────────────────────────────────────

1  Arbitration Award filed by Petitioner, this notice, the attached declarations of Elias Shiber

2  and Faryan Andrew Afifi, and exhibits thereto, the memorandum of points and authorities

3  and the entire record on file in this case, together with any documentary or oral evidence or

4  argument presented at the hearing.

5

6

7  Dated:        May 15, 2020                    AFIFI LAW GROUP

8

9                                              *Faryan Andrew Afifi*

10                                By:_____

11                                         FARYAN ANDREW AFIFI Attorneys for
                                           Petitioners, SHIBER and CANA INC.,

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.    INTRODUCTION

Once an arbitrator renders a legal and valid award (which is contested as to CANA Inc.), then there are only limited grounds for vacating such awards. Those grounds are only the ones enumerated in California Code of Civil Procedure §1286.2(a).  In fact, a line of court of appeal decisions held that the fact that an error of law appears on the face of the award is also grounds for vacating an award.  *See Blue Cross of California v. Jones* (1993), 19 Cal. App. 4th 220, 23 Cal. Rptr. 2d 359 which vacated an award where the arbitrator was considered to have re-written the parties' agreement.  However the California Supreme Court spoke on this issue in two seminal cases, first finding:

> "Those decisions permitting review of an award where an error of law appears on the face of the award causing substantial injustice have perpetuated a point of view that is inconsistent with the modern view of private arbitration and are therefore disapproved."

*Moncharsh v. Heily & Blase,* (1992) 3 Cal. 4th 1, 28, 832 P.2d 899, 916, 10 Cal. Rptr. 2d 183, 200,

Two years later, the Supreme Court held

> "Arbitrators enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of arbitration, so long as the remedy may be rationally derived from the contract and the breach." *Advanced Micro Devices, Inc. v. Intel Corp.,* (1994) 9 Cal. 4th 362, 383, 885 P.2d 994, 1007, 36 Cal. Rptr. 2d 581, 594.

3

Petitioner, is well aware of the status of the law on arbitration awards.  Recognizing this, Petitioner files the present petition and motion because the arbitrator's conduct from the opening statement in a 5 day arbitration through each day demonstrated a weighted bias and non-neutrality which was only too easily observed in the transcript of the arbitration and the final award.  In addition, she exceeded the limited authority provided her by virtue of the parties' agreement to arbitrate and order rescission in limited circumstances.

The relevant facts are simple and straightforward.  CANA, Inc., Shiber's corporation had obtained 4 licenses in City of Maywood right when Recreational Legalization occurred in January 1, 2018.  The licenses issued in December 2017 for a dispensary, cultivation, distribution and manufacturing.  The City of Maywood only issued two licenses for dispensaries in 2018.  Shiber was the sole shareholder of CANA Inc.  He also personally owned the property where a Conditional Use Permit was granted at 4027 E. 52nd Street, Maywood, CA 90270 (the "Property").  His long-time attorney of 10 years, David Welch, knew he wanted to sell his license.  In fact, Shiber had several suitors who were offering approximately $4-$5 Million for 4 licenses and a location.  One agent for buyers testified at arbitration, and another consultant testified as to the values in January 2018, both verifying these values.  None of this testimony was controverted with any testimony as to the value of these licenses by Have a Heart or Kunkel.  However, the attorney, David Welch, introduced another of his clients, Have a Heart and Ryan Kunkel who he knew were interested in acquiring licenses in California.  Welch's firm prepared the agreements.  The agreements were only between Shiber and Have  a Heart.  Kunkel was a guarantor, and CANA Inc., was not a party.  Welch had Have a Heart execute a

conflict of interest waiver, and had CANA execute one, but never asked Shiber to do so and never notified him that in the event of a conflict, Welch was to be Have a Heart's counsel, not Shiber's.  This was a significant fact for Shiber, who was dyslexic, and heavily relied on Welch to guide him as to matters and documents.

Regardless, HAH and Shiber reached an agreement through HAH's President, Ryan Kunkel.  The agreements were both with Shiber individually, because, one was a lease agreement where Shiber owned the property, and the other was a license agreement which had two aspects, both of which Shiber controlled.  First, since CANA was a non-profit still as required by law for medical marijuana, it acted through its President Shiber.  Secondly, if the time came for HAH to want to acquire all the license rights, and the parties could reach an agreement on price, then Shiber would transfer his shares in CANA to HAH.

So, the agreements were signed on February 1, 2018.  However, HAH obtained a 3 month delay on payment of the license fee only.  Yet, HAH was indisputably in default for paying only $300,000 as security deposit which was required to be $306,000, and in failing to pay rent for February, March and April, 2018, which per the agreement Shiber could take out of the security deposit.  Yet, HAH took control of the location, of the licenses for its use (not ownership yet), and began construction of its facility at the Property without permits.  It built extensively, and by late summer, a neighbor witnessing extensive work, complained to the City.  David Mango, the City Director of Building and Safety, came and saw the work, was familiar with the Property, and issued a stop notice because of illegal construction.

By November, 2018, the City shut down all construction activity at the Property, declared that the CUP conditions had been violated for unpermitted work, and the licenses

5

which could only exist with a valid CUP, became null and void with the CUP as a result of the construction.

HAH, then realizing it could not operate at the Property, sent a demand to rescind the agreements based on a clause in the agreements.  This matter was arbitrated, and the arbitrator rendered her award, ordering rescission, and return to HAH of al monies it paid, yet, neither the licenses, nor the unpaid rent for the Property were returned to Shiber.

This result, an egregious divergence from the contracts' limited rescission provision and from any aspect of the law on rescission, was sadly no surprise.  The fact is, the conduct of the arbitrator from the opening statement, on day one, and then each day of a five day arbitration foreshadowed a biased, one sided, and utterly non-neutral proceeding, headed by an arbitrator which was clearly enamored with HAH, Kunkel, and had an agenda of ingratiating herself to HAH, rather than serving as a neutral to decide a contested matter.

2.     **CANA INC., WAS NEVER A SIGNATORY TO THE ARBITRATION AGREEMENTS AND THE ARBITRATOR HAD NO JURISDICTION OVER IT**

"There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate and which no statute has made arbitrable"]; *Goldman v. SunBridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1169 [164 Cal. Rptr. 3d 11]

6

NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

A party cannot be deemed to implicitly consent either.

 "consent to arbitration (or to the arbitrator's power to decide arbitrability) will not be inferred solely from a party's conduct of appearing in the arbitral forum to object to the arbitrator's exercise of jurisdiction, at least if the party makes that objection 'prior to participat[ing]' in the arbitration." *Benaroya v. ,Willis*  (2018)23 Cal. App. 5th 462, 474, 232 Cal. Rptr. 3d 808, 817-818.

Here, the agreements which have arbitration clauses, do not have CANA as a party or as a signatory.  CANA objected in its answer to jurisdiction.  As such, it cannot be and is not bound as a party to this agreement, and the arbitrator was without jurisdiction to decide any matter involving CANA.  Since the decision inexorably included CANA, the entire award must be vacated.

3.      **THE AWARD SHOULD BE VACATED BECAUSE THE ARBITRATOR'S DEMONSTRATED NON-NEUTRALITY WAS MISCONDUCT WHICH SUBSTANTIALLY PREJUDICED PETITIONER'S RIGHTS**

The question is not whether any of these people might actually be biased; the question is whether 'a person aware of the facts might reasonably entertain a doubt that the [arbitrator] would be able to be impartial' given the particular circumstances of the case. *Betz v. Pankow*, (1995), 31 Cal. App. 4th 1503, 1508, 38 Cal. Rptr. 2d 107, 110, The test is an objective one--whether the facts might create an impression of possible bias in the eyes of the hypothetical reasonable person. ( *Id*)

Courts finding the impression of bias have explained that

7

"Our decision is not a reflection on the integrity of the arbitrators involved here. We assume they maintain the highest ethical standards. Nonetheless, we must reverse the judgment because a reasonable person might have an impression of possible bias under the instant facts."        *Ceriale v. Amco Ins. Co.*, (1996)48 Cal. App. 4th 500, 506-507, 55 Cal. Rptr. 2d 685, 689, 1996

> "Plaintiffs' uncontradicted evidence on this point is more than ample to satisfy the "impression of possible bias" test.

Further,  "current or prospective financial dealings with a party are well recognized as grounds for an arbitrator's disqualification." *Gebers v. State Farm General Ins. Co.* (1995), 38 Cal. App. 4th 1648, 1652, 45 Cal. Rptr. 2d 725, 728,

Here, as the record attached hereto, and the declarations of Shiber and Afifi demonstrate, the numerous and egregious examples of favoritism, bias, vastly different treatment of one party as compared to the other, the belittling of Shiber's attorney, the feeding of testimony to help HAH and Kunkel, and their witnesses, and countless other examples do not only demonstrate a doubt that the arbitrator was biased, but conclusively show she was.  Her award, simply ratifies any belief in such bias, and the substantial prejudice to Petitioners is without doubt.

**4.     THE AWARD SHOULD BE VACATE BECAUSE THE ARBITRATOR'S RESCISION EXCEEDED THE AUTHORITY GRANTED THE ARBITRATOR BY THE PARTIES AGREEMENT AND THE AWARD CANNOT BE FAIRLY CORRECTED.**

Rescission Under California Law is not Available to HAH and could not be awarded based on the undisputed evidence in this case.

Under California law, a party seeking to rescind must (1) provide proper notice of rescission, (2) promptly upon discovering facts entitling him to rescind, and (3) restore to the other party everything of value which he has received.  Cal Civ Code § 1691. The rescinding party must meet all three of the above conditions, but the evidence shows HAH has not met any one of them, much less all three.

<div align="center">(1)   <strong>No Proper Notice Was Given.</strong></div>

A declaration of rescission must be accompanied by an offer of restoration to status quo of parties. *Macondray & Co. v. W. R. Grace & Co.* (9th Cir. 1929), 30 F.2d 647, 1929 U.S. App. LEXIS 2483, cert. denied.    A notice of rescission alone does not annul a conveyance; the party who deems himself aggrieved must accompany his prompt demand with an offer to restore whatever of value he has received from his adversary. Kier Corp. v. Treasure Oil Co. (1943), 57 Cal. App. 2d 829, 136 P.2d 59.    Also, a person who seeks to rescind an agreement under which he took possession of realty must restore or offer to restore value of use of property during possession.  *Bush v. Vernon* (1955), 135 Cal. App. 2d 33, 286 P.2d 903.

The only notice of rescission that HAH relies upon is the letter of January 15, 2019 (Exhibit 40).  This letter was not even sent until after Shiber gave HAH and Kunkel a three day notice and advised him in email on January 10, 2019 (Exhibit 208).  Regardless, Mr. Murphy's letter simply offered to give back possession of the property, and nothing more. It did not (and could not) restore the CUP and licenses which HAH obtained, back to Shiber, because they were void by then, due to HAH.  It did not offer to restore the value of the use of the Property (namely the reasonable rental value) for the duration used.  Regardless, the notice did not even suggest an effort to return that item of personal property, namely the licenses.  The notice also failed to either offer to, or actually pay for

<div align="center">9</div>

the construction costs necessary to restore the property back to its prior condition, which as HAH knew by then, was a requirement of the City of Maywood. The notice did not offer to restore everything of value received from Shiber, which would at a minimum have to include the value of the use of the (1) real property and (2) the licenses.

(2)     **HAH never Acted Promptly to be Eligible to Rescind**

Where the right asserted in action for cancellation of contract depends upon right to rescind, plaintiff must act promptly or he is barred. Leeper v. Beltrami (1959), 53 Cal. 2d 195, 1 Cal. Rptr. 12, 347 P.2d 12.  Promptness is a condition of rescinding a stock sales agreement, and failure to take action constitutes waiver of right to rescind. Cutter Laboratories, Inc. v. Twining (1963), 221 Cal. App. 2d 302, 34 Cal. Rptr. 317.  More to the point, the duty to act promptly is paramount, and a delay of more than one month in serving notice of rescission requires explanation. Gedstad v. Ellichman ( 1954), 124 Cal. App. 2d 831, 269 P.2d 661.  Further, a lessee is required promptly to give notice or bring an action for rescission; otherwise the lessor is entitled to retain rent received under the lease. Freligh v. McGrew (1928), 95 Cal. App. 251, 272.  Courts have stated that delays of four months or ten months after notice of facts, preclude entitlement to rescission.  See  Sanders v. Magill (1937), 9 Cal. 2d 145, 70 P.2d 159 (four months); and  Bryan v. Baymiller (1928), 95 Cal. App. 481, 272 P. 1106 (ten months).

Rescission of contract is not allowable where party demanding it cannot or does not restore other party to condition he would have been in but for contract. *Joshua Tree Townsite Co. v. Joshua Tree Land Co.* (1950), 100 Cal. App. 2d 590, 224 P.2d 85. Specifically, where rescission of sales contract relating to tract of land would also require rescission of other agreements between parties relating to options and sales of real estate lots in subdivisions, bulk of those properties **having been conveyed to third parties**

10

**beyond recall**, and it was impossible to return parties to anything approximating status quo, *no rescission could be granted*.

A party affirmatively seeking restitution, is under the correlative obligation to restore benefits received in order that the status quo ante, so far as is practicable, may be established. *Kesterson Lumber Corp. v. Friesleben Estate Co.* ( 1953), 40 Cal. 2d 170, 251 P.2d 945.  For judgment of rescission, restitution of benefits by plaintiff is essential. *Karp v. Jacobs* (1955), 135 Cal. App. 2d 388, 287 P.2d 400.  In equitable adjustment of rights of parties following rescission of contract for purchase of land, where vendor is forced to restore entire consideration received, vendee must account for **value of use of property during entire period of his possession**.  *Heintzsch v. La France* (1935), 3 Cal. 2d 180, 44 P.2d 358.  (Emphasis Added).

One cannot retain portions of contract which he deems desirable and repudiate remainder. *Farina v. Bevilacqua* ( 1961), 192 Cal. App. 2d 681, 13 Cal. Rptr. 791.  In fact, the Supreme Court ruled denying rescission where the use of a valuable fruit orchard by a vendee of the land made it impossible to restore the vendor and required a denial of rescission sought by the vendee. *Wilson v. Beazley* (1921), 186 Cal. 437, 199 P. 772.

Courts explain that the statute essentially "restates the equity jurisprudence applicable in the rescission context." *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1422. The fundamental principle underlying that jurisprudence "is that 'in such actions the court should do complete equity between the parties' and to that end 'may grant any monetary relief necessary' to do so." *Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 316 [85 Cal. Rptr. 138, 466 P.2d 682] (*Runyan*).  Courts explain that the *Runyan* decision therefore indicates that the damages

11

available to parties in cases in which rescission is based upon mistake are more limited than those available in cases in which rescission is based upon fault." *Sharabianlou v. Karp*, (2010) 181 Cal. App. 4th 1133, 1145, 105 Cal. Rptr. 3d 300, 310.

Here, the contract's rescission clause is narrow, as is California law, and none of the requisite elements in this case exist based on the undisputed evidence. By contrast, the evidence showed that HAH caused the catastrophe by conducting unpermitted work, was in breach of the agreement from inception, which was never cured, and as a result, could not and did not return everything of value to Shiber. More importantly, the only fact entitling it to rescission by contract, was that the licenses could not be transferred, but the undisputed evidence showed they absolutely could be, and partially had been.

**5.     CONCLUSION**

This arbitration being a model for the miscarriage of justice, misconduct by an arbitrator and exceeding powers of an arbitrator, should result in vacating the award, with prevailing party costs and fees to Petitioners.

Dated:          May 15, 2020                          AFIFI LAW GROUP

*Faryan Andrew Afifi*

By:_____
                    FARYAN ANDREW AFIFI Attorneys for
                    Petitioners, SHIBER and CANA INC.,

12

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

## DECLARATION OF FARYAN ANDREW AFIFI

I, FARYAN ANDREW AFIFI, declare as follows:

1.      I am an attorney at law, duly licensed and practicing under the laws of the State of California, and the attorney for Petitioners ELIAS SHIBER and CANA INC., in this action.  Each of the matters stated herein is known to me of my own personal knowledge except those stated on information and belief which I believe to be true

2.      In this action, CANA, Inc, was not a signatory to any of the agreements which had arbitration clauses in them, and accordingly had never agreed to waive its right to a jury trial as the parties to the agreements had  done, in favor of arbitration.  Attached hereto a and labeled Exhibit "4" is a true and correct copy of the Statement of Claim and Answer filed by CANA Inc., on April 5, 2019 with JAMS as Respondent.  In the Twenty-First Affirmative defense, CANA Inc., has asserted and never waived the lack of jurisdiction as an affirmative defense.  This Answer was only filed with JAMS in response to the Statement of Claim, and hence the lack of jurisdiction refers only to the arbitration proceeding.  Only ELIAS SHIBER individually filed a Statement of Cross-Claim, not CANA Inc.,

3.      Attached hereto and labeled Exhibit "5" are true and correct excerpts from the transcript of the arbitration proceeding in the above-captioned arbitration on November 18, 2019, which was Day 1 of the arbitration.

4.      Attached hereto and labeled Exhibit "6" are true and correct relevant excerpts from the transcript of the arbitration proceeding in the above-captioned arbitration on November 19, 2019, which was Day 2 of the arbitration.

5.      Attached hereto and labeled Exhibit "7" are true and correct relevant excerpts from the transcript of the arbitration proceeding in the above-captioned arbitration on November 20, 2019, which was Day 3 of the arbitration.

13

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

6.      Attached hereto and labeled <u>Exhibit</u> "8" are true and correct are relevant excerpts from the transcript of the arbitration proceeding in the above-captioned arbitration on November 21, 2019, which was Day 4 of the arbitration.

7.      Attached hereto and labeled <u>Exhibit</u> "9" are true and correct relevant excerpts from the transcript of the arbitration proceeding in the above-captioned arbitration on November 22, 2019, which was Day 5 of the arbitration.

8.      Attached hereto and labeled <u>Exhibit</u> "10" is a true and correct copy of the David Welch Conflicts of Interest Waiver document, which was Arbitration Exhibit 8, and never signed by Elias Shiber.

9.      Attached hereto and labeled <u>Exhibit</u> "11" is a true and correct copy of the only amendment to the original agreements which was in evidence at arbitration, namely to the License agreement, which was Arbitration Exhibit 5.

10.      Attached hereto and labeled <u>Exhibit</u> "12" are true and correct copies of all checks HAH claimed to have paid to Shiber for licensing and the lease, which was Arbitration Exhibit 10, and which are checks dated from April, 2018 through November 2018 only.

11.      There were a number of occasions, which began on the first day of arbitration after HAH's opening statement, when I was to start my opening statement, the arbitrator was either texting or emailing something unrelated to the testimony or questioning proceeding before her. I initially, and politely would ask her if she was ready or words to that effect. This occurred on numerous occasions, and eventually the record bears that out. The portions of the transcript that identify times the arbitrator was text/emailing while I was questioning witnesses are:

Day 1- 18-19- (Exhibit 5)      Page 22:3-6  At the start of my opening statement

Day 2 – 11-19-19 (Exhibit 6) 157:9-13

Day 5 11-22-19 (Exhibit 9)    206:1-5

14

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

12.     The portions of the transcript that reflect the difference in the arbitrator's treatment of myself and my clients, Elias Shiber with that of her treatment of Have a Heart principals and employees, as well as their counsel, including accepting statements by the other side as facts before they are proven, the arbitrator being impressed by and expressing her approval of HAH witnesses, or making a connection with HAH witnesses as opposed to her treatment of Shiber during his testimony and background are:

**Day 1 (Exhibit 5) 11-18-19**

32:13-33:11    51:11-15

51:11-15        52:15-21        54:20-12        62:14-64:19   68:6-69:3        76:2-19

81:12-82:1979:1-23   86:9-16 87:2-6        125:19-126:15

**Day 2- (Exhibit 6) 11-19-19**

18:4-16        28:3-14        43:8-16        48:1-23        95:1-24

109:14-110:13        110:14-11:18        220:16-2211   256:3-257:18

272:7-22        277:13-16

**Day  3 (Exhibit 7) 11-20-19**

14:6-13        15:13-14        43:3-44:20        75:2-76:5        78:5-80:3        120:1-20

120:22-121:17        136:21-25        142:5-14        150:14-15        151:14-25

162:20-24        163:22-164:8        187:3-5        211:22-212:16

237:1-20        244:2-24        274:2-11        278:6-23        284:14-21

**Day 4 (Exhibit 8) 11-21-19**

23:11-24:20        35:18-36:16        60:9-11        82:4-10        105:10-16

123:13-127:10        154:4-13        155:14-156:7  157:17-22        168:12-169:11

184:25-185:5  185:20-186:11 205:19-25        217:18-218:23   246:13-22

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

**Day 5 (Exhibit 9) 11-22-19**

90:16-17        95:8-19        100:19-101:5        130:9-131:3    134:22-135:5

250:19-251:11

13.    The portions of the transcript that reflect the arbitrator feeding testimony or

suggesting testimony to help HAH witnesses are:

**Day 1 (Exhibit 5) 11-18-19**

**Day 2- (Exhibit 6) 11-19-19**

54:6-9        92:1-20        95:1-24        107:23-108:10        136:18-21

149:10-153:13        171:5-17

**Day  3 (Exhibit 7) 11-20-19**

42:9-25        47:7-20

**Day 4 (Exhibit 8) 11-21-19**

101:5-13        104:1-4        132:7-133:17  161:7-19        164:13-17

178:23-179:14        180:4-9        189:1-16        198:5-8        201:5-202:7


**Day 5 (Exhibit 9) 11-22-19**

86:1-8        179:20-182:14        198:10-200:12


14.    The portions of the transcript that reflect undisputed testimony re rescission not

being appropriate or timely, HAH performing work without permits, the stop work order by the

City of Maywood and undisputed expert testimony that the use and assignment of the licenses

under the agreements was valid and could be effectuated but for the illegal construction by HAH

and that the fact that the license and CUP are now void are:

16

**Day 1 (Exhibit 5) 11-18-19**

159:5-19        16:10-12        176:12-21

**Day 2- (Exhibit 6) 11-19-19**

36:16-37:5      166:2-8        167:15-25

**Day  3 (Exhibit 7) 11-20-19**

47:3-44:20      164:8   187:3-5        211:22-212:16

**Day 4 (Exhibit 8) 11-21-19**

**Day 5 (Exhibit 9) 11-22-19**

158:6-24        160:5-161:15  162:21-163:14        164:7-22        165:4-13

165:20-166:21        169:21-170:22        172:10-173:2        173:9-24

177:7-15        178:11-179:5  179:6-17        179:20-182:14        184:3-11

188:19-189:3        192:3-19        194:9-195:19        198:10-200:12

207:4-208:11  209:2  210:25        212:24-213:5        214:7-216:14

221:3-223:8  225:5-13        226:6-18        227:19-23        228:14-231:7

235:17-237:18  238:13-15


I declare under the penalty of perjury, under the laws of the State of California that the foregoing is true and correct.  Executed on May 15, 2020 at Los Angeles, California.

*Faryan Andrew Afifi*

_____

FARYAN ANDREW AFIFI

17

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

## DECLARATION OF ELIAS SHIBER

I, ELIAS SHIBER, declare as follows:

1.     I am an individual, over the age of eighteen, and the Petitioner in this Action  Each of the matters stated herein is known to me of my own personal knowledge except those stated on information and belief which I believe to be true.

2.     I am the sole shareholder and President of petitioner, CANA, Inc.,

3.     I participated and attended the arbitration hearing in this case which took place over five days, November 18-22, 2019 at the JAMS Century City Offices.  I had never before met, spoken with or had any dealings with the arbitrator, Zela Claiborne.

4.     On the first day of the arbitration, as the other party began their opening statement, I noticed a certain connection between the arbitrator in her demeanor and comments to counsel for Have a Heart, and Ryan Kunkel.  Then when the first witness was called, who was Ryan Kunkel, I noticed an even greater friendliness toward him, informal comments exchanged by both he and the arbitrator during his testimony, and I was particularly concerned at the high degree of interest the arbitrator showed in Mr. Kunkel's history, and current expanse of his cannabis operations from Washington State, to Northern California, where the arbitrator stated she was from, and other states as well.

5.     What particularly concerned me was that when my attorney began to question Mr .Kunkel for the first time, the arbitrator seemed to lose interest and was engaging in test messaging on her telephone or IPOD device, seemingly disinterested in what my attorney wanted to cover with the first witness in the case.

6.     The arbitrator's different treatment of our side, as opposed to her treatment of the other side by her comments, demeanor and indeed, attention was so obvious and alarming to me by the second day, that I brought that issue up to my attorney.

1

7.    More importantly, the arbitrator's regular engaging in text messages or emails on her PDA devices continued, again, during my attorney's questioning of witnesses, or presentation of our case.  This became so problematic that I began taking photographs of the arbitrator when she would engage in such text/email activity.  In fact, I recall, my attorney had to stop a few times and asked the arbitrator if she was ready for him to continue, and she even apologized.

8.    Attached hereto, and labeled <u>Exhibit</u> "1" are three photographs I took when I saw the arbitrator again texting during my attorney's questioning of a witness.  I was so frustrated by this that I took the photos to show my attorney.  The angle of the photos is taken so that I was not obvious in using my phone to take the photographs.  However, the IPOD looking device the arbitrator was using is visible with its red cover which I recall.  The reason I took these photographs was that I was observing the arbitrator to engage in texting or emailing again, and not paying attention to my attorney's examination.  I should clarify that when the arbitrator was paying attention, she was looking at the witnesses, the exhibits or taking notes using her pen and pad.  By contrast, when she was not paying attention, and texting or emailing, her activity was clearly different, as evidenced in these photographs.

9.    Attached hereto and labeled <u>Exhibit</u> "2" are three other photographs I took of the arbitrator on yet another occasion when I noticed she was texting during my attorney's examination.  In these photographs her using her IPOD device is clearly apparent.  By this time, my frustration was increasing and I tried to obtain, and did obtain, better photographs of her conduct.

10.    On yet another occasion, again during my attorney's questioning of a witness, the arbitrator again engaged in text messages and emails on her IPOD device with the red cover.  Attached hereto and labeled <u>Exhibit</u> "3" are four other photographs I took of this incident.

11.    The arbitrator's clear bias in my eyes did not end there, but continued in comments she made to my attorney, in her demeanor which was quite the opposite to the other's side's

2

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

witnesses and attorneys, to her attempts to connect with an ingratiate herself with the other side's principal, Mr. Kunkel, and his employees or contractors that testified.  By contrast, she was very harsh and short with our side.  It escalated to the point that I actually believed she was expressing a racist bias against me and my attorney, because I am from Jordan and my attorney was born in Iran, whereas Ms. Claiborne seemed to treat Mr. Kunkel as kin, they were both white and Americans, not foreign born nationals.  I am not stating this is the reason for her conduct, what I am saying is that this was the exact feeling I had as a result of her behavior after only two days of the arbitration.  All this included her comments about the case and evidence which showed she had already accepted or believed the Have a Heart and Kunkel version of events, before we had presented a single witness or presented our case.

I declare under the penalty of perjury, under the laws of the State of California that the foregoing is true and correct.  Executed on May 15, 2020at Los Angeles, California.

*Elias Shiber*

_____
ELIAS SHIBER

---

3

**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD**
*LASC Case No. 20STCP01632 Shiber v. Have A Heart Compassion Care and Ryan Kunkel*

**EXHIBIT "1"**







**EXHIBIT "2"**







**EXHIBIT "3"**









**EXHIBIT "4"**

FARYAN ANDREW AFIFI (SBN 167344)
FERENA NOVIN BUTLER (SBN 198618)
AFIFI LAW GROUP
1801 Century Park E, Suite 1100
Los Angeles, California 90067

Tel: (310) 407-3000
Fax: (310) 407-3004

Attorneys For Respondents and Cross-Claimant,
ELIAS SHIBER and CANA INC.,


## JAMS ADR SERVICES

## ARBITRATION

| | |
|---|---|
| HAVE A HEART COMPASSION CARE, INC.,  v. | CASE NO. 1210036053 |
| SHIBER et al. | |
| ELIAS SHIBER,        v. | **ANSWER AND GENERAL DENIAL** |
| HAVE A HEART COMPASSION CARE, INC., a Washington corporation; RYAN KUNKEL, an individual; and ROES 1-50, inclusive, | |

Respondents, ELIAS SHIBER, an individual (hereinafter "SHIBER") and CANA Inc, hereby generally deny the allegations by Claimant against them, and

1.      Further, this answering defendant alleges that the complaint is vague, ambiguous, compound, and unintelligible, and that this answering defendant is unable to anticipate every affirmative defense which would apply, and accordingly, reserves the right to assert additional affirmative defenses if the same become applicable.

-1-
ANSWER

## FIRST SEPARATE AFFIRMATIVE DEFENSE

2.      The Complaint and each purported cause of action contained therein fails to state facts sufficient to constitute a cause of action against this answering defendant.

## SECOND, SEPARATE AFFIRMATIVE DEFENSE

3.      Unclean hands: As a second affirmative defense to the Complaint on file herein, this answering defendant alleges that to the extent the Complaint seeks equitable relief, Plaintiffs' inequitable conduct constitutes unclean hands and therefore bars the granting of relief to Plaintiffs herein.

## THIRD, SEPARATE AFFIRMATIVE DEFENSE

4.      Offset: As a fourth affirmative defense to the Complaint on file herein, this answering defendant alleges that they have suffered damage by reason of Plaintiffs' conduct; that they have the right to an offset of any amount of money owed to or due Plaintiffs by way of damage.

## FOURTH, SEPARATE AFFIRMATIVE DEFENSE

5.      In Pari Delicto: As a fourth affirmative defense to the Complaint on file herein, this answering defendant alleges that Plaintiffs herein and each and every purported cause of action contained in the complaint is barred because Plaintiffs has engaged in acts and courses of conduct which rendered them in pari delicto.

## FIFTH, SEPARATE AFFIRMATIVE DEFENSE

6.      Equitable Estoppel: As a fifth affirmative defense to the Complaint on file herein, this answering defendant alleges that Plaintiffs herein and each and every cause of action contained therein is barred by reason of acts, omissions, representations and courses of conduct of Plaintiffs by which this answering defendant were led to rely to their detriment, thereby barring, under the

ANSWER

doctrine of equitable estoppel, any causes of action asserted by Plaintiffs.

## SIXTH, SEPARATE AFFIRMATIVE DEFENSE

7.      As a sixth affirmative defense to the Complaint on file herein, this answering defendant is informed and believes and. based upon such information and belief, alleges that the damages referred to in the Complaint by Plaintiffs were proximately caused by Plaintiffs, in that at all times relevant herein, Plaintiffs failed to exercise for their own protection the proper care and precautions which a prudent person under the same and similar circumstances would have exercised. If this answering defendant committed any wrongful acts at all (which supposition is made for the purpose of this defense without admitting such to be a fact), the aforesaid conduct of Plaintiffs, and or entities or persons associated in any way or manner with Plaintiffs, contributed to the happenings of Plaintiffs's alleged damages.

## SEVENTH, SEPARATE AFFIRMATIVE DEFENSE

8.      As a further affirmative defense, this answering defendant alleges that Plaintiffs incurred costs and extended benefits on their own volition, and without any order, acceptance or affirmance from defendants.

## EIGHTH, SEPARATE AFFIRMATIVE DEFENSE

9.      As a further affirmative defense, this answering defendant alleges that the appropriate time period in the statute of limitations has expired on the causes of action in the complaint prior to the filing of the complaint, and those causes of action are therefore time-barred.

## NINTH SEPARATE AFFIRMATIVE DEFENSE

10.      As a further affirmative defense, this answering defendant alleges that the Plaintiffs failed to mitigate their damages, and should be barred from recovering because of those acts and omissions.

ANSWER

## TENTH SEPARATE AFFIRMATIVE DEFENSE

11.     As a further affirmative defense, this answering defendant alleges that the damages Plaintiffs seeks to recover in this action have already been paid for and any further recovery would constitute a windfall to Plaintiffs.

## ELEVENTH SEPARATE AFFIRMATIVE DEFENSE

12.     As a further affirmative defense, this answering defendant alleges that the Plaintiffs failed to exhaust their administrative and procedural remedies necessary prior to invoking the present lawsuit.

## TWELFTH SEPARATE AFFIRMATIVE DEFENSE

13.     As a further affirmative defense, this answering defendant alleges that the alleged contract is barred by the statute of frauds, as provided in California Civil Code, §1624 (b).

## THIRTEENTH SEPARATE AFFIRMATIVE DEFENSE

14.     As a further affirmative defense, this answering defendant alleges that the Plaintiffs consented either expressly or impliedly to the acts, conduct or omissions of defendant, and any damages Plaintiffs may otherwise be entitled to should be reduced according to such consent.

## FOURTEENTH SEPARATE AFFIRMATIVE DEFENSE

15.     As a further affirmative defense, the alleged agreements lack consideration.

## FIFTEENTH SEPARATE AFFIRMATIVE DEFENSE

16.     As a further affirmative defense, this answering defendant alleges that the complaint is barred by the doctrine of laches.

## SIXTEENTH SEPARATE AFFIRMATIVE DEFENSE

17.     As a further affirmative defense, this answering defendant alleges that the Plaintiffs intentionally and purposefully made statements, and conducted themselves in ways to create the

ANSWER

complained of situations.

### SEVENTEENTH SEPARATE AFFIRMATIVE DEFENSE

18.     As a further affirmative defense, this answering defendant alleges that the Plaintiffs waived any right or claim which they assert in this lawsuit.

### EIGHTEENTH SEPARATE AFFIRMATIVE DEFENSE

19.     As a further affirmative defense, this answering defendant alleges that the Plaintiffs sustained no damage or harm as a result of any of the acts or statements complained of.

### NINETEENTH SEPARATE AFFIRMATIVE DEFENSE

20.     As a further affirmative defense, this answering defendant alleges that any claim of Plaintiffs should be discounted and set-off against any amounts owed by Plaintiffs to defendants.

### TWENTIETH SEPARATE AFFIRMATIVE DEFENSE

21.     As a further affirmative defense, this answering defendant alleges that Plaintiffs are barred from recovering all or some of their damages by virtue of the doctrine of avoidable consequences.

### TWENTY-FIRST SEPARATE AFFIRMATIVE DEFENSE

22.     As a further affirmative defense, this answering defendant alleges that this action is barred because the court has no jurisdiction over the complained of acts and alleged wrongdoings.

### TWENTY-SECOND SEPARATE AFFIRMATIVE DEFENSE

23.     As a further affirmative defense, this answering defendant alleges that Plaintiffs lacks standing to assert some or all of the claims herein.

### TWENTY-THIRD SEPARATE AFFIRMATIVE DEFENSE

24.     As a further affirmative defense, this answering defendant alleges that Plaintiffs has failed to perform the terms of the agreements or contracts that Plaintiffs seeks to enforce, none of

ANSWER

which have been excused or waived.

<div align="center">TWENTY-FOURTH SEPARATE AFFIRMATIVE DEFENSE</div>

25.     As a further affirmative defense, this answering defendant alleges that Plaintiffs' claims are barred by the doctrine of stare decisis and res judicata.

<div align="center">TWENTY-FIFTH SEPARATE AFFIRMATIVE DEFENSE</div>

26.     As a further affirmative defense, this answering defendant alleges that Plaintiffs' claims are barred by the doctrine of judicial estoppel.

WHEREFORE, this answering defendant solely on their own behalf, respectfully pray for the following relief:

1.     That the complaint be dismissed in its entirety with prejudice and that Plaintiffs recover nothing thereon;

2.     A judgment in favor of each defendant should be entered and Plaintiffs should recover no sum, award or any other benefit by means of this action

3.     An award and judgment should be rendered in favor of each defendant for costs of suit, including reasonable costs and attorneys' fees, expended in the course of defending the subject action; and

4.     For such other and further relief that this Court may deem just and proper.

DATED:     April 5, 2019          Respectfully Submitted,

                                  AFIFI LAW GROUP

                                  *Faryan Andrew Afifi*

                                  _____
                                  FARYAN ANDREW AFIFI, Attorney for
                                  Respondents, and Cross-Claimant

<div align="center">-6-</div>

<div align="center">ANSWER</div>

**EXHIBIT "5"**

```
 1                    MR. MURPHY:  Iowa.  Davenport, Iowa,

 2     right?

 3                    MR. KUNKEL:  Yes, Iowa.

 4                    ARBITRATOR:  I didn't even know you could

 5     do that in Iowa.  But I don't -- I have had cases

 6     involving cannabis retail space, of course here in

 7     California, as well as in Oregon and Washington but have

 8     not had anything to do with Iowa.

 9                    MR. KUNKEL:  You know, there's 23 states

10     that have legalized marijuana?

11                    ARBITRATOR:  That's --

12                    MR. KUNKEL:  It's more than one --

13                    ARBITRATOR:  It's all but the feds.

14                    MR. MURPHY:  Right, well --

15                    ARBITRATOR:  Okay, I didn't mean to --

16                    MR. MURPHY:  No, no --

17                    ARBITRATOR:  I'm just telling you.

18                    MR. MURPHY:  Well, I just -- I'm very

19     proud of him.

20                    ARBITRATOR:  Yes.

21                    MR. MURPHY:  And I'm very proud of what

22     he's accomplished in life, and so as we know, Prop 64

23     opened the floodgates in California and what it created

24     was a two-tiered system.  And a two-tiered system, we

25     call it horizontal alignment of how the licensing works
```

Page 5

1    and that you need to get a separate retail,

2    distribution, manufacture.  You need to set separate

3    licenses.  They have to be licensed at the local level

4    and the state level.  It's complicated.

5                 And in 2017, which was the interim period

6    between when Prop 64 was enacted and when it would go

7    into effect on January 1 in 2018, it was like a gold

8    rush in California.  It was a new gold rush, a green

9    rush.  And --

10                ARBITRATOR:  Yeah.  I've seen a little of

11   that.

12                MR. MURPHY:  And there was -- things were

13   in flux and it was unpredictable and the jurisdictions

14   were unpredictable and everyone had a different -- every

15   jurisdiction, local jurisdiction, had -- could make

16   their own rules and they just had to align with the

17   state rules.

18                And during that period, Have a Heart

19   Compassion Care -- which the entity itself owns one

20   store, the original in Washington State, the one that

21   opened in 2011 -- decided it wanted to open a store in

22   California and take advantage of this new opportunity in

23   California.

24                So that is the background of how Have a

25   Heart decided it wanted to be here.  Now, it didn't know

                                                    Page 6

1    where it wanted to be, it just knew -- they knew they

2    wanted to try California out and expand in California.

3    So as you -- Ms. Claiborne, as you said, you've read the

4    agreements.

5                You've read the briefs and the agreements

6    are really where this dispute begins.  And as you know,

7    we have really five documents, all integrated.  We have

8    one, the first, which is the license transfer agreement,

9    Exhibit 1, which is the agreement by which the authority

10   to use the licenses would be effectively and actually

11   transferred to Have a Heart Compassion Care so that it

12   could be the licensee, could be the -- have the power of

13   the licensee.

14               And then there was the lease agreement

15   which was integrated.  They incorporate each other by

16   reference, and that agreement which Mr. Shiber -- and by

17   the way, Mr. Shiber who's also here, is also -- has been

18   one of the original participants in the cannabis

19   industry.  He has a -- his own medical dispensary up in

20   the valley.  And Mr. Shiber, through an entity called

21   Kana, obtained those four licenses that are at issue in

22   the first agreement, Exhibit 1.

23               And we will show that alter ego -- that

24   Kana and Mr. Shiber, an alter ego.  Kana was really just

25   a holding place for those licenses.  So agreement one is

Veritext Legal Solutions
866 299-5127

```
 1    Let me begin with a couple of things.  First of all,

 2    until I heard opening statement, I couldn't tell you how

 3    happy I am that we don't have a jury trial.  We need an

 4    astute legal mind to understand this case, both sides.

 5                   So, and I want to echo what Mr. Murphy

 6    said (indiscernible) Your Honor before -- and I'm going

 7    to call you Your Honor.  I hope --

 8                   ARBITRATOR:  No, no.

 9                   MR. AFIFI:  (indiscernible).

10                   ARBITRATOR:  No.  No.

11                   MR. AFIFI:  But from our previous

12    dealings, I think we're both in very good hands in this

13    case because we need someone to get their hands around

14    this important issue, so grateful and first experience

15    with you, and I'm very happy to be here.

16                   Mr. Shiber, my esteemed friend now and my

17    client, who I initially met as an adversary while he was

18    represented on a matter by the esteemed Mr. David Welch.

19    That's how we first got to know each other.  But Mr.

20    Shiber is a -- is someone that kind of represents some

21    of the opportunities in this country that are offered.

22    He's an immigrant.  He's here from Jordan.  He has --

23    you saw the opening briefs.  He has dyslexia.  That's

24    not told to you for sympathy.  It is told to you because

25    it is an actually impactful fact on numerous events of
```

Page 22

```
1                    MR. AFIFI:  (indiscernible).

2                    ARBITRATOR:  Yes, you're getting there?

3                    MR. AFIFI:  I'm getting there

4       chronologically.

5                    ARBITRATOR:  Okay.

6                    MR. AFIFI:  Okay.

7                    ARBITRATOR:  All right, yeah.  So Mr.

8       Shiber wasn't completely in the dark at that point, when

9       the disclosure was made.  He understood that there was a

10      lawyer representing both sides?

11                   MR. AFIFI:  Absolutely not.

12                   ARBITRATOR:  Okay, now that's what I want

13      to hear.  Okay, go ahead.

14                   MR. AFIFI:  You know what, I was going to

15      get to it, but I'm going to get to it --

16                   ARBITRATOR:  No, you can go ahead and get

17      to it (indiscernible).  I just -- I'm listening.

18                   MR. AFIFI:  (indiscernible)

19      chronologically for you.

20                   ARBITRATOR:  That's fine.

21                   MR. AFIFI:  Okay, so the agreements --

22      and I'll stick to it.  I'm going to get to the conflict

23      in a second -- the agreements that are drafted are

24      drafted, and this is also unbeknownst to Mr. Shiber.

25      And (indiscernible) I'm going to be saying a few things.
```

Page 32

1   Some of them -- not the conflict waiver -- some of them

2   will have a signature on it and you'll be asking

3   yourself, I would expect, well how is it that Mr. Shiber

4   doesn't know this when he signed the document that says

5   something along these lines.  The answer's simple.

6            Mr. Shiber, because he has dyslexia,

7   doesn't read the documents, can't read lengthy

8   documents. He can read small portions and digest it

9   simply.  He was actually relying on Mr. Welch to tell

10  him what he needed to do and say, what he needed to

11  read, and what he didn't need to read.  Or if

12  (indiscernible), what it is for him to do what, when.

13  This is time and time again.  This has been his practice

14  for years and he's relying on Mr. Welch, who was not

15  just his lawyer over the years, but Mr. Shiber

16  considered him a friend, truly did.

17            Clearly, that's not in play anymore, but

18  the five and one contracts which (indiscernible) all of

19  a sudden have a lease agreement that has a five-year

20  term and then we have a licensing agreement.  It's

21  called a license -- a signed agreement.  What is really

22  is, is the use of the license agreement (indiscernible)

23  terms, and then has a provision where you could acquire

24  this license if you want and you can (indiscernible),

25  but that is a one-year term.

Veritext Legal Solutions
866 299-5127

```
 1    the evidence is going to show Mr. Shiber has -- there's

 2    no allegiance between him and Mr. Welch.  He's pursuing

 3    from a separate firm his claims for malpractice --

 4                   ARBITRATOR:  Right.

 5                   MR. AFIFI:  -- the lawyer.

 6                   ARBITRATOR:  I assumed so.

 7                   MR. AFIFI:  I understand from Mr. Murphy,

 8    they're doing the same thing, so as far as I understand,

 9    no one -- everyone has whatever rights they have against

10    Mr. Welch.  But we're certainly not arguing, although

11    the Claimant may -- Mr. Murphy just said they're not --

12    that Mr. Welch has muddied the water and now we don't

13    know who's right or wrong.  I don't think that's the

14    case.

15                   ARBITRATOR:  I'm not even saying that.

16    I'm not trying to suggest anything like that.  I'm just

17    saying from me, from my point of view as a third party

18    neutral, you know, I'm thinking I have to separate where

19    he did, what Welch did, from what the parties did in

20    some instances, and maybe I don't, really, but you can

21    make that clear to me.  I like to raise the issue.

22                   MR. AFIFI:  I think from our point of

23    view, Your Honor, and I won't speak for Mr. Murphy, but

24    I'd be surprised if he has a different point of view,

25    from our point of view if you conclude that Mr. Welch
```

Page 51

1    was acting on someone's behalf when an act occurred,

2    then that act is imputed to the party.

3                    ARBITRATOR:  To the party.  Yep.

4                    MR. AFIFI:  I think at the end of this,

5    we would be requesting, depending on what your decision

6    is, for you to identify whether or not there were acts

7    by Mr. Welch on behalf of Party A or Party B that you

8    are imputing Party A or Party B.

9                    ARBITRATOR:  Right, right.

10                   MR. AFIFI:  And so a request that we

11   could make -- Mr. Murphy's certainly welcome to speak

12   his mind on that, whenever he wants to --

13                   ARBITRATOR:  Right, and at the end of the

14   day, I may not see it that way.  I'm just raising this

15   issue.

16                   MR. MURPHY:  It's an added layer of

17   complexity, but -- and I don't mean to cut in --

18                   MR. AFIFI:  No, no.

19                   MR. MURPHY:  But I do agree with my able

20   opposing counsel that if an act was taken on behalf of

21   our client as -- Ms. Claiborne, as you see it, or on

22   behalf of Kana or Mr. Shiber, that that should be

23   imputed to that person.  And I -- hopefully identified

24   in the decision.

25                   ARBITRATOR:  Yeah.

                                                    Page 52

```
 1   ever sign this agreement if he knew that it's a five and
 2   one or even a five and five.  He thought at a minimum,
 3   it's 99 years, but regardless, the documents are what
 4   they are.  But at a minimum, he would've never -- this
 5   is the nonsense (indiscernible) he had no idea about.
 6   He was convinced to sign an addendum giving Have a Heart
 7   three months on paper, three months, of free rent and
 8   three months of free licensing, total of six months'
 9   effective value on an agreement that is a one-year --
10   according to them is one year and should've never been
11   more than one year.  In no world would Mr. Shiber or
12   anyone, for that matter, have agreed to that.  Why?  He
13   always, even when the agreement and the addendums were
14   signed -- addenda were signed, he believed this was a
15   long-term deal.  He would've never entered into it if it
16   weren't.  So when I tell you the mess started when the
17   contracts were negotiated to Have a Heart's benefit,
18   this is supported by multiple evidence afterwards.
19              I want to just comment on a few things
20   that I heard in Mr. Murphy's opening that I think
21   (indiscernible).  On this issue of moratoriums, the City
22   of Maywood after giving -- issuing these -- and the
23   licenses to us, to Shiber and Kana, after giving those
24   to them, the moratoriums affected new licenses.  The
25   moratoriums affected transfers on licenses.  We never
```

Page 54

```
1    are -- we have 18 retail licenses throughout the country

2    and I think we're just under 400 employees right now.

3                    ARBITRATOR:  Wow.

4                    THE WITNESS:  We just did a big hiring

5    spree in Oakland last weekend.

6                    ARBITRATOR:  Eighteen licenses.

7                    THE WITNESS:  Yeah.

8                    MR. MURPHY:  So, Your Honor --

9                    ARBITRATOR:  Yes.

10                   MR. AFIFI:  So he asked a question, he

11   answered it.

12                   ARBITRATOR:  I did.

13                   MR. AFIFI:  I'm not going to object to

14   the question, but that gets to an issue because if I

15   were to object to that question, the objection would be

16   it lacks foundation because we're not -- I know, you

17   don't know, we're not talking about Have a Heart

18   Compassion Care anymore, the way you just heard that

19   testimony.

20                   ARBITRATOR:  We're talking about the

21   business that started in Washington.

22                   MR. MURPHY:  Sure.

23                   ARBITRATOR:  That's what we're talking

24   about.

25                   MR. AFIFI:  That's (indiscernible).  I'm
```

Page 62

```
 1    my saying, you didn't ask the question, I understand,

 2    but the arbitrator did.

 3                  ARBITRATOR:  I did.  Because I like

 4    knowing the background of these things.  But you're

 5    correct, we're talking about, you know, Have a Heart in

 6    Washington.

 7                  MR. AFIFI:  That's --

 8                  ARBITRATOR:  It's not an issue here.

 9    It's just background.  But you can handle any issue that

10    you're concerned about on cross.

11                  MR. AFIFI:  Will do.

12                  ARBITRATOR:  And we're going to go, by

13    the way, until -- I think we just go until noon and then

14    take a break because we've got a deadline here.

15    Sometimes, I would have lunch a little bit later, but we

16    don't want to do that.

17                  MR. AFIFI:  Agreed.

18                  ARBITRATOR:  Okay, good.  Eighteen

19    licenses.  I wrote it down.  Okay.

20    BY MR. MURPHY:

21        Q    Now, when you talk about 18 licenses, are

22    those all licenses -- when you say "we" what are you

23    referring to?

24        A    Stores that I'm involved in.

25        Q    Okay.  So Have a Heart Compassion Care, the
```

Page 63

```
 1    Claimant in this action, other than this Maywood issue,

 2    how many stores has it ever owned?

 3         A     One, in Seattle.

 4         Q     And that one in Seattle is the same store that

 5    opened in 2011?

 6         A     Correct.

 7         Q     So in the beginning, how many investors did

 8    you have?

 9         A     None.

10         Q     It was just you?

11         A     Just me.

12         Q     How many shareholders of Have a Heart

13    Compassion Care, the Claimant in this action, how many

14    shareholders are there as of today?

15         A     Just myself and then my wife, through spousal

16    rights.

17              ARBITRATOR:  Through what?

18              THE WITNESS:  My wife through spousal

19    rights.

20              ARBITRATOR:  Yes.

21              THE WITNESS:  So...

22    BY MR. MURPHY:

23         Q     And what is your position with Have a Heart?

24         A     I'm the CEO.

25         Q     And have you always been the CEO?
```

Page 64

```
1    today.
2                    ARBITRATOR:  You have an ownership stake
3    in 15?
4                    THE WITNESS:  Yeah, operating stores, so
5    we have a total of 18 licenses right now, but those are
6    not all open.  Fifteen of them are.
7    BY MR. MURPHY:
8         Q    And you said 16, what was that additional?
9         A    That would've been Maywood.
10                   ARBITRATOR:  That would be the what?
11                   THE WITNESS:  This -- the new location.
12                   ARBITRATOR:  Okay.  You're going to have
13   to speak up because --
14                   THE WITNESS:  I'm trying.  I'm sorry.
15                   ARBITRATOR:  Yeah, and you really do want
16   me to hear you.
17                   THE WITNESS:  Okay.
18   BY MR. MURPHY:
19        Q    So of those 15 -- of those 16 stores in which
20   you have some ownership stake, all of them except for
21   Maywood are open.  That's your testimony?
22        A    Yes.
23        Q    Of the stores that you have -- of this 28 to
24   30 stores, what are the stores in California that are
25   currently open?
```

Page 68

1          A      Are you asking me the locations?

2          Q      Yes.

3          A      Santa Cruz, San Francisco, Oakland, Coalinga,

4    and then San Bernardino and Blythe.

5          Q      And these stores are branded as Have a Heart

6    but not owned by Have a Heart Compassion Care?

7          A      Yes, although Santa Cruz is under a different

8    name.

9          Q      And who are the corporate entities that own

10   these other stores?

11         A      It's different in every jurisdiction.

12         Q      And the basis for your decision as to the

13   corporate structure, what are some of the factors that

14   are taken into consideration as to the corporate

15   structure?

16         A      Some states have different caps on how many

17   stores you can own and some have residency requirements,

18   so you can't own everything that I'm, you know, involved

19   in.  Some are partnerships.  Some I don't own any of it;

20   it's just a management contract where I offer a service.

21   So it just varies state to state, city to city.  The

22   industry is very messy right now.

23         Q      Which was the first of these California stores

24   to open?

25         A      The one in Fresno County, Coalinga.  Little

Page 69

```
 1    sale of it.  So it's tricky.
 2                    ARBITRATOR:    Are they pretty actively
 3    monitoring all this, too?
 4                    THE WITNESS:    Some states more so than
 5    others, but the -- I'd say the federal government as a
 6    whole, no.   It's more a case by case, if the state has
 7    an issue with an operation, they would reach out to the
 8    feds for assistance.
 9                    ARBITRATOR:    Thank you.
10    BY MR. MURPHY:
11           Q      Who is the CEO of Interurban?
12           A      I am.
13           Q      And when was this company founded?
14           A      I want to say 2016, if my memory serves right.
15           Q      And at its founding, do you know how many
16    shareholders there were?
17           A      Right under 10.   I took a bunch of my
18    different partners and long-term employees from Have a
19    Heart.   I brought them into that and gave them equity in
20    that.  So I'd say, I think it was about 10.
21           Q      And does it have a board?
22           A      Today it does, yes.
23           Q      And is there one person who owns a majority,
24    more than 51 percent, of the shares?
25           A      No.
```

                                                    Page 76

1    for supervising and understand all of its finances?

2         A    I am.

3         Q    Who signs the checks of Interurban?

4         A    I do.

5         Q    Who is the signatory to the checks of

6    Interurban?

7         A    I am.

8         Q    Who ensures that all debts owed to Interurban

9    by those entities that it manages pays their bills?

10        A    Also me.

11        Q    Are you responsible for monitoring the monthly

12   satisfaction of debts owed by each of the entities that

13   Have A Heart or that Interurban manages?

14        A    Yes.

15        Q    Have you ever been the subject of newspaper

16   articles or press reports about the cannabis industry?

17        A    Yeah.  Yes.

18        Q    Could you estimate how many?

19        A    Quite a few.  More than 20.

20        Q    And could you identify some of the periodicals

21   that have reported on your activity in the cannabis

22   industry?

23        A    I'll try.  There's articles in Forbes, New

24   York Times, CNN, ABC was at one of my shops a week ago.

25   Quite a few.  All the majors have done stories or

                                              Page 79

```
 1                    ARBITRATOR:  A case once that involved
 2    edibles, and this was people starting out before it was
 3    legal in California.  This was a few years back.  So, I
 4    learned a lot about the business and the different --
 5    you know, the different kinds of names for the various
 6    edibles.  And at the end of -- we got a resolution and
 7    at the end of the mediation, one of the guys tried to
 8    hand me some --
 9                    MR. MURPHY:  Samples?
10                    ARBITRATOR:  That's right.  Some kind of
11    liquid, you know, little bottle of something with
12    cannabis in it.
13                    MR. MURPHY:  That's hysterical.
14                    ARBITRATOR:  Can you see me leaving the
15    JAM's office in Los Angeles before it was legal and
16    going to the airport --
17                    MR. MURPHY:  That's really funny.
18                    ARBITRATOR:  (indiscernible) security.  I
19    said, no, thank you.
20                    MR. AFIFI?:  That's hysterical.  That's
21    quite a tip.
22                    ARBITRATOR:  Yeah.  Right.  No, thanks.
23                    MR. AFIFI?:  Sounds about right.
24    BY MR. MURPHY:
25         Q    We're going to go through a couple names that
```

1    are going to come up during this arbitration.  The name

2    Charley Wells has come up.  C-H-A-R-L-E-Y Wells.  Who is

3    Charley Wells?

4         A    Charley has been with Have A Heart for a long

5    time, and then he moved over to Interurban when we

6    formed that company.  He used to be a store manager so

7    he's really intimately knowledgeable about the

8    operations.  And now in the last few years we've put him

9    through school, he's our draftsman in the company.  So,

10   he does all the Florida support plans, all the interior

11   design, he runs all the CAD software.  And so he is the

12   point person when it comes to the design now, making

13   sure that it complies with city ordinance, and he works

14   with the attorneys.

15        Q    And he's an employee of Interurban?

16        A    He is, yeah.

17        Q    Was he involved in the -- in any aspect of the

18   Maywood store attempt?

19        A    Yes.

20        Q    And what was his role?

21        A    He was the draftsman.  He was the person that

22   designed the retail layout.

23        Q    Mike Raquiza?

24        A    Yes.

25        Q    Who is Mike Raquiza?

Page 82

```
 1    the industry called that for some reason?
 2                    THE WITNESS:  Because his card says D.R.
 3    Welch.
 4                    ARBITRATOR:  Oh.  Oh.  (Laughs) I see.
 5                    THE WITNESS:  Sneaky.
 6                    ARBITRATOR:  Well, it is kind of a joke.
 7                    THE WITNESS:  It is but he never corrects
 8    anybody.
 9    BY MR. MURPHY:
10        Q    Mr. Kunkel, we're going to have a chance to
11    get to probably one exhibit before we break for lunch.
12    And I would like you to please open up to Exhibit 7 in
13    your exhibit binder, and my colleague is going to pull
14    that out.
15                    ARBITRATOR:  I see what you mean.
16    BY MR. MURPHY:
17        Q    Mr. Kunkel, have you seen this document
18    before?
19        A    Yes.
20        Q    And if you could flip to the last page.  Is
21    that your signature at the end of Page 3?
22        A    Yes.
23        Q    And what is your understanding of what this
24    document is?
25        A    This is the agreement for services with David
```

Page 86

```
 1    Welch, your attorney.
 2         Q     And in Paragraph -- if we could go to the
 3    first page.   Paragraph 1 which describes the current
 4    state of affairs and scope of engagement.   And I'm going
 5    to read some language to you and ask you some questions.
 6    The agreement defines you as Have A Heart Compassion
 7    Care, and it says, "Have engaged the firm to provide
 8    general counsel regarding local and state regulations in
 9    the State of California for cannabis.   The firm will
10    represent Have A Heart as a business entity.   Our work
11    will focus on the licensure as a recreational and
12    medicinal cannabis dispensary in California.   And our
13    initial research tells us that the cities of Compton,
14    L.A., Marysville, Maywood, Paris, and Port Hueneme are
15    all interested in providing some form of dispensary
16    license."
17           And then if you skip down, it says, "We will
18    provide you and advise and counsel on the application
19    process as well as work with Freeman Public Affairs,
20    Inc., to make the necessary introductions to the City
21    Council members and staff in the respective cities." And
22    it refers to structure and corporate operations as well
23    as real estate holdings.
24           Is that an accurate description of the scope
25    of services for which Have A Heart retained D.R. Welch?
```

Page 87

```
 1    representing both Kana and Have a Heart in this
 2    transaction?
 3                    MR. AFIFI:  I'm sorry.  Before we get an
 4    answer to this question, there was a prior question he's
 5    answering and reading from the document.  I just want to
 6    know where he's reading from; that's all I'm asking.
 7    What page number was he just talking about third
 8    sentence, fourth sentence; that's all I'm asking.
 9                    MR. MURPHY:  Can I ask my questions?  And
10    then if he has questions --
11                    ARBITRATOR:  I think that is the way we
12    do it.
13                    MR. AFIFI:  But he gave an answer that is
14    unclear as to where he's reading.
15                    ARBITRATOR:  You can ask him that.
16    BY MR. MURPHY:
17         A    The conflict waiver said so.
18         Q    So let's break that out.  You do agree that
19    this conflict waiver does state that you are going to be
20    representing both Have a Heart and Kana in this
21    transaction, correct?
22         A    That's correct.
23         Q    Okay.  And what you're referring to -- correct
24    me if I'm wrong -- is the language where you say -- oh,
25    I've got a second page, it's the first full paragraph
```

Page 125

1   that says -- Mr. Hsu, if you could please pop over to

2   the second page.   Where in the first page are you saying

3   -- are you saying that there's a representation that

4   you're not representing both parties?   Read the

5   language.

6        A    Yes.   The potential conflict exists in that

7   the firm has previously represented Kana and will

8   represent HAH in the current matter.   It's the second

9   paragraph, second sentence.

10       Q    The potential -- aren't you just disclosing in

11   that that -- well, let me back up.   Are you aware that

12   in a conflict waiver, it is your job to (a) just get a

13   written consent of all parties that there will be a

14   joint representation, correct?

15       A    Mm mmm.

16       Q    And also, it is your duty to disclose in

17   writing all of the potential conflicts that exist.   Are

18   you aware of that ethical obligation?

19       A    Not to the second part, yes.

20       Q    Okay.   So you're not aware that there is an

21   ethical obligation in a conflict waiver to disclose all

22   of the potential conflicts.

23       A    Yes, I'm not aware of that.

24       Q    Okay.   So isn't it possible that what you are

25   doing in that sentence is just disclosing the potential

```
 1              Q    Was it placed in your client trust account?

 2              A    I don't remember.  If you have something that

 3        can refresh my recollection?

 4              Q    I don't.  I'm curious.  Should you have put it

 5        in your client trust account?

 6              A    Would I have?

 7                        ARBITRATOR:  No, the question was should

 8        you have.

 9        BY MR. MURPHY:

10              Q    Whose property was it.  Strike my question.

11        Whose property was it?

12              A    It was Shiber and  Kana's property.

13              Q    Okay.  So you concede that it was at least in

14        part Have a Heart's property, correct?

15                        MR. AFIFI:  Misstates the testimony.

16                        ARBITRATOR:  He said it was Shiber and

17        Kana's.  I'm sorry --

18        BY MR. MURPHY:

19              Q    Oh, I'm as sorry.  You're saying it was

20        totally Kana's property?

21              A    Shiber and Kana.

22                        ARBITRATOR:  Shiber and Kana

23        (indiscernible).

24        BY MR. MURPHY:

25              Q    Thank you for that clarification.  The next
```

Page 159

```
 1    sentence says, "This additionally affirms that going

 2    forward and for the term of the agreement, we will

 3    receive $6,000 monthly upon receipt of payment from Have

 4    a Heart, LLC, which shall last for at least 5 or 90

 5    years, whichever is longer."  Do you see that?

 6         A    I do.

 7         Q    So this memorialized, then, the agreement that

 8    you have that for the life of the agreement, your firm

 9    would be getting $6,000 a month?

10         A    That's correct.

11         Q    Which is about $72,000 a year, correct?

12         A    That's correct.

13         Q    It's several hundred thousand dollars over the

14    life of the lease, correct?

15         A    Of five years, yes.

16         Q    And as to this agreement memorialized here,

17    you never disclosed this to Have a Heart, did you?

18         A    That's correct.

19         Q    If you could please look at the subsequent

20    pages, and Mr. Hsu's going to scroll through these

21    slowing, and we're just going to read out the check and

22    the dates.  So Page 2 of Exhibit 29 is a check from

23    Elias Shiber to your firm for $6,000, dated November of

24    2018.  Do you see that?

25         A    I do.
```

Page 160

```
 1   pull permits?

 2        A    No.

 3        Q    So if someone were to testify to that, they

 4   would be committing perjury?

 5        A    I believe so.

 6        Q    Exhibit 37.  Do you recall this letter?

 7        A    I do recall this letter.

 8        Q    And in this letter --

 9             MR. MURPHY:  Mr. Hsu, can you scroll up,

10   just so we can see the top of the letter?

11   BY MR. MURPHY:

12        Q    This is from the City of Maywood to your firm,

13   and this is actually in response to the letter that you

14   had sent on October 24th, correct?

15        A    That's correct.

16        Q    And in this letter, isn't it true that the

17   City of Maywood was rejecting Have a Heart's rights

18   under the agreement that had been executed on February

19   1?

20        A    They were objecting --

21        Q    Have a Heart's rights under that agreement?

22        A    It was Kana's rights, but they were telling us

23   that we had (indiscernible).

24        Q    That was not my question.  Isn't it true that

25   -- all right, why don't we just turn to that part of the
```

**EXHIBIT "6"**

1      Q    So what was said by Elias Shiber?

2      A    That David would be the point person for

3   everything on that deal.  He would prepare the

4   contracts.  He would be our person to schedule any

5   access to the building.  And I didn't -- I don't think I

6   even had Elias's number until we met again later.

7      Q    And when you say point person, do you mean --

8   what do you mean by point person?

9      A    He would be the person to contact for anything

10  related to that transaction.

11     Q    So if you wanted to speak to Elias Shiber, who

12  would you -- who were you instructed by Elias Shiber to

13  communicate with?

14     A    David Welch.

15     Q    When was the next time you spoke to Elias

16  Shiber?

17     A    At David's office.

18     Q    And this is the February 1 meeting?

19     A    I believe so.

20     Q    Prior to that February 1 meeting, did you have

21  any teleconferences with David Welch?

22     A    Not that I recall.

23     Q    Did you instruct David Welch to include terms

24  in the agreement?

25     A    Not that I recall.

Page 18

```
 1        A    I had to borrow the money to commence this

 2    project.

 3                   ARBITRATOR:  Let me make sure I'm

 4    understanding.  At the time you had this disagreement

 5    about what the deal actually was supposed to be, as you

 6    understood it, you had already deposited the $300,000?

 7                   THE WITNESS:  I had.

 8                   ARBITRATOR:  And when did you deposit it?

 9                   THE WITNESS:  I actually -- I'm sorry,

10    can you pull the date?

11                   MR. MURPHY:  Actually, so we have that

12    document, Your Honor.

13                   THE WITNESS:  Before I showed up to the

14    office that day.

15                   MR. MURPHY:  It actually -- Mr. Hsu, do I

16    have that in --

17                   MR. HSU:  Should be in Exhibit 9.

18                   MR. MURPHY:  In our binder --

19                   ARBITRATOR:  Exhibit 9?

20                   MR. MURPHY:  Can you just pull it up, so

21    we could just -- it's a one-page exhibit that shows the

22    -- it's not in the witness binder.  Maybe flip it, if

23    you can.

24                   THE WITNESS:  I gave Mike the

25    instructions the day I signed it.
```

Page 28

```
 1    would have worked if we were able to get market share

 2    and maintain that.  But today, everyone has licenses. LA

 3    is in the process of issuing hundreds right now.  So no.

 4         Q     And how close is LA to Maywood?

 5         A     It borders.  Both in LA County.

 6         Q     Turn to Exhibit 2, please.  This is the Lease

 7    Agreement.  And it is true that the conditions for

 8    rescission were the same in the Lease Agreement as they

 9    were in the License Assignment, correct?

10         A     Yes.

11                    MR. AFIFI:  It's all good.

12                    MR. MURPHY:  I'm laying a foundation.

13                    MR. AFIFIF:  I stopped myself.

14                    MR. MURPHY:  Thank you.  See, we're

15    resolving our --

16                    ARBITRATOR:  That's okay.  That's very

17    good.

18                    MR. AFIFI:  I was just going to say, I

19    would stipulate to that.  The documents speak for

20    themselves.  Doesn't matter.

21    BY MR. MURPHY:

22         Q     Prior to signing the agreements and the

23    meeting that you described where things got hot, had

24    Elias Shiber ever delivered to you a copy of the

25    Conditional Use Permit approved by the City of Maywood?
```

Page 36

```
 1        A     No.
 2        Q     Did David Welch every provide you -- prior to
 3   signing this agreement and that meeting, did David Welch
 4   ever provide you with a copy of the Conditional Use
 5   Permit?
 6        A     No.
 7        Q     Did anyone ever describe to you, prior to that
 8   meeting where the agreements were discussed in 2018, did
 9   anyone, either Shiber or anyone at David Welch's office,
10   describe for you the limitations imposed on the Maywood
11   Property as a result of the CUP?
12        A     No.
13        Q     I think we talked about this yesterday.  Do
14   you have an understanding of what a legal non-conforming
15   use is?
16        A     I do now, yeah.
17        Q     And what is your understanding of what a legal
18   non-conforming use in a permit is?
19        A     It's when a business type goes into a zoned
20   area for a different business type.  I.e., if a bar goes
21   into a retail district, or something like that.
22        Q     And prior to the February meeting that you
23   just testified to, were you ever told that there was a
24   legal non-conforming use in a Conditional Use Permit
25   that had an expiration date?
```

Page 37

```
 1    Heart for the $300,000?

 2        A    He was.  Yeah.  Mike just gave us a loan.

 3              ARBITRATOR:  I'm confused about what

 4    you're asking.

 5    BY MR. MURPHY:

 6        Q    So -- can you pull up Exhibit 9, please?

 7              Exhibit 9, if you could scroll up to the top,

 8    please -- Exhibit 9 is a statement from Mike Raquiza's

 9    bank account, correct?  And this reflected a wire that

10    you testified earlier you asked Mike Raquiza to pay, the

11    security deposit on behalf of Have A Heart, and you

12    testified earlier that it was on February 1.  Is that

13    correct?

14        A    Yeah.  Remember context is important, so even

15    today, in Washington, the Cannabis banks I do have, I

16    can't do wires.  We have limited banking service.

17        Q    And so this was Mike Raquiza's money,

18    personally?

19        A    Yeah.

20        Q    Personally, that was paid?

21        A    Yes.

22        Q    And was he reimbursed by either Interurban or

23    Have A Heart for that payment on behalf of Have A Heart?

24        A    Yes.

25              ARBITRATOR:  Sorry, I forgot about the
```

                                        Page 43

```
 1    mean Have A Heart's team -- whether employee or agent,

 2    in California, other than David Welch at this time?

 3         A    No.   We had a consultant I mentioned -- how I

 4    met David, Jim Freeman, who I talked to.   But no.

 5         Q    Looking back on this disbursement of the

 6    security deposit less than one month after the deal was

 7    inked, do you have an understanding as to whether or not

 8    you and Elias Shiber were in conflict?

 9         A    Yes.   We were in conflict.

10         Q    You just didn't know it?

11         A    I just didn't know it.

12         Q    Again, during the oral argument yesterday, do

13    you recall the accusation being made that Have A Heart

14    missed the first month's payment pursuant to the

15    Addendum?

16         A    I heard that, yes.

17         Q    Is that true?

18         A    I don't believe it is, no.

19         Q    Could you pull up Exhibit 10, please?

20              So are you on page 1 of Exhibit 10?

21         A    Yes.

22         Q    Is this a check that you signed?

23         A    Yes.

24         Q    That's your signature?

25         A    Yes.
```

Page  48

```
 1                    ARBITRATOR:  So those were the plans that
 2     were permitted and approved by the City?  For a grow
 3     structure?
 4                    THE WITNESS:  Yeah.  In hindsight, that
 5     was --
 6                    ARBITRATOR:  Rather than a retail?
 7                    THE WITNESS:  Yeah.  Well, they have a
 8     small little section for what they consider retail, but
 9     --
10                    ARBITRATOR:  But you wanted big retail?
11                    THE WITNESS:  You couldn't operate in --
12     maybe five years ago, but in today's environment, that's
13     not realistic, what the City understood to be retail.
14                    ARBITRATOR:  Okay.  But you and your
15     staff didn't check with the City at all?
16                    THE WITNESS:  We tried.
17                    ARBITRATOR:  What does that mean?
18                    THE WITNESS:  The first time my staff
19     went there -- I think you'll meet one of them today,
20     Charley and Ed Mitchell -- the City was having
21     complications with -- I think they had federal agents at
22     the City Hall.  They were -- I think somebody gave
23     testimony yesterday -- a handful of the staff had been
24     getting into issues --
25                    ARBITRATOR:  Unrelated to your project?
```

Page 54

```
 1    fine, but can I just ask the knowledge question?

 2                    ARBITRATOR:  You may.  And then we'll go.

 3    BY MR. AFIFI:

 4        Q     Excluding anything you learned from counsel,

 5    just put that aside for a second.

 6        A     Okay.

 7        Q     Until today, have you, through talking or

 8    looking at any documents, talking to anyone or looking

 9    at documents, seen or heard that anyone at Have A Heart

10    --

11                    MR. MURPHY:  He just said he doesn't know

12    how to siphon out the attorney-client communications, so

13    we just said I'm going to talk to him about that, and

14    you're asking the same question again.

15                    MR. AFIFI:  No, I'm excluding it.  What

16    do you mean, he doesn't understand?

17                    MR. MURPHY:  Well, yesterday, we blew the

18    attorney-client privilege with Welch, 'cause he --

19                    ARBITRATOR:  I don't think we're getting

20    anywhere.  Let's just stop here.  And think about the

21    question and how it can be answered without invading

22    privilege.

23                    COURT REPORTER:  This marks the end of

24    Media Number 3.  The time is 11:58 a.m.  We are off the

25    record.
```

Page 92

1          Q      And so we're clear on the record, is there one

2    vendor to whom those payments were made regarding that

3    you are seeking recovery for in your adjusted claim?

4          A      Yeah.   Jose DeVilla.

5          Q      So to summarize, are you seeking recovery --

6    let me back up.   Is Have A Heart seeking recovery from

7    Elias Shiber for all checks written to Elias Shiber as

8    reflected on page two of Exhibit 13?

9          A      Yes.

10         Q      Is Have A Heart seeking recovery of the

11   $300,000 that was paid by Mike Raquiza, and reimbursed

12   by Have A Heart, as reflected on page one -- you see at

13   the very top there, it says 125, 175?

14         A      Yes.

15         Q      So that's the security deposit, correct?

16         A      Correct.

17         Q      And any other entry in this document referring

18   to Jose DeVilla, are you seeking recovery of those?

19         A      Yes.

20         Q      Are there any other items in this document for

21   which Have A Heart is seeking recovery?

22         A      No.

23         Q      And if you go to Exhibit 11 -- we're not going

24   to scroll through it.   But if you could open up Exhibit

25   11, Mr. Kunkel, in your binder.

                                                    Page 95

```
 1   sourcing that deal?

 2        A     That's my understanding, yes.

 3        Q     That's your understanding or testimony?

 4        A     That's my testimony and my understanding.  I

 5   asked David if was getting paid, and the answer was no.

 6        Q    I said, was there any conversation about it?

 7        A     But that would be a conversation.

 8                   ARBITRATOR:  That's what he's testifying

 9   to, I guess -- that there was a conversation, however

10   brief, right?  Am I understanding you correctly?

11                   THE WITNESS:  Yeah.  I asked him if he's

12   getting paid and he said no.

13   BY MR. AFIFI:

14        Q     When did you ask him that?

15        A     The morning I had breakfast with him and

16   Elias.  It was -- that was one my first times, actually,

17   meeting David as well, in person.  My understanding is

18   that attorneys aren't brokers, that he would benefit

19   from the added work since he was the person drafting all

20   the documents.  I figured he'd be charging both parties.

21   I figured that's how he makes his money, not as a

22   broker.

23        Q    So I'm clear, on that morning, that was -- did

24   you say it was one of the first times you met him?

25        A    We'd only met a few times up until that point.
```

Page 107

1    We hadn't had much face time together.

2          Q    Okay.  But face time or not, that was the

3    first time you had any conversation or communication

4    with David Welch about whether or not he would get a

5    piece of the Maywood deal.  Is that true?

6          A    Yes.

7          Q    So there's no emails or letters or anything

8    prior to that, on that subject?

9          A    I don't believe there is.

10         Q    All right.  And so when you brought that up,

11   you brought it up because you knew, in this industry,

12   sometimes people have such expectations.  Right?

13         A    Can you phrase that part again?

14         Q    You brought up to David Welch that morning

15   whether or not there was going to be compensation

16   because you knew that was typically the norm in this

17   industry?

18              ARBITRATOR:  Well, I think that question

19   is, in my book, confusing, because you said it would be

20   the norm.  It would be the norm, maybe, for a real

21   estate agent, but would it be a norm for a lawyer?  And

22   I think the witness just said no.  So I just want to

23   make sure I'm clear on the testimony.  I think he said

24   that he wouldn't expect a lawyer to charge him some kind

25   of a finder's fee, at least without disclosing it.  Is

Page 108

```
 1    that your testimony?
 2                    THE WITNESS:  I don't care if he did.  I
 3    just wanted to know.
 4                    ARBITRATOR:  If he had disclosed it?
 5                    THE WITNESS:  Yeah, it was common
 6    practice.  Again, first attorney in this state.  Is this
 7    how you guys do it?  Does your law allow it?  I don't
 8    know.  I just wanted to know.
 9                    MR. AFIFI:  I'm sorry, Your Honor, I
10    think you may have misheard the testimony.
11                    ARBITRATOR:  Okay, maybe I did.  I'm just
12    trying to clarify what -- I want to make sure I hear it
13    properly.
14                    MR. AFIFI:  Let me do it right.
15                    ARBITRATOR:  Thank you.
16    BY MR. AFIFI:
17        Q     On that morning, you asked.  You just told us
18    you asked David Welch whether he was being compensated
19    other than your fees on this deal.  True?
20        A     Yes.
21        Q     And the reason you asked him that is that, in
22    this industry, you're aware that sometimes people
23    expected a commission or a finder's fee.  True?
24        A     I can't answer that part, because to say what
25    I assumed was the norm back then is so far from what it
```

Page 109

1    is today.   I asked him because I wanted to know, you're

2    putting this deal together, how do you benefit?   Not

3    because it may have been the norm, but because -- is

4    there another benefit here?   That's why I asked the

5    question.

6           Q     Okay.   You asked it because, for whatever

7    reason, in your mind, there was a possibility that he

8    would be getting some benefit, whether it was the norm

9    or some other reason.   True?

10          A     Yeah, I think the answer to that would be

11   true.   Again, I'm struggling with the questions.   But

12   yes.   Sorry, the use of the word norm is throwing me

13   off.

14          Q     I don't want to talk about the norm.   I want

15   to know: there was a question in your mind for a reason,

16   as to whether or not David Welch would be compensated on

17   this transaction.   True?

18          A     True.

19          Q     And that question in your mind, was it --

20   you've already told me it's not because of the norm,

21   correct?

22          A     No.   I said I don't want to answer questions

23   around what I believed was the norm.   Simple terms,

24   please.

25          Q     What was the reason that question was in your

1    mind, concerning this attorney you'd already established

2    a relationship with, as an attorney.

3         A    Why else would he do it?  I just wanted to

4    make sure that I understood why he was doing this.

5         Q    Okay.  And so whatever legal fees he was

6    charging for doing the deal to you may not be sufficient

7    motivation for him to do the deal.  Is that true?

8         A    Well, I assumed, based on that deal, that he

9    was going to get compensation from me for all the extra

10   work, and Elias, for drafting the contracts.

11        Q    I understand that.

12        A    That felt like a substantial payment to me.

13        Q    Right.  And so that, in your mind, that is a

14   reason why he would do the deal, wouldn't it be?

15        A    It would be.  Should be enough.

16        Q    So why would you ask him whether he was

17   getting anything else on that deal, if that's enough?

18        A    I didn't know it was enough until I asked him.

19        Q    Okay.

20        A    You understand?

21        Q    I understand.

22        A    I had to ask him, what are you -- are you

23   getting paid on this?

24        Q    As of the time of this meeting, that morning

25   meeting in Westwood, David Welch had been your attorney

                                          Page 111

```
 1                    ARBITRATOR:  I had a couple of mediations
 2      involving some of the --
 3                    THE WITNESS:  It's messy.
 4                    ARBITRATOR:  Yeah.
 5                    MR. AFIFI:  They have that in LA as well.
 6                    ARBITRATOR:  Is that right?
 7                    MR. AFIFI:  They're myriads of cases
 8      there.  There's already litigation on that.
 9                    ARBITRATOR:  I have other subjects my
10      cases are about, too.
11                    MR. AFIFI:  Heaps of litigation.
12      BY MR. AFIFI:
13         Q    Briefly, you described Interurban Capital
14      Group, too, how it helps with banking, and explained how
15      it facilitates all of that earlier, do you recall that?
16         A    Yes.
17         Q    One of the other things that you testified to
18      in your deposition was that Interurban Capital Group
19      actually does the fundraising for the roughly $25
20      million that you raised in 2018, right?
21         A    Interurban did its own fundraising, yes.
22         Q    Right.  And that $25 million that -- there was
23      a press release that you raised $25 million.  That money
24      came into Interurban Capital, right?
25         A    Yes.
```

Page 121

```
 1        Q    And notwithstanding that, you were still
 2   continuing to fundraise with Interurban after the $25
 3   million hit the company, right?
 4        A    Yes.
 5        Q    Are you still fundraising today?
 6        A    No.  Unless you're offering.  A joke.  Too
 7   soon?
 8        Q    It's a little too soon.  But we can talk
 9   afterwards.
10        A    No, we're fully funded at this point for the
11   business plan we have.
12        Q    Got you.  We've covered a few of these, so I'm
13   going to go back over --
14             ARBITRATOR:  Take your time.  It's all
15   right.
16   BY MR. AFIFI:
17        Q    Jim Freeman, the individual who introduced you
18   to David Welch.
19        A    Mm-hmm.
20        Q    We covered him in your deposition.  You
21   described him as a lobbyist, correct?
22        A    Yes, but that's a broad term.  So his exact
23   title is a Government Affairs Liaison.
24        Q    His title aside, what you understood his value
25   to you would be, was that he could use -- you could use
```

Page 122

```
 1              ARBITRATOR:  Just answer the question.
 2   If there's something you can't remember or you don't
 3   know, you can say that.  You don't need to try to
 4   speculate or guess what the answer is.
 5              THE WITNESS:  So then the truth is, I
 6   don't know if this agreement allows for him to make
 7   purchase and sale agreements.
 8   BY MR. AFIFI:
 9      Q    Right.  I'm just saying, that wasn't --
10              ARBITRATOR:  Well, what about "We will
11   assist you in structuring your California corporate
12   operations, as well as real estate holdings"?  I mean --
13              MR. MURPHY:  Can we scroll up so we can
14   get the whole paragraph in context?
15              ARBITRATOR:  Yeah.
16              MR. MURPHY:  The whole thing you're going
17   to ask questions about.
18              THE WITNESS:  I mean, again, I just
19   thought I was hiring a guy who was going to help me
20   conduct business down here and, yes, maybe buying a
21   store --
22              ARBITRATOR:  And the language, as I see
23   it, is pretty general language.  So whatever.
24              THE WITNESS:  I'd only had like three
25   attorneys in my whole life by this point, so I assumed
```

Page 136

```
 1        Q    I have no doubt you see where I'm going.  As I
 2   said, I know you're smart.  But what I'm asking you, if
 3   you could, is just to answer my question.
 4        A    I'm trying, but you got to ask if right and
 5   make sure there's context behind the words.
 6                  ARBITRATOR:  Let's make sure the
 7   questions are clear.  And if you don't understand, then
 8   ask him.  Ask counsel to rephrase the question so you
 9   can answer.
10                  MR. MURPHY:  Can we forego the commentary
11   about my client's qualities that you reference --
12                  ARBITRATOR:  Yeah, we don't -- we'll make
13   our own assessment of your client's personality.
14                  MR. AFIFI:  Thank you.  Happy to do it.
15   BY MR. AFIFI:
16        Q    Mr. Kunkel, again, we're talking about the
17   arrangement reached at that breakfast meeting and the
18   discussions with Mr. Shiber.  And I want to make sure
19   I'm clear on what you walked away -- what this handshake
20   deal, what you understood it to be.  Okay?
21             So tell me if this part's correct.  As part of
22   that agreement, is this correct, as far as the duration
23   of time: that you understood this license was only good
24   for a year, that's why you wanted a one-year license
25   assignment agreement.  Correct so far?
```

Page 149

```
1          A      Yes.

2          Q      And the license being good for one year, I

3    know you have some sort of -- but the license being good

4    for one year meant that it was good from November of

5    2017 to November of 2018.   That was your understanding

6    at the meeting?

7          A      Yes.

8          Q      And it was also your understanding that Mr.

9    Shiber had agreed with you that you could have up to six

10   months from when you signed this deal to get operating

11   and then start paying rent for what was left, meaning

12   the balance, of one year from that date.   True?

13         A      No.   The contract has renewals built in.

14         Q      Whose right was it -- the handshake that you

15   walked away.  Who had the right to renew it?  You?  Or

16   Mr. Shiber?

17         A      We never specified.  But clearly, it's in

18   everyone's best interest to continue the contract.

19         Q      That's not what I'm asking.  What was your

20   understanding of who had the right to renew it?

21         A      Nobody figured out who had the right on a

22   handshake deal in a 45-minute table eating.

23         Q      So that wasn't discussed?

24         A      Not there.

25         Q      Okay.  But we know now, when you look at the
```

Page 150

```
 1                    MR. HSU:  30 to 45 minutes.

 2                    MR. MURPHY:  Mr. Hsu's going to be doing

 3      the testimony.

 4                    ARBITRATOR:  And you'll want cross

 5      examination, so --

 6                    MR. AFIFI:  I assume so, yes.

 7                    ARBITRATOR:  What do you suggest?

 8                    MR. AFIFI:  I wasn't planning on going

 9      through all my questions with Mr. Kunkel, just those

10      that are relevant to the direct.  So I wasn't planning

11      on spending that degree of time, number one.  And number

12      two, I would like to finish.  We're just kind of getting

13      to some salient points that I think are important.

14                    ARBITRATOR:  Okay, yeah.

15                    MR. AFIFI:  If not completely finish, get

16      to a point --

17                    MR. MURPHY:  I guess we're only in

18      November of 2017 and we've been going an hour and 15

19      minutes.  I just want to alert us to the fact that a

20      witness has to go.

21                    MR. AFIFI:  I didn't want to -- just so

22      you know, I got started at 1:30.

23                    ARBITRATOR:  It's okay.  What's your

24      estimate of time?

25                    MR. AFIFI:  I'm just going to go by
```

```
 1          Q     By the way, I have absolutely no problem with

 2     you interjecting.   I was simply asking if you were done.

 3     But Mr. Kunkel, when Mr. Mitchell was asked to come and

 4     inspect it, fairly quickly after the deal was signed,

 5     did he report back to you, to your understanding, as to

 6     what he found the condition of the property to be?

 7          A     Yeah.   He told me I was an idiot and we should

 8     have spent more time on it, and it faces the

 9     neighborhood.  If we're being honest, yeah.  I took a

10     lot of heat for this.

11          Q     What do you mean, if I'm being honest?

12          A     If I'm being -- if I'm speaking with humility,

13     yeah.  A lot of my team members thought I was -- it was

14     a bad idea to do this.

15          Q     Okay.  So when Mr. Mitchell came in a couple

16     weeks after you signed on February 1, he said this was a

17     bad idea?

18          A     Yeah, and that's how Charley felt when he came

19     back.

20          Q     I'll cover it, but I want to know from you.

21          A     Yeah.  It was embarrassing.  Because I moved

22     too quick, there was urgency to sign this deal.  I

23     should have spent more time, more diligence, you know.

24     So yeah, I took a lot of heat for it.  They said, "You

25     made a mistake."
```

Page 166

1        Q    Mr. Mitchell told you, after he inspected the

2    property, that you made a mistake and he gave you

3    reasons why he believed that was true.   Right?

4        A    Yes.

5        Q    I want to cover the reasons he gave you.   Not

6    the ones you yourself concluded, just the ones he gave

7    you.

8        A    Okay.

9        Q    Mr. Mitchell told you that it was a mistake

10   because the entrance was on the street rather than some

11   other direction?

12       A    Yeah.   You're in residential, yeah.

13       Q    He said you're in residential?   That's the

14   mistake?

15       A    Yeah.   Because you open the front door, you're

16   looking at homes.   And there's children.   And -- yeah.

17       Q    Okay.   I just want to be clear.   Was it a

18   mistake that you were located in a residential area, or

19   because the front entrance faced the residential area?

20       A    The mistake is that I made the decision to go

21   into a building without spending diligence on it.

22       Q    That's one mistake.   The second one,

23   specifically, was the residential -- I want to

24   understand what he told you.   Was it a mistake to be in

25   a residential area?   Or was he telling you it's a

Page 167

```
 1    page, "You may" -- he says -- "and I advise you do

 2    contact independent legal counsel regarding our

 3    concurrent representation."  And then it continues

 4    there.  Do you see that?  Do you see that, Mr. Kunkel?

 5        A    I do.

 6        Q    Okay.  And then if I go to the next paragraph,

 7    starting in the middle, you were acknowledging when you

 8    signed this that you have been provided -- I'm reading

 9    from the document -- a reasonable opportunity to seek

10    the advice of independent counsel of your choice.  Do

11    you see that?

12        A    Yes.

13        Q    All right.  So my question is, at the time

14    that you signed it, or any time before that, did you

15    notice that it was -- this document was telling you to

16    locate independent counsel before you signed it?

17        A    No.

18        Q    Okay.  Did anyone tell you, including Mr.

19    Welch -- I'm including him just for humor -- did anyone,

20    including Mr. Welch, tell you, other than what's in this

21    document, to seek independent counsel before signing?

22        A    No.  He would -- he never encouraged me to

23    check his work with another attorney, and he never read

24    his contracts like this, which would be really nice if

25    attorneys did this with their clients before they signed
```

Page 171

```
 1                ARBITRATOR:  Overruled.
 2                THE WITNESS:  I -- if I had to conform to
 3      these plans, I would do so to the best of my ability,
 4      but the setup of the space would never -- would never be
 5      approved by cannabis licensing.
 6      BY MR. HSU:
 7          Q    And why do you say that?
 8          A    Because there -- as far as the retail space
 9      goes, which you can see on this space here -- do you
10      guys mind if I jump up here?
11                One of the requirements is that you have to
12      have a limited access area, and secure product storage.
13      But if you see, in the dispensary, it's just a singular
14      room.  There's an electronic room, which could house
15      security surveillance footage, but there's nowhere to
16      store product.
17                As well as the stairwell takes you directly
18      upstairs into cultivation, so you're intermixing two
19      licenses, and they don't have their own entryway.
20      They'd be forced to go through the dispensary itself,
21      and so you're combining licenses, and that would never,
22      ever work.
23          Q    So would these plans --
24                MR. AFIFI:  Sorry, Your Honor.  I'd
25      object and move to strike.  Other than the witness can
```

Page  220

1    give his opinion, because you're allowed it.   But it

2    lacks foundation as to whether he has the expertise to

3    opine as to whether the state licensing would approve

4    that or not.

5                   ARBITRATOR:  We've had a lot of

6    information about his background and his experience in

7    designing these facilities, so he's learned something

8    over time.  I'm going to let him tell us what his view

9    is.

10                  MR. AFIFI:  Your Honor, just so I'm

11   clear, it began with -- and I said, no objection to his

12   opinion, but he began with, "The state will not allow

13   that."  And I'm saying he's already testified that he

14   has no expertise either in state licensing, as an

15   architect, or --

16                  ARBITRATOR:  Overruled.  Let him go.  If

17   you want to question him on cross, you may.

18   BY MR. HSU:

19        Q    Would these plans be consistent with a Have A

20   Heart retail stores, as you know those retail stores

21   prior to Maywood?

22        A    No.

23        Q    And why not?

24        A    Because they're lacking some key rooms that we

25   have for our operating needs.  A secure space to receive

                                        Page 221

```
 1    your fault.  That's mine.
 2              ARBITRATOR:  Well, I wanted to make sure
 3    that you know that I'm thinking that.  I try to -- I try
 4    to let lawyers know.
 5              MR. AFIFI:  This goes to the issue of the
 6    interfacing between the City of Maywood and Have A
 7    Heart.
 8              ARBITRATOR:  Of course, right.
 9              MR. AFIFI:  And whether or not the
10    permitted set was as has been described so far in
11    testimony.  I'll tie it in for you, certainly by the
12    time we get there.  But yeah, there are little nuances
13    that I think are impactful when we get there.  If you
14    haven't seen it, that's on me and I'll certainly explain
15    it.  But can I get --
16              ARBITRATOR:  Okay, go ahead.
17              MR. AFIFI:  I'm not just going over
18    exhibits just to go over it.
19              ARBITRATOR:  Good.
20              MR. AFIFI:  There are specific issues and
21    the ones that aren't, we'll move on.
22              ARBITRATOR:  Thank you.
23              MR. AFIFI:  Of course.
24    BY MR. AFIFI:
25         Q    Okay, the reason I'm pulling up Exhibit 46 is
```

Veritext Legal Solutions
866 299-5127

```
 1   to remind you of what you testified to here.  You say,

 2   on March 26 when you got the word that Mr. Mango had

 3   said no, you say, "Thank you for looking into this.  We

 4   will adjust our plans for the space and go from there."

 5   Right?

 6        A    Yes.

 7        Q    Okay.  So you knew then, as of March 26, that

 8   there were no permits, because Mr. Mango said he's not

 9   going to approve the site plan.  Right?

10        A    Yes.

11        Q    Okay.  When you adjusted those plans, you

12   changed the front entrance location, correct?

13        A    I reverted it back to the original location.

14        Q    Got it.  But you still had other portions of

15   the plans that were different than the plans that we

16   talked about earlier, that Mr. Hsu showed you.  Right?

17        A    Yes.

18        Q    Okay.  Now, how long after that did you submit

19   the revised set of plans?  And I'll reference for you

20   the July 2018 email where you had the revised plans.

21   Was that the next time?

22        A    That may very well be.  I'm not the greatest

23   with dates.  I'd have to refer back.

24        Q    Okay.  Do you have any recollection, just a

25   yes or no, as to whether between this email and the July
```

Page 257

```
 1    BY MR. AFIFI:
 2         Q    It says, "To whom it may concern: I am the
 3    owner and primary contact person of Kana," and then
 4    continues on.  When you asked Mr. Kunkel to sign this,
 5    did you look at this document to see what it was saying?
 6         A    No.
 7         Q    Did you know whether or not, one way or the
 8    other, if Mr. Kunkel was involved with Kana?
 9         A    No.
10         Q    Do you know what Kana, Inc. is?
11         A    No.
12         Q    Same question for the last page, 221-4.  I
13    assume your answer is the same?  You didn't look at this
14    document to see what it meant, or what it was saying?
15         A    No.
16         Q    Last one.  If you could put up 225 and 226.
17              MR. HSU:   225 and 226?
18              MR. AFIFI:   I mean one at a time, but I
19    think these two will wrap it up.
20    BY MR. AFIFI:
21         Q    225 is an email from you to Mr. Robert Kerns
22    at the Welch firm.  I'm sorry, from David Welch to you,
23    where it says, "We have a call in to BCC to check the
24    status of your application."  And it says, "We were
25    informed that we will need to change parts of the
```

Page  272

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2          I, MICHAEL BRIGGS, the officer before whom the

 3    foregoing proceedings were taken, do hereby certify that

 4    any witness(es) in the foregoing proceedings, prior to

 5    testifying, were duly sworn; that the proceedings were

 6    recorded by me and thereafter reduced to typewriting by

 7    a qualified transcriptionist; that said digital audio

 8    recording of said proceedings are a true and accurate

 9    record to the best of my knowledge, skills, and ability;

10    that I am neither counsel for, related to, nor employed

11    by any of the parties to the action in which this was

12    taken; and, further, that I am not a relative or

13    employee of any counsel or attorney employed by the

14    parties hereto, nor financially or otherwise interested

15    in the outcome of this action.

16              Dated:  December 2, 2019

17

18

19

20

21                    <%17500,Signature%>

22              MICHAEL BRIGGS

23         Notary Public in and for the

24            State of California

25
```

Page  277

**EXHIBIT "7"**

1    him.  I think he might've moved that year, later in the

2    year, but I'd have to double-check with him.

3         Q    The move would've been from which city to

4    which?

5         A    From Santa Barbara to Bellevue, where he's at

6    now.

7         Q    Understand --

8         A    Which is in Washington.

9         Q    Yeah.  So, based on your best recollection,

10   your expectation would be that Mr. Raquiza would've been

11   in Santa Barbara in or around February 1st of 2018?  Did

12   I capture that correctly?

13        A    Yeah.  He lived in Santa Barbara during that

14   time.

15        Q    Okay, fair enough.  What about Jim -- James

16   Freeman, the lobbyist we discussed yesterday?  Do you

17   recall if he was there at the meeting -- the second

18   meeting on February 1st?

19        A    No, he wasn't there.

20        Q    Okay.  So, I've gone over three of the names

21   that we've encountered in this case.

22        A    Yeah.

23        Q    Is there anyone else other than these three

24   that you can affirmatively rule out that were not there,

25   affiliated with Have A Heart?

                                                  Page 14

```
 1          A     Yeah.  Do you want me to go down the dossier
 2    of people that -- that may or may not have been there
 3    and then guess?
 4          Q     No.  I just want to know is there anyone else
 5    you can affirmatively rule out.  It's a yes or no
 6    question.
 7          A     No.  You're -- you're good.
 8          Q     Okay.  Then you've answered...  Thank you.
 9    So, your testimony, I believe, from yesterday was that
10    when you walked into that meeting February 1st, you had
11    already signed the agreements on January 24, 2018,
12    roughly about a week or so before, fair?
13          A     Yes.
14          Q     And you were -- when you walked in that day,
15    you were unaware that the documents you had signed
16    required payment right away upon the effective date,
17    true?
18          A     I don't...  Can you ask that a different way?
19          Q     Sure.  Your expectation was, from the first
20    meeting you had, I think you testified, that you would
21    not have to make any payments on the lease or the
22    license agreement for several months later, correct?
23          A     Based on the conversation we had, yes.
24          Q     That's what I'm saying.
25          A     Yes.
```

Page 15

```
 1              THE WITNESS:  I don't.

 2   BY MR. AFIFI:

 3       Q    Well, when you testified it was in the fall of

 4   2017, would you classify fall to be before Christmas of

 5   2017?

 6       A    I would classify fall to be before Christmas,

 7   by definition, but I don't remember when it was.

 8       Q    Okay.  So, I'm going to show you the licenses

 9   that are part of Exhibit 200.  And let me see which one

10   we can read the best...okay.  Here we go.  These were

11   the licenses that you had seen, to the best of your

12   recollection, on the day of the breakfast meeting,

13   right?

14       A    I feel like it was, yeah.

15       Q    Okay.  And if you see the license, at the

16   bottom here it says, "Issued in accordance with Maywood

17   ordinance and valid for one year from date up." Do you

18   see that?

19       A    Yeah, but it's December 27th, so that doesn't

20   make sense.

21       Q    We'll get there.

22       A    Okay.

23       Q    Whether it makes sense is for the arbitrator

24   to decide.  But I'm asking you this language is what led

25   you to believe that this license was only good for one
```

Page 42

```
 1    year, right?
 2         A    Yes.
 3         Q    All right.  And if the license were issued on
 4    December 27th, do you know how it was that you saw a
 5    copy of this at least as of the time of the breakfast
 6    meeting, which would have preceded that date?
 7         A    Well, I said I think.  And I feel like it was,
 8    but, again...
 9         Q    Do you have any explanation as to how you
10    could've seen this license before it was issued?
11         A    I guess I couldn't have, so that answers the
12    question that I could not have seen this before the
13    breakfast meeting, if the breakfast meeting was before
14    December 27th.
15         Q    Would you then agree that then it's probably
16    unlikely that you would've had a one-year conversation
17    in the breakfast meeting for the term of the agreement
18    and it was actually going to be five and five or 95 and
19    95 on both agreements, as of then?
20         A    It's possible.
21         Q    Okay.
22         A    Again, we're talking about two years ago about
23    a conversation.  It's not a simple, you know, pick and
24    pull.
25         Q    That's fair.
```

Page 43

1          A      Okay.

2          Q      Okay.  Now, if I could -- still sticking on

3    Exhibit 200 -- and we'll go to the deposit.  So, we

4    talked about the user fee being due on February 1st.

5    Let's look at when the deposit is due.  Look at Section

6    2.6, which I'll direct you to here.  Section 2.6 talks

7    about the deposit.  It says, "Within three calendar days

8    after the parties sign this assignment..." Do you see

9    that?

10         A      Yes, I see that.

11         Q      Okay.  And I represent to you that the same

12   language appears for the deposit and the lease

13   agreement.  Three calendar days.

14         A      Okay.

15         Q      So, even though the user fee and the lease fee

16   would've been due on February 1st, when you all signed -

17   - or Mr. Shiver did, you still had three days to pay the

18   deposit.  You knew that, right?

19         A      Well, no, because I didn't read this.

20         Q      No, I know you didn't read it when you signed

21   it, but I thought on February 1st, by then you certainly

22   read it, didn't you?

23         A      Not the whole thing.  This would've taken me

24   hours.  We didn't have enough time.  I was sitting there

25   with company, with David and Elias.

Page 44

1    that true?

2        A    I don't recall.

3                MR. MURPHY:  Vague...  It's just

4    confusing.

5        A    I honestly don't recall if I knew that to be

6    the case or not.

7        Q    Okay, fair enough.  All right, but Section

8    2.1.2 of that agreement did give you the option to

9    acquire these licenses.  That you knew, didn't you?

10       A    That I know now, yeah.

11       Q    No, no, no.  On February 1st, you knew that --

12   regardless of whether the term of the license was

13   supposed to be five or one year or anything like that,

14   you knew that Have A Heart had the right to acquire the

15   rights to these licenses too, right?

16       A    Well, that's what the whole deal was.  That's

17   what we were doing.

18       Q    Well, no, that isn't...  Remember, you

19   testified, sir, that you were initially acquiring the

20   right to use the licenses, with an option to acquire the

21   licenses outright, correct?

22       A    Oh, you mean to buy them permanently?  Yes.

23       Q    Yes.

24       A    Yes.

25       Q    You've got a right to use them upon signature,

                                        Page 47

```
 1    breaking point.
 2                      THE WITNESS:  Sorry.
 3                      ARBITRATOR:  So, let's take our 15
 4    minutes now and come back and we'll continue this.  With
 5    that last answer, I think it was time for a break.
 6                      THE WITNESS:  Sorry.
 7                      ARBITRATOR:  Okay.  Thank you.
 8                      COURT REPORTER:  This marks the end of
 9    Media Number 1.  The time is 10:45 a.m.  We are off the
10    record.
11                      MR. MURPHY:  At a certain point we should
12    -- because we're almost halfway through the week, we
13    should meet and confer as to where we are on time...
14                      (Break)
15                      COURT REPORTER:  This marks the beginning
16    of Media Number 2.  The time is 11:04 a.m.  We are on
17    the record.
18                      MR. AFIFI:  Your Honor, before I proceed,
19    there's a scheduling issue that I discussed with Mr.
20    Murphy and we're at a little bit of an impasse and we
21    need your assistance.  There is a third party witness as
22    part of our case whose testimony I expect is going to be
23    a total of ten minutes.  There's on exhibit that's one
24    page.  And he's a third party witness.
25                      I reached out to Mr. Murphy about
```

Page 75

1    scheduling a couple days ago and we discussed the time

2    yesterday.  I told him I'm going to have him come at one

3    today.  Yesterday -- and I'm not holding Mr. Murphy to

4    this -- yesterday, Mr. Murphy told me that he thought

5    his case would be done by today, so one o'clock would be

6    fine.  We've arranged for him to be here at one today.

7    And it looks like we -- Mr. Murphy's case may not be

8    done by one.  I understand that.  But I had asked Mr.

9    Murphy right after the break to confirm that this

10   gentleman -- his name is Joe Garcia -- would be, you

11   know, on and off, literally --

12                    ARBITRATOR:  Who is he?

13                    MR. AFIFI:   Joe --

14                    ARBITRATOR:  Who is it?

15                    MR. AFIFI:   His name is Joe Garcia.

16                    ARBITRATOR:  How does he fit in?

17                    MR. AFIFI:   He was -- he was one of the

18   people who had brought an offer to Mr. Shiber before his

19   deal was signed.

20                    ARBITRATOR:  Oh.  Okay.

21                    MR. AFIFI:   And there's one text that's

22   one page that we'll be conferring with him, and that's

23   it.

24                    MR. MURPHY:  May I respond?

25                    ARBITRATOR:  Yes, you may.

                                            Page 76

1    first because he's in his case and he's got a third

2    party witness.  Does the document say what you want this

3    witness to say?  Do we need the witness?  Or does it --

4    or does the document not say it?

5                    MR. AFIFI:   The document does say what

6    it wants to say but there's more that he stands on what

7    the deal is.

8                    ARBITRATOR:  All right.

9                    MR. AFIFI:   He still needs to testify.

10                   ARBITRATOR:  Mr. Murphy's witness goes

11   first --

12                   MR. AFIFI:   But can I just say --

13                   ARBITRATOR:  No.

14                   MR. AFIFI:   That's a (indiscernible)

15   witness.

16                   ARBITRATOR:  Because every time I tell

17   you -- give you a ruling, you tend to argue.  And I'm

18   not going to argue.  We're going to proceed.

19                   MR. AFIFI:   I apologize, Your Honor.  I

20   -- I won't argue it.

21                   ARBITRATOR:  Thank you.

22                   MR. AFIFI:   I just want to say that when

23   Mr. Murphy makes a statement, if you'll just give me a

24   chance to say something before you rule I'd appreciate

25   it, that's all.

1          ARBITRATOR:   I didn't think that this was
2   an issue that required a lot of thought and
3   deliberation.
4          MR. AFIFI:   Fair enough.  Thank you,
5   Your Honor.  Okay, so may I proceed with the witness?
6          ARBITRATOR:   Yes, please.
7          MR. AFIFI:   Thank you.
8   BY MR. AFIFI:
9       Q    Mr. Kunkel, before we broke off, we were
10  talking about that if you had found out that, in fact,
11  escrow had been transferred, why not just ask for it to
12  be transferred back, you said something I just didn't
13  understand.  What's the reason -- I'm sorry, we took a
14  break so I just couldn't follow up.
15      A    Oh, no, I was asking in a facetious manner had
16  you ever requested to be returned your money by someone
17  that had robbed you?  Because I imagine that would be
18  akin to what had happened here since we're talking about
19  hypotheticals.
20      Q    Okay, so in other words, if the only thing you
21  knew was that the money had been transferred to Mr.
22  Shiber, if that's all you knew, that was, to you,
23  knowledge that you were being robbed and, therefore,
24  canceled the deal.  True?
25      A    Yes.

Page  79

```
 1        Q    Isn't it actually true, sir, that whether the
 2   deposit was in Mr. Shiber's account or Mr. Welch's
 3   account was really not important to you at any point in
 4   time?
 5        A    No.
 6        Q    Isn't it true that if it were important, you
 7   would've followed up at some point from February 1, 2018
 8   all the way to December of 2018 about whether or not Mr.
 9   Welch was functioning in that escrow capacity that you
10   expect him to?
11        A    Why?  He's my attorney.  I thought I had to
12   follow up with him.
13        Q    Because after he told you that you can't get
14   your money back and it would be a year of litigation at
15   a minimum then.
16        A    It doesn't matter.  It's a contract.  My
17   understanding doesn't matter -- it was a contract.  That
18   was my bad, okay?  I put 300K in so let's move on.  It
19   wasn't -- it wasn't like an ongoing concern for distrust
20   with my attorney.  It was I signed it, it's a contract,
21   I'm bound by it, I got over it -- I got over it in like,
22   20 minutes.
23        Q    Okay, but did you believe that you could
24   choose who your escrow -- third party escrow could be?
25        A    Never even crossed my mind.
```

Page 80

```
 1                    ARBITRATOR:   Mr. Afifi?

 2                    MR. AFIFI:   Sorry.

 3                    ARBITRATOR:   You know, you can say I'm

 4    interrupting your cross, which I am, in a way, but I

 5    want to make sure that I understand the follow-up

 6    questions that you have.   And if I'm confused about what

 7    the main question is, then the follow-up questions

 8    you're asking this witness don't mean anything to me.   I

 9    assume you're trying to get me to understand, right,

10    since I'm the finder of fact?

11                    MR. AFIFI:   Your Honor, you misunderstood.   I

12    was referring to Mr. Murphy's comment, not yours.

13                    ARBITRATOR:   Okay.   All right.   Well, I think

14    this is just confusing, a confusing line of questions.

15    Maybe you can help clear it up.

16                    MR. AFIFI:   Okay, just so we're clear, what I

17    was commenting on was Mr. Murphy's comment --

18                    ARBITRATOR:   Okay.   I --

19                    MR. AFIFI:   -- not Your Honor.   You can ask

20    questions.

21                    ARBITRATOR:   Listen, I don't take things

22    personally.   I really don't.

23                    MR. AFIFI:   Okay.

24                    ARBITRATOR:   I just want to make sure

25    factually I'm understanding whatever it is.   I mean, the
```

Page 120

1    other side may disagree with you, but I want to

2    understand your position through your questions.

3              MR. AFIFI:   Okay.   And I think you will.

4              ARBITRATOR:   Okay.

5    BY MR. AFIFI:

6         Q    Mr. Kunkel, this memo that was written, you

7    testified was something you requested of Mr. Welch,

8    triggered by an event where you said they were down

9    there, Mr. Mango, Mr. Welch and a variety of other

10   people.  My question is, when he's down there, was that

11   they were all meeting at the property, or they were all

12   meeting at the City?

13        A    Well, I know they were at the property, but I

14   don't know if they started at the City or vice versa.

15        Q    What you were referring to was a meeting at

16   the property with Mr. Mango and others?

17        A    Yes.

18        Q    And what you understood -- you weren't there,

19   but you understood that at that meeting, Mr. Mango was

20   saying Have a Heart's never going to start operating

21   here, words to that effect?

22        A    Yes.

23        Q    Okay.  And that was alarming to you,

24   generating the need for you to ask Mr. Welch for this

25   memo, right?

                                      Page 121

```
 1              ARBITRATOR:  Thank you.

 2              COURT REPORTER:  Thank you.

 3                        (Off the Record)

 4              COURT REPORTER:  This marks the beginning of

 5    Media Number 3.  The time is 1:07 PM.  We are on the

 6    record.

 7              ARBITRATOR:  Thank you very much.  Let's

 8    continue with Mr. Kunkel's testimony and his redirect

 9    now.

10              MR. MURPHY:  Mr. Hsu, could you please put up

11    Exhibit 7?

12              MR. HSU:  Do you mind if I turn off those side

13    lights that we have on?

14              ARBITRATOR:  Oh, we'd be happy to have those

15    off, because they kind of glare when you're trying to

16    read, right?

17              MR. HSU:  Yeah.

18              MR. MURPHY:  Are we ready?

19              ARBITRATOR:  Yes.

20              REDIRECT EXAMINATION OF RYAN KUNKEL

21    BY MR. MURPHY:

22        Q    Mr. Kunkel, this is the engagement agreement

23    that we've spent a lot of time speaking about.  A couple

24    of follow-up questions.  In this letter, Mr. Welch says,

25    beginning on the fourth line in Section 1, "Our initial
```

Page 136

```
 1                MR. MURPHY:  I want to ask him a question

 2   about it because --

 3                ARBITRATOR:  Okay.

 4                MR. MURPHY:  -- there was an insinuation made

 5   that I'd like to clear up on the record.

 6                ARBITRATOR:  Okay.  All right.

 7   BY MR. MURPHY:

 8        Q    There was testimony read regarding

 9   conversations that may or may not have been had with

10   David Welch and included in that testimony that ended

11   with the following question and answer.

12                MR. AFIFI:  Sorry.  What page?

13                MR. MURPHY:  110, Line 18.

14   BY MR. MURPHY:

15        Q    "Did you ever tell him, David Welch, that,

16   'Look, we're not paying anything more, but if you wanted

17   to get a piece from a seller, that's your business,' or

18   words to that effect?"  And you answered, "It's

19   possible."  Here's my question.  At any point after

20   execution of the conflict waiver, did you have that

21   conversation -- would you have had that conversation?

22        A    After this -- sorry.  After we signed the

23   conflict waiver?

24        Q    Yes.

25        A    No.
```

Page 142

```
 1                    THE WITNESS:  I'm learning.

 2                    ARBITRATOR:  Yeah.  Okay, go ahead, Mr.

 3    Afifi.  Just sit right there.  Just ask --

 4                    MR. AFIFI:  Is this fine?

 5                    ARBITRATOR:  -- your ask your question.

 6    Yeah.

 7                    MR. AFIFI:  Can you pick up audio?  Okay.

 8                    ARBITRATOR:  Just (indiscernible) this is

 9    fine.

10              RECROSS EXAMINATION OF RYAN KUNKEL

11    BY MR. AFIFI:

12         Q    Mr. Kunkel?

13         A    Mm hmm.

14         Q    On the decision that you made to rescind

15    versus terminate that you were just asked about, when

16    you said that you chose rescission because everybody

17    walks away and gets their money back, that doesn't

18    include what Mr. Shiber had lost for the entire year of

19    2018 in either rent or assignment fees.  He'll never get

20    that back, based on that decision.  True?

21                    MR. MURPHY:  Objection.  Calls for a

22    legal conclusion.

23                    THE WITNESS:  Yeah.

24                    ARBITRATOR:  Sustained.

25                    MR. AFIFI:  (indiscernible)
```

Page 150

```
 1                    ARBITRATOR:  Oh, your -- is Mr. Hsu

 2    questioning this witness?

 3                    MR. MURPHY:  Yes.

 4                    ARBITRATOR:  Okay.  That's perfectly

 5    fine.

 6                    MR. AFIFI:  Your Honor, can I just

 7    clarify the question then?

 8                    ARBITRATOR:  What do you want to clarify?

 9                    MR. AFIFI:  That everyone goes back and

10    gets their money back, but Mr. Shiber doesn't get his

11    money back, and that's --

12                    ARBITRATOR:  That's a legal conclusion,

13    and I would expect to hear from both of you in briefs

14    what your analysis is of what rescission would mean in

15    this case, if we were to have rescission.  I mean, I

16    would expect you to brief that.

17                    MR. AFIFI:  Fair enough.  I'll let it go.

18                    ARBITRATOR:  Yeah.  Thank you.

19                    MR. AFIFI:  Learn my lesson.

20                    THE WITNESS:  Where do you want me to

21    move?

22                    MR. MURPHY:  You're done, and --

23                    ARBITRATOR:  You're done.

24                    MR. MURPHY:  For now.  Mr. Davila is

25    going to come.  He's going to grab Mr. Davila.
```

Page 151

1          Q    Have you -- in construction projects that

2     you've worked on, have you been present during an

3     inspection by the City of permitted work?

4          A    Yes.

5          Q    And what happens during -- can you summarize

6     what happens during those inspections?

7                    MR. AFIFI:  Calls for a narrative.  I'm

8     not --

9                    ARBITRATOR:  Overruled.

10                   MR. AFIFI:  Okay.

11                   THE WITNESS:  Do I answer now?

12                   ARBITRATOR:  Government ahead.

13                   THE WITNESS:  Okay.

14    BY MR. HSU:

15         A    So then an inspector shows up to check the

16    first stage, which is rough, meaning any electrical,

17    plumbing and framing that was done.  And that's about

18    it.

19         Q    And does the inspector eventually approve?

20         A    Yeah.  Once approved, and we can cover up the

21    walls.

22         Q    And in your experience from these inspections,

23    if the inspector does not approve of the work, watch

24    happens after that?

25         A    It'll be --

                                        Page 162

```
 1                   MR. AFIFI:  Objection.  Lacks foundation,
 2       Your Honor.
 3                   ARBITRATOR:  Okay.  I'm going to ask you
 4       to stop objecting, unless it's something really
 5       important, because he's just explaining kind of what's
 6       going on in a construction situation.  It's not a major
 7       issue in this case, I don't think.  So let's get through
 8       this.
 9       BY MR. HSU:
10            A    We're given a correction and we're given about
11       24 hours to correct.
12            Q    Is there a fine involved?
13            A    No.
14            Q    How are you -- strike that.  Have you ever
15       done work for Have a Heart Compassion Care?
16            A    No.  Not in the past, no.
17            Q    Well, in -- ever, I assume you have done work
18       for Have a Heart Compassion Care?  And ever -- I'm
19       talking about any time.
20            A    No.  I have not done work for them in the
21       past.  This project was my first project --
22       (indiscernible) yes.
23            Q    Okay.  That's what I'm asking.  So how were
24       you introduced to Have a Heart Compassion Care?
25            A    I was called by Larry Wagner and he mentioned
```

1    he had a building that needed some repairs.  I was given

2    the code to go into the building.  I went in, did my

3    assessment, and came back with a contract.

4         Q    So is Mr. Wagner an employee of Have a Heart?

5         A    Yes, of Have a Heart.  Yes.

6         Q    And he reached out to you?

7         A    Yes.

8         Q    And he informed you that there was a property

9    in Maywood.  Is that correct?

10        A    Yes.   Correct.

11        Q    And what was your understanding of what Have a

12   Heart was intending to do with the property?

13        A    Repair.  Repair the building, because there

14   was a lot of -- when I inspected the building, there was

15   a lot of things that were not up to code.  They were

16   outdated.  There was a lot of electrical problems, a lot

17   of framing problems.  And that's what I went in there to

18   do.

19        Q    And so what was your intended role, at least,

20   with respect to the Maywood property?

21        A    To fix it.

22        Q    As part of your engagement with Have a Heart,

23   was Loroca Builders to pull permits in connection with

24   the property?

25        A    No.

Page 164

1    to rephrase (indiscernible).  We don't have no business

2    with Have a Heart, and you need to get out of here.  If

3    you want to see a document, you have to bring someone

4    who represents Kana.  So on our next meeting --

5         Q    Sorry, just to stop you there.  So this is

6    when Mauricio and Joe from Mr. Welch's office go to the

7    city to try to obtain this document, Mr. Mango at the

8    city said what you had just said?

9         A    No.  I sent Mauricio there first.

10        Q    Okay, got it.

11        A    You know, plans, public -- those are public

12   documents.  He could pull them for any building.  So --

13   but he knew because -- how can I say it?  He didn't want

14   (indiscernible) any information on the building.

15        Q    So then -- so this was prior to --

16        A    Yes.

17        Q    Okay.  So this was prior to when Mauricio was

18   able to obtain this document?

19        A    Yes.  Then we reached out to -- I reached out

20   to David, and David sent Joe with Mauricio to the city.

21   And then they pulled these plans.

22        Q    And they were -- so once Mauricio was able to

23   go into the city with Joe from Mr. Welch's office --

24        A    Yes.

25        Q    -- did you know if they interacted with Mr.

Page 187

1        A      Yeah.

2        Q      And whether you believed the work you did

3   after that was construction work or not, your testimony

4   is that you were loading and installing equipment and

5   other factors after you got that stop-work order, true?

6        A      No.  We were delivering, we were unloading,

7   and leaving materials that needed to be set up by the

8   technicians that were going to come in and do the setup.

9   It was just making sure that everything was in the

10  building.  You know?  That was the only thing that was

11  going on after we got that work-stop order.

12       Q      Okay.  And to your knowledge, was anyone else

13  -- maybe not LaRoca Builders, but any other construction

14  companies or people doing any work after that stop-work

15  order besides you guys?

16       A      No, no.  It was just us.

17       Q      Well, did you ever come in and see that there

18  was some work done that you guys hadn't done on any days

19  after that stop-work order?

20       A      The only thing that -- the only thing that I

21  could say that we did after that -- and I'm going to say

22  you could consider it some work was when we had the

23  flood.  And that was the only work we went in there and

24  did, because we had to stop the damage.  It was ruining

25  everything.

                                        Page  211

```
 1        Q    Is this the flood that after which you went
 2   and got a roof permit, right?
 3        A    Yes.
 4        Q    But after the roof permit, you never did any
 5   work, correct?
 6        A    We didn't do the roof, yeah.
 7        Q    So the flood work that you said you did was
 8   done before you actually went and got the roof permit,
 9   correct?
10        A    We got the roof permit because of the flood,
11   yes.
12        Q    I'm just talking about the work that you did.
13        A    Yes.
14        Q    You said after -- sorry.  You said after the
15   stop work order that you got, you did some work, and
16   that was related to the flood, correct?
17        A    Correct.
18        Q    And I think you testified when Mr. Hsu was
19   asking you that the work you did after the flood was to
20   do some work on the roof to prevent any further leaks.
21   After that, you went and got a permit for.
22        A    No.
23        Q    Okay.
24        A    We went in there to clean up the water and to
25   air out the walls.  And then we got a roof permit.  You
```

                                              Page 212

1    suggested to opening up walls so he could do an

2    inspection; we suggested moving the stairs; we suggested

3    removing the bathroom, and he said, it doesn't matter no

4    more.   He said --

5         Q     Because Have A Heart is not going to get a

6    permit to work it.

7         A     He said they're not going to get a license.

8         Q     But, let me ask you this --

9              THE ARBITRATOR:   It's not the permit,

10   it's the license.

11             MR. DAVILA:   It's the license.

12             THE ARBITRATOR:   Right.

13             MR. DAVILA:   He kept saying --

14             THE ARBITRATOR:   That's the issue.

15             MR. DAVILA:   -- it was from day one, it

16   was the license, from the moment that (indiscernible) --

17        Q     I got you.

18        A     Okay.

19        Q     I got you.   Was there a reason you couldn't do

20   this work, $7000 worth of work, in a week, put it back

21   to the way it was, and then have Kana come and apply for

22   the permit?

23        A     Well, because at that point, we had a Stop

24   Work Order.

25        Q     Of course.   That means you can't work without

Page  237

1              MR. AFIFI:  On the line.  Just kidding.

2              (Laughter)

3          REDIRECT EXAMINATION OF JOSE DAVILA

4     BY MR. HSU:

5          Q     So, Mr. Davila, Mr. Afifi asked you quite a

6     bit about potentially doing work that is ultimately

7     deemed unpermitted by the city, is that right?

8          A     Yes.

9          Q     In your experience, for the work that you do,

10    if you do work that is ultimately deemed unpermitted by

11    the city, does the city instruct you to fix the issue?

12         A     Yes.

13         Q     And do they issue a fine?

14         A     Yes.

15         Q     And typically, in your experience, how much

16    are those fines?

17         A     I'll say in the high $2000s, $3000s, and in

18    the low, $400s.

19         Q     In that November meeting where Mr. Mango

20    visited the property and informed you that Have A Heart

21    couldn't operate in that property, did he issue any

22    fines?

23         A     No.

24         Q     Did he tell you to fix any structural issues?

25         A     No.

                                        Page  244

```
 1          Q    When the Cookies folks purchased the

 2    Huntington Patient Association, was that pursuant to a

 3    written purchase and sale agreement?

 4          A    It was done on a handshake.

 5          Q    So, there were no written documents

 6    memorializing the sale?

 7          A    I think maybe one piece of document, or a

 8    couple pieces of documents.

 9          Q    The store that you operated at the direction

10    of my dear friend, Richie Stone, what was the name of

11    that store?

12          A    GGR.  Gourmet Green Room off the 405 on 2000

13    Cotner street -- or Avenue.

14          Q    Not far from here?

15          A    No.

16          Q    Because that was pursuant to a receivership,

17    you had written instructions governing what you could

18    do, correct?

19          A    No.

20          Q    You had no written instructions to operate the

21    store pursuant to a --

22          A    Well -- Mr. Pasternak told me exactly -- he

23    wanted -- he didn't know anything about running a

24    marijuana shop.  So, I had to bring some of my staff

25    people to run the shop and report the numbers to Mr.
```

Page  274

```
 1                THE ARBITRATOR:  Yeah, go ahead.
 2                MR. MURPHY:  Yeah, thank you.
 3     BY MR. MURPHY:
 4          Q    Are you aware that you've alleged that one of
 5     the item -- the bases for fraud against David Welch is
 6     that Kana never signed a conflict waiver?
 7          A    I did not sign a waiver.
 8          Q    Okay, but are you aware that, on behalf of
 9     Kana, you have sued David Welch for -- based upon the
10     accusation that Kana never signed a conflict waiver?
11                THE ARBITRATOR:  If you don't know --
12                MR. SHIBER:  I don't know, okay.
13                THE ARBITRATOR:  Just say you don't know.
14     There's nothing wrong with that answer.  It's an honest
15     answer.
16                MR. SHIBER:  I don't know.  Yes, ma'am.
17     BY MR. MURPHY:
18          Q    The name Edwin Movagarian has come up in this
19     case, correct?  Do you know who Edwin Movagarian is?
20          A    He was a good friend of mine.
21          Q    A couple weeks ago, you sued him for fraud and
22     breach of fiduciary duty, correct?
23          A    Yes.  He owes me money.
24          Q    And that's based upon a $300,000 dollar loan,
25     correct?
```

Page 278

```
 1                    MR. AFIFI:  -- either this case has merit
 2     or it's not.  It's on its own merits.
 3                    THE ARBITRATOR:  Right.  That's right.
 4                    MR. AFIFI:  It doesn't matter what else
 5     he's done.  That's why it's not relevant, but...
 6                    MR. MURPHY:  Amazing.
 7                    MR. SHIBER:  Excuse me?  I thought you
 8     said something.
 9                    MR. MURPHY:  I said, "Amazing."
10                    MR. SHIBER:  Oh, okay.
11     By MR. MURPHY:
12         Q    Kana was formed in 2017, correct?
13         A    I don't remember the date, but close, yes.
14         Q    All right, and well, you were the
15     incorporator.  You started Kana, Inc., correct?
16         A    Yes.
17         Q    The sole purpose for creating Kana was to
18     obtain licenses in the City of Maywood, correct?
19         A    That, and I like the name.  I want to preserve
20     the name.
21         Q    Kana has performed no other function from when
22     it was created to the present, other than to be the
23     holder of those licenses, correct?
24         A    Yes.
25         Q    When you formed Kana, your purpose was
```

Page 284

**EXHIBIT "8"**

```
 1              And we discussed, yes, genuinely, I went
 2   with good faith with Mr. Kunkel -- and he's real nice
 3   guy -- that, you know, I want to do my best in my
 4   benefit to continue for him to operate in that location
 5   because of profitable for me.  But then, I found out
 6   it's one year and five years.  If he practice his rights
 7   on five years and I still have the license, the license
 8   will not be good without that location.
 9              So whoever wrote the contract is -- it
10   does not make sense because if he let the license go and
11   continue with the building, my license will go away, so
12   all the couple years I worked to obtain the license is
13   going to go away.  I trust -- with all honesty, I
14   trusted David that he has out best interest in there and
15   we continue because I'm going to make money, he's going
16   to make money, and Mr. Kunkel going to -- profitable
17   because it's a good location.  Cookies are doing good
18   business in there.  So I thought everybody benefit --
19              ARBITRATOR:  So Mr. Welch was just very
20   persuasive?
21              THE WITNESS:  Yes, ma'am, and he -- like,
22   you see the text, yes, so he said 99 years.  And I
23   calculated 99 years, yes, it enticed me to go into this
24   thing, but knowing that one year and give him -- Mr.
25   Kunkel wants six months.  We have that disagreement in
```

Page 23

```
1    David's office and I compromised, six to three months.
2    I wouldn't even give him three months if I know that is
3    one year, you know.  And I'll be -- all honestly, that I
4    was genuine with this contract and I hope that we could
5    do other business with Mr. Kunkel, you know?
6                    ARBITRATOR:  Okay.  Now, I'm going to
7    turn this back to Mr. Murphy.
8                    MR. MURPHY:  There's a lot to unpack
9    there.  Okay.
10   BY MR. MURPHY:
11        Q    So you testified at your deposition and your -
12   - indeed, your counsel has represented in this case that
13   you didn't read the agreement because you have dyslexia?
14        A    I can read certain words; certain words, I
15   cannot, you know, read it and I cannot comprehend it.
16   And I relied on David by his text, says 99 years and,
17   you know, it's going to be profitable, yada, yada, yada.
18        Q    Do you believe you're excused from this
19   contract because you have dyslexia?
20        A    No.  I'm -- actually, my dyslexia is -- made
21   me work harder to kind of compensate for my, if you
22   will, my deficiency --
23        Q    I --
24        A    -- in reading.
25        Q    I appreciate that, and I'm not asking these to
```

Page 24

```
 1                    MR. AFIFI:  Thank you.

 2                    ARBITRATOR:  Please, until something

 3     really important?  It's distracting to all of us.  Just

 4     let him ask his questions.

 5                    MR. MURPHY:  I just need to ask the

 6     question again, because the whole purpose --

 7                    ARBITRATOR:  Yeah, go ahead.

 8                    MR. MURPHY:  -- of that was to disrupt.

 9     So I'm going to ask this again.

10                    MR. AFIFI:  Your Honor, I object to that

11     comment, though.  The comment (indiscernible) --

12                    ARBITRATOR:  Okay.  You may object to it,

13     but I'm asking you now to be quiet because you are

14     interrupting and I'm going to ask him not to interrupt

15     your examination of the witness as well.  It's

16     evenhanded.

17                    MR. AFIFI:  Yes, Your Honor.

18     BY MR. MURPHY:

19          Q     So I want you to think about the four licenses

20     issued by the City of Maywood to Kana.  Are you thinking

21     about those?

22          A     The -- yes.

23          Q     Okay.  And Kana is the holder of those

24     licenses, correct?

25          A     Yes.
```

                                                    Page 35

1        Q    And the City of Maywood recognizes Kana as the
2    holder of those licenses, correct?
3        A    Correct.
4        Q    And the ownership of those licenses is Kana,
5    correct?
6        A    In a way, yes.  Because I'm controlling Kana.
7    I own the licenses.
8        Q    With that caveat, okay.  So the ownership
9    which is currently held by Kana, controlled by you,
10   cannot be transferred to Have a Heart, correct?
11       A    No, it can transfer.
12       Q    How?  You're saying that the City of Maywood
13   would allow Have a Heart to become an owner of those
14   licenses?
15       A    To my understanding, yes.
16       Q    Okay.  But that never happened, did it?
17       A    It did happen.
18       Q    It did?  When did Have a Heart become the
19   holder of those licenses?
20       A    I think I saw some documents that he was
21   saying I'm the owner of Kana and they're -- I don't have
22   the document in front of me --
23       Q    That's not the question.  That's not my
24   question.  When did Have a Heart, the entity, become the
25   holder of the licenses issued by the City of Maywood?

                                              Page 36

```
 1    think, a pretty simple accounting matter that the

 2    lawyers can take a look at.

 3    BY MR. MURPHY:

 4         Q    Could you turn to Exhibit 29?

 5         A    Me?

 6         Q    Yes -- I don't think you actually have it in

 7    front of you, so we're just going to -- and if you could

 8    scroll down and find the earliest of these checks.  They

 9    start in reverse order, so -- and just pause here.  You

10    wrote this check to David Welch on November 7th, 2018,

11    for $6,000, correct?

12         A    I think so, yes.

13         Q    And that's --

14         A    -- remember, yes.

15         Q    That $6,000 was to pay David Welch for his

16    portion of that month's license and lease payments from

17    Have a Heart, correct?

18         A    Yes.

19              MR. MURPHY:  Okay.  So scroll down.  So

20    this was October.  Scroll down, September.  August.

21    Actually, could you go to August for me real quick?

22    BY MR. MURPHY:

23         Q    So this is for $7,200.  This was Maywood

24    August fees and what else were you paying him for?  Do

25    you recall?
```

Page 60

```
 1    by now instead having an empty building.  But I file a
 2    lawsuit about my good friend so I can get my money back
 3    so I can get some work done.
 4         Q    Well, you had $300,000 from the security
 5    deposit.  You could've used that.
 6         A    Is that a question?
 7         Q    Yeah.  You could've used the security deposit
 8    to pay for improvements on the building.
 9         A    Well --
10         Q    Isn't that what it's for?
11         A    Well, the 300 -- when the defaulted on the
12    lease, they had five more years, so that went to the
13    defaulting of the lease.
14         Q    So your testimony is that the balance of the
15    security deposit was used to pay the remaining five
16    years on the least after rescission?
17         A    Absolutely.  I have expenses.  I have taxes.
18    I have everything else.  And to comment that I visit the
19    building and the building had a kitchen, have a shower,
20    have a bathroom.  All of them are gone, so there's no --
21    I understand it was outdated kitchen in the building,
22    but the company took the kitchen out.
23         Q    Well, except you wouldn't know because you
24    hadn't visited the building until you -- until after you
25    took possession?
```

Page 82

1        A     Once we were doing the whole (indiscernible)

2    of figuring out how to get open, I guess.

3        Q     So we've had a lot of testimony; you haven't

4    been here.  Are you talking about when disputes had

5    arisen with the city or --

6        A     Yes, yes, after I seen the city cuss out Mr.

7    Elias' representative and witnessed that whole thing.

8        Q     All right.  We will get to the cussing in a

9    minute.

10       A     Yeah, but, yeah, I received some plans from

11   Welch.  They were not plans that I had.  It clearly

12   would not work for us.  There was productions lights in

13   the plans and we are a retail company, so I --

14             ARBITRATOR:  You were going to grow?

15             THE WITNESS:  That's not what we do.

16   BY MR. MURPHY:

17       Q     So you received the plans from Charley and

18   then what is the next task that you had to perform for

19   the Maywood property?

20       A     I do some research to try to find who's

21   building in the area, someone that's reputable, so

22   usually we'll see who's pulling permits or we'll check

23   advertisements and we'll have some phone calls with a

24   couple local contractors.

25       Q     And did you interview multiple contractors?

                                           Page 101

```
 1    the Have a Heart logo.
 2         A      Yeah, that's last -- that's the glass they
 3    used to make a swimming pool shimmer.
 4         Q      Okay.
 5         A      Actually hard to get.  Expensive, anyways.
 6    It's really beautiful when the light hits it.
 7         Q      So that's the floor?
 8         A      Yes, I have Joe Dugan out of San Luis Obispo
 9    does Pebble Tec.  He does a great job.
10         Q      So this is pebble -- the pebble floors, is the
11    name of the company.  Is that right?
12         A      Pebble Tec, yes, sir.
13         Q      Pebble Tec.  Okay, thank you.
14                    ARBITRATOR:  Nice logo.
15                    THE WITNESS:  Thank you.  Yeah, we're all
16    really excited about that.
17                    MR. MURPHY:  Scroll down to the next
18    picture, please.
19    BY MR. MURPHY:
20         Q      And this is not -- this is how the building
21    looked when you first -- before you began construction?
22         A      What?
23         Q      Is this how the building looked before you
24    began construction?
25         A      No.
```

Page 104

```
 1        Q    This is towards the end?
 2        A    Yes.  Yeah, there's heavy wall vinyl up and
 3   it's -- finishes happening.
 4        Q    You said vinyl?
 5        A    Yeah, it's heavy wall vinyl.
 6        Q    Okay.  Scroll down to the next.  And this is
 7   before the vinyl went up, correct?
 8        A    Correct, yeah.  That's when they were prepping
 9   a level five finish so that heavy wall vinyl can be
10   installed.
11        Q    Thank you.  Next picture, please.  What is
12   this that we're looking at?
13        A    Looks like the dumbwaiter.
14        Q    Oh, that's right.  There's a dumbwaiter in the
15   building and it had to be -- did it have to be restored
16   somehow?
17        A    Yeah, I mean, that was a custom-made
18   dumbwaiter.
19        Q    Thank you.
20        A    In order to safely get product from -- product
21   inventory safe upstairs where it's securely kept.
22        Q    Scroll down.  Let's stop here.  So we've seen
23   a lot of floor plans that have a large space towards the
24   back of the building.
25        A    Yes.
```

Page 105

```
1    delivery, and (indiscernible) on this manufacturing, and
2    we had -- we just had to go through a lot of different
3    hurdles to make sure they're all completely separated
4    and had different common areas and it just -- I mean,
5    Maywood, obviously, is different than Oakland, but that
6    wouldn't have been approved.
7                    ARBITRATOR:  What did you mean when you
8    say incubated 10 people?  What --
9                    THE WITNESS:  Yeah, so --
10                   ARBITRATOR:  What are you talking about?
11                   THE WITNESS:  Essentially, for the next
12   three years we pay all their rent and we gave them free
13   space in order to --
14                   ARBITRATOR:  Oh, getting them started --
15                   THE WITNESS:  -- their business.
16                   ARBITRATOR:  Startups?
17                   THE WITNESS:  Yes.
18                   ARBITRATOR:  Are they the ones who -- I
19   live up near there.
20                   THE WITNESS:  Yes.
21                   ARBITRATOR:  Are they the ones who were
22   formerly operating illegally and now Oakland is bringing
23   some of them in and trying to make them into the lawful
24   biz?
25                   THE WITNESS:  There is some of that.
```

Page 123

```
 1                    ARBITRATOR:  Uh huh.
 2                    THE WITNESS:  These particular
 3    incubators, I don't know, because I don't think Josh
 4    Chase had a record.  I know for our store up there, we
 5    had to hire 75 -- I think over 75 percent of the people
 6    had to be incarcerated.
 7                    ARBITRATOR:  Yeah.
 8                    THE WITNESS:  For a cannabis charge.
 9    It's very unique.
10                    ARBITRATOR:  Right.  Where is that?
11                    THE WITNESS:  That's in Oakland --
12                    ARBITRATOR:  On where --
13                    THE WITNESS:  On Broadway Street.
14                    ARBITRATOR:  On Broadway?
15                    THE WITNESS:  Right next to the police
16    station.
17                    ARBITRATOR:  All right.
18                    THE WITNESS:  Just literally -- you know
19    the big main police station?
20                    ARBITRATOR:  I do.
21                    THE WITNESS:  You cannot miss it.  Right
22    in Chinatown.
23                    ARBITRATOR:  Oh.
24    BY MR. MURPHY:
25         Q    Isn't it amazing the world, just -- you have a
```

Page 124

1    cannabis operation next to a police station.  It's

2    amazing.

3         A    Yeah, it was on the news a couple times,

4    actually.

5         Q    It's amazing.

6              ARBITRATOR:  Yeah, well, it's probably

7    pretty good, though, the police are right there.

8              THE WITNESS:  That's right.

9              ARBITRATOR:  Keep an eye and make sure

10   there aren't more robberies or whatever.

11             MR. MURPHY:  Especially if you have your

12   point of sale right next to the (indiscernible).

13             THE WITNESS:  That's what we're hoping,

14   for sure.

15             ARBITRATOR:  Yeah.

16   BY MR. MURPHY:

17        Q    At what --

18             ARBITRATOR:  I had a case about that one

19   time, that they -- what you had to go through to get a

20   permit, what were the requirements in Oakland and

21   Emeryville.

22             THE WITNESS:  It is so unique.

23             ARBITRATOR:  Yeah.

24             THE WITNESS:  I think it's -- they're

25   still kind of figuring out as they go, but they had some

1    bad --

2                      ARBITRATOR:  (indiscernible).

3                      THE WITNESS:  They had some scenarios

4    where people would -- people in really small areas and

5    ended up some big fights and it ended up being, just not

6    what they wanted, so they were, I think, really happy

7    when Broadway opened and Chapman was the name of the

8    street where we did the incubators.

9                      ARBITRATOR:  Yeah.  Good, thank you.  I

10   was interested.

11   BY MR. MURPHY:

12       Q    What did you -- what were you instructed, if

13   you recall, do to with these plans when he sent them to

14   you, when David Welch sent them to you on November 1?

15       A    Well, at this point, him and Jose started

16   working together with Mauricio and this Joe guy, but it

17   seems like he's telling me to not include cultivation

18   and have some new proposed plans match these plans, in

19   particular, the stairwell.

20       Q    And you said in particular -- so what about

21   the stairwell needed to be changed in the plans?  Do you

22   recall?

23       A    Yeah, I think they wanted -- I don't want to

24   butcher this, but he was at this point trying to have

25   our plans mimic these plans, to a certain degree because

```
 1   then they would sign off on it.   And so at this point,
 2   he was saying, hey, if you -- you need to move a
 3   stairwell.   I mean, at this point, we're like, hey, I
 4   mean, whatever you tell us to do, we're obviously -- we
 5   would like to do.   So -- to get open.
 6        Q    Could you please turn to Exhibit 91?   Do you
 7   recall receiving this email from David Welch the next
 8   day?
 9        A    I see from Jose -- yeah, Jose sent some
10   modifications.   Looks like these threads from Jose to
11   Michael, sent to -- from David Welch to Jose Davila and
12   then Joseph -- I think Joseph, the CC on that is the
13   football guy.
14        Q    Oh, Joseph (indiscernible)?
15        A    Yeah, I believe that he works -- I believe he
16   works for Mr. Welch in his firm.
17        Q    And was this the guy you were talking to --
18   about before who --
19        A    Supposed to talk to Mango.
20        Q    The football player.
21        A    Yes, ex-football player or something,
22   (indiscernible).  "My initial review looks good.  Let me
23   take a closer look over the weekend."
24        Q    Do you --
25        A    Yeah, so I think at this point, he's saying --
```

Page 127

```
 1                    THE WITNESS:  -- like he was pretty mad
 2     at Shiber.  I mean, I don't even -- he didn't mention
 3     Welch at all.  It was -- you know, Elias can call the
 4     mayor all he wants this time, it's not going to do
 5     anything.  I'm tired of this --
 6                    ARBITRATOR:  And could you tell why --
 7                    THE WITNESS:  -- S-H-I-T.
 8                    ARBITRATOR:  -- he said he was angry at
 9     Shiber?
10                    THE WITNESS:  It seemed like they had
11     some history and I think -- I don't want to butcher
12     this, but I feel like Elias had maybe had friends there
13     and was able to get things done that Mango wasn't happy
14     about.  You know what I mean?  And I think since then,
15     that mayor and those council members are no longer
16     there.
17                    ARBITRATOR:  Yeah, I heard.
18                    THE WITNESS:  Okay.
19                    ARBITRATOR:  Okay, yeah.  Thank you.
20     BY MR. MURPHY:
21         Q     Could please flip to Exhibit 12?
22         A     Exhibit 12.
23         Q     the first page here is an invoice from La Roca
24     Builders and the date is 1/24/2019.
25         A     Yes.
```

Page 132

```
 1        Q     Were you the person who received invoices from

 2   La Roca Builders?

 3                    MR. AFIFI:   What exhibit?

 4                    MR. MURPHY:   I'm sorry, Exhibit 12, Page

 5   1 is where we are.

 6                    MR. AFIFI:   Thank you.

 7                    THE WITNESS:   I am confused on the date

 8   because I believe that -- I mean, 1/24/2019, that's kind

 9   of...

10   BY MR. MURPHY:

11        Q     So I'm just going to let you rest assured,

12   we've already had Jose --

13        A     Okay.

14        Q     -- deal with dates.

15        A     Okay.

16        Q     But I just want to ask you about who was the

17   person who processed upon receipt --

18        A     Yeah, Jose --

19        Q     -- invoices?

20        A     -- forwards me an invoice, or typically how it

21   works, a general contractor, we'll come to an agreement.

22   Like, hey -- every project's different, right, so

23   sometimes it'll be every two weeks you'll invoice me,

24   right, for work done.  You know, you want to keep your

25   general contractors paid so they can continue to move
```

Page 133

```
 1          Q     Okay.

 2          A     -- music.

 3          Q     So there were change orders that were sent to

 4    you by text by Mr. Davila?

 5          A     Well, like the live music, I don't know if

 6    that's necessarily a change order for work because

 7    that's more of, like, asking a band to play at our grand

 8    opening, right, so I don't -- it's not necessarily a

 9    construction-related deal, nor is storage rental for all

10    the equipment we pulled out of there.

11          Q     Let me make it simpler.  Was any of the work

12    described on Page 12.1 -- again, that first page --

13          A     Yes.

14          Q     Any of that work described in any texts by Mr.

15    Davila to you?

16          A     Text or phone call.

17          Q     I'm only asking about texts now.

18          A     Oh.

19          Q     You told me about emails.  I got that.

20          A     I don't know.  I'd have to check my records if

21    we had texts on it, but I know it was communicated via

22    text or phone call.

23          Q     And by --

24                ARBITRATOR:  Let's move on from the

25    subject.  You've kind of gone over and over it.  What's
```

Page 154

```
 1    the point?

 2               MR. AFIFI:  You'll get it in just a

 3    minute, yes, Your Honor.

 4               ARBITRATOR:  Okay, I'll get it.

 5               MR. AFIFI:  Yes.

 6               ARBITRATOR:  All right.

 7               MR. AFIFI:  Thank you.

 8    BY MR. AFIFI:

 9        Q    Mr. Raquiza, putting phone calls aside, to the

10    extent there were texts, did you ever, prior to today,

11    look through your texts with Mr. Davila to produce them

12    to counsel for Have a Heart in this case?

13        A    I looked for Mr. Welch texts. I don't -- they

14    had me to that app.  There's like an app that you can

15    use to make your text messages into a pdf format so then

16    I could put it to my email, then forward it for Mike to

17    review when this case started.  I don't -- can I ask him

18    about that?

19               MR. MURPHY:  I would object on attorney-

20    client privilege (indiscernible).  I mean, you're

21    talking about --

22               THE WITNESS:  I can --

23               ARBITRATOR:  Well, I don't think we've

24    gotten into --

25               MR. MURPHY:  Yeah.
```

Page 155

```
 1                   ARBITRATOR:   -- an attorney-client
 2    privilege yet.   We're talking about --
 3                   THE WITNESS:   I don't know if I did that
 4    with Jose Davila's text messages or not.
 5    BY MR. AFIFI:
 6        Q     Okay, I'll represent to you --
 7        A     I --
 8        Q     -- some --
 9        A     -- with Mr. Welch.
10        Q     -- texts between you and Mr. Welch were
11    produced.
12        A     Yes.
13        Q     And mister -- you and Shiber were produced.
14        A     Yes, I -- that's my point.
15        Q     Okay.
16        A     No, I did that.
17        Q     But at no point were any texts between you and
18    Mr. Davila produced for us in this case.  So my question
19    is, did you ever look through and try to get, through
20    the program or whatever, any texts you had between you
21    and Mr. Davila?
22        A     No.
23        Q     Okay.  Let me move on.  Now we're done.  Thank
24    you.
25                   ARBITRATOR:  Thank you.
```

Page 156

```
 1   BY MR. AFIFI:

 2        Q    You -- towards the end of your testimony with

 3   Mr. Murphy earlier today, you said that -- you described

 4   a conversation that you had with this gentleman Edwin

 5   after that meeting with David Mango.  You recall that?

 6        A    Yes.

 7        Q    So there was that yelling match between him

 8   and David Mango.

 9        A    Yes.

10        Q    And then afterwards, you described your

11   conversation with Edwin, right?

12        A    Well, yeah, they were cussing at each other.

13   Yes.

14        Q    No, they were cussing --

15        A    Yes.

16        Q    Then after that, you described today, a

17   conversation between you and Edwin, right?

18        A    Yes.

19        Q    And you said that in that conversation, Edwin

20   told you that, why did you use this general contractor,

21   you should've used another general contractor that we

22   could've use to go through the --

23        A    It's not why did we use a general contractor.

24   It was, you used the wrong general contractor.  Because,

25   like, you know, this isn't how it's done here.
```

Page 157

```
 1          Q    Okay, so when she said --

 2               ARBITRATOR:  I'm much scarier.

 3               THE WITNESS:  I mean, not that I don't

 4    like you --

 5               ARBITRATOR:  I'm way scarier than --

 6    BY MR. AFIFI:

 7          Q    I get it, but (indiscernible) she has all the

 8    power here, so --

 9          A    Okay.

10          Q    So when Ms. Claiborne asked you --

11          A    Yes.

12          Q    -- were you supposed to use a contractor who

13    was going to bribe someone --

14          A    Yeah.

15          Q    -- and you said yes, you were being careful

16    and accurate then, too, right?

17          A    Yes.

18          Q    Yeah.  That's the conversation you and Edwin

19    had as you can relate it today, right?

20          A    Yes.

21          Q    And we -- at your deposition, I asked you

22    about that same event.  You recall that?

23          A    No.

24          Q    Was there a reason, can you tell me, that you

25    didn't disclose any of this about Edwin telling you you
```

                                        Page 161

```
 1    think we ever got to that.

 2    BY MR. AFIFI:

 3         Q    Okay.  Let me read from your deposition.  Have

 4    you read your transcript from your deposition?

 5         A    No, I have not.

 6         Q    All right, so let me read it for you and see

 7    if this is -- starting on Page 51.  By the way, the

 8    total transcript is 72 pages, so --

 9         A    Do I have a copy of that here, in this book?

10         Q    Your counsel does.

11                   MR. MURPHY:  No, I don't have his

12    transcript here.

13                   ARBITRATOR:  You have to just listen.

14                   THE WITNESS:  Okay, no --

15                   ARBITRATOR:  He'll --

16                   THE WITNESS:  No worries, Mr. Afifi.

17                   ARBITRATOR:  He'll get --

18                   THE WITNESS:  I believe you.

19    BY MR. AFIFI:

20         Q    Okay, I'm just going to read from your

21    transcript, starting on Page 51, Line 7.  "Question --

22                   ARBITRATOR:  Let's just move on with it.

23    It's going to take a long --

24                   MR. AFIFI:  Let me read it, if I read it

25    wrong before.  Is that all right?
```

Page 164

```
1    to let you know that part of the conversation before we

2    got into the car and drove to Maywood.

3         Q    Okay --

4         A    And today, I did remember that after talking -

5    - we had, like, 20 minutes to talk before we came in and

6    I remembered that when I was talking to Mike.

7                   MR. MURPHY:  Can I just -- you never said

8    at the end of this, is there anything else, so you're

9    making the witness feel like he did something wrong

10   here, so I --

11                  ARBITRATOR:  He did nothing wrong.

12                  MR. MURPHY:  Yeah, so you never followed

13   up and said, is there anything else.  So what -- that's

14   not (indiscernible).

15                  ARBITRATOR:  Let's not go there --

16                  MR. MURPHY:  Yeah.

17                  ARBITRATOR:  -- because I'm not hearing

18   that he did anything wrong.  You don't need to defend

19   him --

20                  MR. MURPHY:  I --

21                  ARBITRATOR:  -- in that regard.

22                  MR. MURPHY:  Thank you.

23                  ARBITRATOR:  Let's just --

24                  THE WITNESS:  But, Mr. Afifi, to help you

25   out, just so you know, that conversations where he
```

Page 168

1    talked about, we paid the wrong contractor, was like in

2    that parking lot of the city right when we walked out of

3    there.  And then we did jump in the car to go to the

4    spot and that's when he looked at it, so that would be

5    the sequence of events.

6    BY MR. AFIFI:

7         Q    I understand.  Just so we're clear, when you

8    were in the parking lot with Edwin, the yelling match

9    had already stopped, right?

10        A    Yeah, well, the yelling match was inside the

11   city.

12        Q    Got it.

13        A    And then you walk --

14        Q    There was no yelling match out in the parking

15   lot, true?

16        A    Well, no, Mango was -- me and Edwin were never

17   yelling at each other at all.  Like, I didn't say

18   anything inside the city.

19        Q    Thank you.  You answered my question.

20        A    Okay.

21        Q    Thank you.  Okay, let me show you Exhibits 212

22   and 13, and they are in large part, similar to

23   photographs you just say, but these were the exact

24   photos at your deposition, so I want to ask you in that

25   order, if you don't mind.  Starting with 212.

Page 169

```
1        A    I believe I was in Washington.

2        Q    State of Washington?

3        A    I think so, or maybe I did it right when I got

4   back.  I'm not sure.  I believe I did it either same day

5   or when I got back.

6                 ARBITRATOR:  You know, if you don't know,

7   you can just say, I don't know.

8                 THE WITNESS:  Just say, I don't know?

9                 ARBITRATOR:  I don't remember.

10                 THE WITNESS:  Okay.  I don't remember.

11  BY MR. AFIFI:

12        Q    Would it have been either Washington or Santa

13  Barbara?  Were those the two choices?

14        A    I don't remember.

15        Q    Was there somewhere else that you were in

16  February besides the State of Washington or Santa

17  Barbara, where you resided?

18        A    Quite possibly.  We've been very busy.

19        Q    Okay.  You weren't in Los Angeles, then,

20  though?

21        A    Are you asking me if I was in Los Angeles in

22  February?

23        Q    On February 1st.

24        A    I don't remember.

25        Q    Okay.  You told me that this wasn't even on
```

                                        Page 178

```
 1    your radar.  Maywood wasn't even on your radar as of

 2    February 1st, so my question is, was there any reason

 3    you would've been in Los Angeles then?

 4                    ARBITRATOR:  I think the witness has --

 5                    THE WITNESS:  I don't remember.

 6                    ARBITRATOR:  -- already said in many

 7    different ways that he doesn't recall.  I don't really

 8    want him to speculate.  I think, let's just move on.

 9                    MR. AFIFI:  Okay, Your Honor.

10                    THE WITNESS:  I can -- if you wanted to,

11    if it was, like, important, I could find where -- I

12    could, like, contact my banker and I could figure out

13    where I sent the wire from.

14    BY MR. AFIFI:

15         Q    Okay.  Do you remember -- do you recall which

16    branch you used to wire the money?

17         A    No.  If I recalled what branch I used, then I

18    would know where I was at.

19         Q    Okay.

20         A    So...

21         Q    Do you remember what time of day you --

22                    ARBITRATOR:  Why is this relevant to the

23    issues in this case?  We know that he sent it.  We know

24    why he sent it.  We know what day he sent it on.

25                    MR. AFIFI:  I just have one more question
```

Page 179

```
1    on that.
2                    ARBITRATOR:  Okay.
3                    MR. AFIFI:  I'll move on.
4                    ARBITRATOR:  All right.
5                    THE WITNESS:  I'm sorry, Mr. Afifi.  I
6    mean, I definitely could find that out for you.
7                    MR. MURPHY:  You don't need to apologize.
8    BY MR. AFIFI:
9         Q    Okay, so you have some records to show when
10   the wire was sent.
11        A    Something -- I think I can -- you want to flip
12   that the other way?  Maybe there's some information on
13   that.
14                   ARBITRATOR:  Does it make a difference to
15   our case --
16                   MR. AFIFI:  That wasn't my question.
17                   ARBITRATOR:  -- where he was when he sent
18   it?
19   BY MR. AFIFI:
20        Q    Yeah, just -- my question is, do you know what
21   time of day you sent the wire?
22        A    Well, the -- it might tell us right there.
23                   ARBITRATOR:  Say it, yeah.
24                   THE WITNESS:  Can we flip it?
25                   MR. AFIFI:  I'm sure someone can flip it.
```

Page 180

```
 1    that was being done at --
 2                  MR. MURPHY:  Objection.  Calls for a
 3    legal conclusion.  Sorry.
 4                  MR. AFIFI:  -- at the Maywood property.
 5                  ARBITRATOR:  Sustained.
 6    BY MR. AFIFI:
 7        Q    Okay.  Did you see any document that led you
 8    to believe that these were permitted plans that you had
 9    at the city of -- for the work that you were doing at
10    the City of Maywood?
11        A    Every time I get a set of plans -- I thought I
12    answered this for Mike, but I'll clear this up for you.
13    By the time something gets to me, that means it's time
14    to go build it which means that Charley in design has
15    gotten with the local attorney and it's time to build
16    now, which means that there's plans.  We build very nice
17    buildings and if we didn't have permits, we would never
18    be -- it wouldn't come to my desk, so, I don't know how
19    to answer your question.
20        Q    Okay.  Do you remember at your deposition when
21    I asked you this, you said that you never saw any
22    construction permits but believed Welch was handling all
23    of the permitting?
24        A    Correct.
25        Q    So let's break it down.  So, two things.  You
```

Page 184

```
1    never saw any permitted plans but you thought Welch was
2    handling it, correct?
3         A    Okay, I can answer your question, yes.  I
4    guess I never saw --
5                   MR. MURPHY:  I didn't get a chance to
6    assert my same objection for legal conclusion because
7    you're asking about permitted plans.
8                   MR. AFIFI:  That's in his prior
9    testimony.
10                  THE WITNESS:  Okay, yes, I never saw
11   permitted plans.  We could say that, I guess.
12   BY MR. AFIFI:
13        Q    Okay, thank you.  Now --
14        A    I mean, the thing is, is that now that I'm at
15   the end of this, I -- okay.
16        Q    Yeah, just wait for a question.  You also said
17   that when you were first engaged to start working on
18   this project, you did some research and you described
19   what that research was.  Do you remember that?
20        A    No.  Could you help me?
21        Q    today, you said that you did some research.
22   You went -- you looked for permits and you did some --
23        A    I --
24        Q    -- research for contractors --
25        A    I didn't say I looked --
```

Page 185

```
 1                    MR. MURPHY:   Misstates prior testimony.
 2    BY MR. AFIFI:
 3         Q     Sorry?
 4         A     I don't believe I said I looked for permits.
 5    I said I tried to find a local contractor.
 6         Q     How about -- you didn't say anything about
 7    permits?
 8         A     Maybe I said something like, I would try to
 9    find local contractors that have worked at the city
10    before and have pulled permits or something.
11         Q     Okay.  That pull permits.
12         A     Well, yeah, because how we do it is, like,
13    Larry, a project manager that works with me, he'll like
14    -- he'll look at whatever you can look at on the city's
15    site -- I'm not aware -- and he'll try to see, like,
16    who's working there and that's usually the list of
17    people that we try to call to find a contractor.
18         Q     Got it.  As part of your research, did you
19    look to the County Recorder's Office to see what was
20    recorded on the property at all?
21         A     No.
22         Q     All right.  And I believe you said that the
23    permitting process, the cost of getting permits, as you
24    understood it, would've been more expensive to have a
25    contractor do than an attorney do, correct?  That was
```

Page 186

```
 1          A      And --

 2                      ARBITRATOR:   And local code.

 3                      THE WITNESS:   Yeah, I mean, all the -- to

 4     me, I think it's all kind of different, wherever you go

 5     because there's different climates and so there's

 6     different codes and even different building materials,

 7     so in my experience, you want to use someone local that

 8     has already built in the area and is up to date on how

 9     things are supposed to be.

10     BY MR. AFIFI:

11          Q      And based on your building and project

12     management history, you would agree, would you not, that

13     the first step to make sure things are built to code is

14     to make sure you have permits for the building you

15     intend to do, correct?

16          A      I don't understand the question.

17          Q      To make sure that the final product is built

18     to code, one of the steps, you testified to, is to make

19     sure you got a contractor who's -- understands what the

20     code is, right?

21          A      Yes --

22          Q      You just testified.

23          A      Correct.

24          Q      And would you agree with me that the first

25     step, before you even get the contractor to make sure
```

Page 189

```
 1        A    Yes.

 2        Q    And the Exhibit 89 that was shown to you, and

 3    I'll put it up again or if you want to look at it, it's

 4    in the other book.  I'll put it up for the Court.

 5        A    So you started that, Mr. Welch is Have a

 6    Heart's attorney?

 7        Q    No, Exhibit 89 I'm asking you about now.  this

 8    is the November 1st email that Mr. Welch sent to you.

 9        A    Yeah.

10        Q    It says, "See attached.  Use the name Kana."

11    Right?

12        A    Yes.

13        Q    And then there's these plans that you spent

14    quite a bit of time explaining the deficiencies.

15        A    Was that defined as quite a bit of time to

16    you?

17        Q    Earlier, because we don't have to take that

18    right now.

19        A    Okay, I'm just -- for the record, I think

20    quite a bit of time is an opinion, but okay.  I could've

21    gone a lot longer.

22        Q    No problem.  What I'm trying to say is we

23    don't need to take that time again.

24        A    Yes, sir.

25        Q    You've already covered it.
```

Page 198

1           MR. AFIFI:  Your Honor, that's why I'm

2     asking.

3           ARBITRATOR:  Well, yeah, you are, but

4     you're asking it in a way that implies or puts words in

5     his mouth, I think, that implies the he said something

6     different from what he said.  So please, be careful

7     about that.  Is Edwin coming to testify in this case?

8           MR. AFIFI:  He's not on either of our

9     witness lists.

10          ARBITRATOR:  Be interesting to hear from

11    him.

12          MR. AFIFI:  Okay.

13          ARBITRATOR:  Well, I mean, it may not be

14    possible, but, you know, it sounds as if he may have

15    made some comments that would've helped us here.

16          THE WITNESS:  Mr. Afifi?

17    BY MR. AFIFI:

18      Q    Let me ask the question, Mr. Raquiza --

19      A    I was in that city --

20      Q    Would you mind?

21      A    -- and Mr. Mango said, hey, Elias isn't going

22    to be able to call the mayor to get this one done.  You

23    know what I mean?  Which would make me think that he has

24    connections, Mr. Shiber over there, at the City of

25    Maywood.  Maybe not anymore, but when that mayor and

Page  201

```
 1    that city council was there.

 2                   MR. AFIFI:   Your Honor, first of all, I

 3    move to strike as nonresponsive.   I hadn't asked a

 4    question.

 5                   ARBITRATOR:   Well, you know, we were

 6    having this discussion and we don't strike in

 7    arbitration.   That's not the way we operate.

 8                   MR. AFIFI:   Well if we don't, then this

 9    is where I was going.

10                   ARBITRATOR:   Okay.

11    BY MR. AFIFI:

12        Q    Okay, so you're suggesting that what Edwin

13    said to you was that Elias is not going to be able to

14    get this one through, correct?   Is that right?

15        A    Wait, Mr. Mango said that.

16        Q    No, Edwin.   You said Edwin told you that.

17        A    No, Mr. Mango was yelling at Edwin telling him

18    that.

19        Q    I --

20                   MR. MURPHY:   (indiscernible).

21                   THE WITNESS:   Okay.

22    BY MR. AFIFI:

23        Q    Mr. Raquiza.   Mr. Raquiza.

24        A    Yeah.

25        Q    I --
```

```
 1                    THE WITNESS:  Yeah, I think I got --

 2                    ARBITRATOR:  -- to how many?

 3                    THE WITNESS:  I think I got a text

 4    message with the amount and to who.

 5                    ARBITRATOR:  To how many?

 6                    THE WITNESS:  Three of them.

 7                    ARBITRATOR:  Three of them?  There's

 8    three of them, yeah.

 9    BY MR. AFIFI:

10        Q    And to be clear, these were donations to their

11    reelection campaigns, correct?

12        A    I believe so.

13        Q    Okay.  And did you do it?

14        A    Yes.

15        Q    Okay.

16                    ARBITRATOR:  You did?

17                    THE WITNESS:  Yeah.

18                    ARBITRATOR:  Like, how much of a

19    donation?

20                    THE WITNESS:  It was, you know, within

21    that -- the legal amount or couple thousand dollars or

22    something.  We can --

23                    ARBITRATOR:  Each?

24                    THE WITNESS:  Yes.  Because it was, we

25    got to get these people reelected because they're the
```

                                              Page 205

```
 1   Mr. Murphy on --

 2                  ARBITRATOR:  I don't want to hear it.

 3   I've heard enough of these arguments.  It's wasting our

 4   time.  I want to finish this case tomorrow.  Let's move

 5   forward with the witness, and you may start examining

 6   him.

 7                  MR. AFIFI:  Thank you, so I know, am I to

 8   proceed with my next witness after Mr. Velarde today?

 9                  ARBITRATOR:  No.

10                  MR. AFIFI:  -- which is Mr.

11   (indiscernible).

12                  ARBITRATOR:  I've already made a ruling

13   on that.

14                  MR. AFIFI:  And, Your Honor, you made a

15   ruling without considering our email where I have

16   notified him of my witnesses today on Monday in a

17   written email, even though his email was late, and

18   that's what I want to put on the record.  If you're

19   telling me you made that ruling, without even --

20                  ARBITRATOR:  Let's hear from this

21   witness.

22                  MR. AFIFI:  Fair enough.  I'm trying to

23   make a record.  Thank you, Your Honor.

24                  ARBITRATOR:  V-E-L-A-R-V-E?

25                  THE WITNESS:  What?
```

Page 217

```
 1                          ARBITRATOR:  V-E-L-A-R-V-E?

 2                          THE WITNESS:  D.

 3                          ARBITRATOR:  D-E?

 4                          THE WITNESS:  D-E.

 5                          ARBITRATOR:  Okay, thank you.

 6                          MR. AFIFI:  For the record, his last name

 7       starts with a V not a B, just --

 8                          ARBITRATOR:  I got V.  I got the V.

 9                          MR. AFIFI:  Okay.

10                          ARBITRATOR:  Thank you.

11                          MR. AFIFI:  Good afternoon -- Thank you,

12       Your Honor.

13       WHEREUPON,

14                             FELIPE VELARDE

15       called as a witness, and having been first duly sworn to

16       tell the truth, the whole truth and nothing but the

17       truth, was examined and testified as follows:

18                             DIRECT EXAMINATION

19       BY MR. AFIFI:

20            Q    Mr. Velarde, good afternoon.  How are you?

21            A    Fine.  How are you?

22            Q    Okay.  Mr. Velarde, would you tell the Court

23       what you do for a living?

24            A    I'm a general contractor for the past 35

25       years.
```

Page 218

```
 1    redo it.  But that's happened sometimes.  I mean, not on

 2    that size, you know, but at least something on my

 3    building, the inspectors what you to change it or the

 4    code changed or something, you know, in the middle of

 5    your progress of the work so you have to redo it.  But -

 6    -

 7                    ARBITRATOR:  That's a lot of

 8    construction.

 9                    THE WITNESS:  Sometimes you have -- yeah.

10                    ARBITRATOR:  Lot of construction to

11    remove.

12                    THE WITNESS:  In this particular case, I

13    think remove the whole thing.

14                    ARBITRATOR:  Okay.

15                    THE WITNESS:  And looks like they

16    (indiscernible) a lot of money, really.

17                    ARBITRATOR:  I see.  I'll let you

18    continue.

19                    MR. HSU:  Yeah.

20                    ARBITRATOR:  I just wanted to --

21    BY MR. HSU:

22        Q     Well, to continue off that question, and I'll

23    just go back to your description.  You say you're

24    charging for providing labor, equipment, and material to

25    demolition and I believe on your -- in response to Mr.
```

                                              Page 246

**EXHIBIT "9"**

```
 1    would be a legal conclusion probably, as you guys call

 2    it. But the seller's permit goes to whoever physically

 3    operates, not administratively or whoever owns what

 4    licenses.

 5                    ARBITRATOR:  Right. But that would be

 6    a -- then Cana would not be operating it?

 7                    MR. KUNKEL:  Correct. That should be Have

 8    a Heart in that scenario, yes.

 9                    ARBITRATOR:  I'm sure Mr. Welch would say

10    you could do that?

11                    MR. KUNKEL:  We signed a lot of things,

12    as you saw, just to try and get this thing open. I

13    don't --

14                    ARBITRATOR:  Okay. I don't know the

15    answer to this.

16    BY MR. AFIFI:

17        Q    Mr. Kunkel, have you through any of your

18    entities -- Have a Heart, Inc., the claimants here, or

19    any of the Interurban entities you have, have you ever

20    acquired license rights from another entity in any

21    jurisdiction?

22        A    When you say license rights, have I bought a

23    store?

24        Q    An existing store with an existing license.

25        A    I have. And so, I did that in Santa Cruz. I
```

Page 86

```
 1    aside, there wasn't any way for them to use the licenses
 2    that I can see so far. If there is, then you can put
 3    that into evidence. But I'm not seeing it here.
 4                    MR. AFIFI:  There is.
 5                    MR. KUNKEL:  There is.
 6                    MR. AFIFI:  If you allow me to ask the
 7    witness --
 8                    ARBITRATOR:  Okay, go for it.
 9                    MR. AFIFI:  -- we'll either get there or
10    establish some of the framework for that.
11                    ARBITRATOR:  Or maybe your client can
12    explain it.
13                    MR. KUNKEL:  You're not going to get
14    there through me, Mr. Afifi. I'm just being honest. We
15    clearly have demonstrated we've done everything, even
16    falsified documents, with our attorney to try and get
17    open.
18                    ARBITRATOR:  You may finish your -- go
19    ahead.
20                    MR. KUNKEL:  Sorry.
21                    MR. AFIFI:  Your Honor, I haven't asked a
22    question.
23                    MR. KUNKEL:  We have literally done, and
24    I think we've demonstrated that for four days, we have
25    done everything, even Mike going to pay off city council
```

Page 90

```
 1                    MR. AFIFI:  Understood, your Honor.
 2                    ARBITRATOR:  Maybe your client is aware.
 3       BY MR. AFIFI:
 4            Q     You and Mr. Shiber couldn't reach an agreement
 5       on a price for you to acquire those licenses that Cana
 6       owned, correct?
 7            A     We never talked about a price to buy those
 8       licenses.
 9            Q     Okay. But, did you offer him any number that
10       he rejected to just acquire the licenses outright?
11            A     Not that I recall.
12            Q     Okay. But Have a Heart was looking to acquire
13       licenses, not to do an arrangement like you did here, in
14       various locations in California back in 2017 and 2018,
15       true?
16            A     Not at that point. We didn't have the money to
17       do it. As you saw, I had to borrow money from Mike who
18       was just coming onto the company, from, like, his
19       personal bank account, just to do this. So we didn't
20       have a war chest to go and buy licenses. So, it's true
21       in that year we did look for some. We never found any.
22       But no, we never agreed on a price.
23                  This deal came to me as, hey -- because our
24       attorney, David, knew that we didn't have a lot of
25       money, and we were just coming in the industry, that
```

                                                      Page 95

1          MR. AFIFI:  Your Honor, can I finish what

2     I want to say on the record?

3               COURT REPORTER:  This marks the end of

4     media number 2. The time is 11:55 a.m. We are off the

5     record.

6               (Off the record.)

7               (End Media 2.)

8               (Begin Media 3.)

9               COURT REPORTER:  This marks the beginning

10    of media number 3. The time is 11:36 a.m. We are on the

11    record.

12    BY MR. AFIFI:

13         Q    Mr. Kunkel, I want to show you Exhibit 239.

14               MR. MURPHY:  Object -- attorney-client

15    privilege. This arises from a transaction outside the

16    scope of what's at issue in this case. I ask that this

17    be withdrawn. The Point Hueneme deal is not at issue

18    between Mr. Shiber and Mister -- and Have a Heart.

19               MR. AFIFI:  You know, it can't be

20    attorney-client privilege. Dan Zaharoni is on this

21    email, who is not their client.

22               ARBITRATOR:  Right.

23               MR. AFIFI:  So it can't be attorney-

24    client privilege.

25               ARBITRATOR:  I'm going to overrule. Go

                                            Page 100

1    ahead.

2    BY MR. AFIFI:

3         Q     Okay. Mr. Kunkel, in or about 2018, your

4    organization was looking to acquire a dispensary in

5    Point or Port Hueneme area in California, correct?

6         A     Yeah. I think Mike was leading the charge on

7    that one.

8         Q     And you ultimately found out from Mike that

9    they had been acquired for a value of 18 million for

10   that location, correct?

11        A     No. no, they didn't get acquired. So they got

12   an offer.

13        Q     Okay. They got an offer. You weren't offering

14   them 18 million, correct?

15        A     No, that's ridiculous.

16        Q     How much were you offering to pay them?

17        A     I wasn't. I don't think we ever made an offer.

18        Q     No, how much were you willing to pay them?

19        A     I never saw the store. It was a bad location.

20   Mike drove up there once. And, plus, these aren't clean

21   deals. These are David Welch, like, hey, there's all

22   these weird people involved. So, I wasn't --

23                    ARBITRATOR:  That was a Welch suggestion,

24   potential?

25                    MR. KUNKEL:  Yeah. He tried to even sell

                                             Page 101

1    voters indicated that they wanted." Do you disagree with

2    this analysis of the Director for the Brennan Center for

3    Justice?

4         A    I do not.

5         Q    Okay. So, in fact, when you were taking into

6    account the $5 million valuation was appropriate, maybe

7    you should have done a discount for the fact that, at

8    that moment, Jeff Sessions was threatening to go after

9    dispensaries.

10        A    It actually was a discount, actually.

11        Q    Oh, you did do a discount?

12        A    No. basically, what it does, is I just gave,

13   basically, a lower number on it, basically, based off

14   the numbers, because I'm watching this market. I

15   remember when Jeff Sessions, when that happened. All my

16   friends, everybody was paranoid at that point. Everybody

17   I knew who had dispensaries, grows, everything. I got

18   calls every day, and we were all worried.

19        Q    I'm just fascinated because a couple of

20   minutes ago I asked if you took into account when you

21   did your valuation, and you said no. so, you did or you

22   did take into account that the 30 percent drop in the

23   markets as a result of the attack by Jeff Sessions, did

24   you take that into account, or did you not?

25        A    It was into account. But the thing is, what

Page 130

1    happened is everybody overreacts. And I know how the

2    government is. And then when these statements happen,

3    things change later. So, it happens, as it happened

4    right now. Nothing ever happened from it.

5         Q    Did you look at how long it took for stocks to

6    rebound?

7         A    Oh, yeah. It was a long recovery.

8         Q    Yeah, it was. So, about when did stocks

9    rebound, do you think?

10        A    About a year later.

11        Q    Okay. What event caused them to rebound?

12        A    Just the fact that it didn't move forward.

13        Q    Okay. Actually, are you aware that the most

14   significant increase in stocks at that time took place

15   in October of 2018? This is actually if you look at the

16   Canadian Marijuana Index, took place when Trump passed

17   the farm bill that dealt with CBD, and Jeff Sessions

18   resigned. Are you aware of that?

19        A    I am.

20        Q    Okay. Are you aware that as -- so let's keep

21   this window in mind. So you're saying that, on January

22   1, 2018, $5 million was appropriate. Four days later,

23   Jeff Sessions attacks the marijuana industry, and it

24   takes a year to get back. So let's just think about

25   October 2018. Did you look at any of the Maywood city

Page 131

```
 1    mocking the witness.
 2                    ARBITRATOR:  Overruled.
 3                    MR. MURPHY:  I retract that. Sorry. I
 4    apologize.
 5                    ARBITRATOR:  Overruled.
 6    BY MR. MURPHY:
 7         Q    Question. You talked about supply and demand,
 8    right? You kind of looked at, like, where Maywood is,
 9    and kind of you did a -- you looked at a map, right?
10         A    Right.
11         Q    Did you actually drive to the location?
12         A    I did.
13         Q    You did? When did you do that?
14         A    I've done it twice, actually.
15         Q    Okay. Did you -- you looked at, like, whether
16    Vernon -- like, you looked at the cities immediately.
17    But you know these are small cities, right?
18         A    Correct.
19         Q    And are you aware that Los Angeles is just a
20    couple of miles away?
21         A    Yes.
22         Q    And you're aware that Los Angeles actually has
23    more dispensary licenses than any other jurisdiction in
24    the state of California?
25         A    Yes.
```

                                          Page 134

1        Q       Yes. Did you consider that, and how many of

2   those had been issued over time, to determine whether or

3   not $5 million was appropriate?

4        A       Well, the fact that Maywood is limited

5   license, and there's only a couple of licenses there, I

6   thought -- I looked at it, and I figured this is a

7   license that's going to be valuable.

8        Q       But you're talking about -- so, when you talk

9   about limited license, you're talking about whether how

10  many stores are going to be available for someone.

11       A       Correct.

12       Q       But if the city is really small, and Los

13  Angeles is a couple of miles away, does it really

14  matter, because a person doesn't know what the city line

15  is. They're just going to drive to the nearest MedMen,

16  which is not that far away, actually, from this

17  operation. Are you aware of that?

18       A       I am.

19       Q       Okay. So, did you -- were you focused on the

20  city lines to determine whether or not the valuation of

21  $5 million was appropriate?

22       A       Usually, those licenses are valuable. And it's

23  up to the person who actually builds out the locations

24  whether they're going to build the draw or not.

25       Q       Actually, I want to ask you a question about

Page 135

1    safety, what -- in 2017 through the present, what

2    aspects of building and safety were you either

3    supervising or involved with?

4         A    Everything from permit issuance to building or

5    occupancy inspections of buildings in the city. I have

6    inspectors, and I supervise that. I don't -- on

7    occasion, I actually accompany them, but it's just the

8    full service of a building department. We also do plant

9    check, and we have outside engineers that we contract

10   with. And I'm responsible for pretty much everything.

11        Q    Okay. And, what is your background in

12   education in terms of preparing you for the building and

13   safety position that you're supervising today?

14        A    I have a Bachelor of Science degree in

15   Economics. I became a project manager building tract

16   housing for some years, and then started working for an

17   engineering firm and became certified to inspect and

18   work for a few cities. And now I became a city employee.

19        Q    How many years have you been employed at the

20   city of Maywood?

21        A    Twenty-three, about twenty-three the first

22   stint, and just recently.

23        Q    Okay. In the years 2018 through the present,

24   if one were to do construction at the Maywood property,

25   other than nominal work, was that something that

```
1        A    Yes.

2        Q    How did you become aware of that?

3        A    My building inspector also handles more

4   commercial industrial code enforcement, received a

5   complaint.

6        Q    What was the name of your inspector?

7        A    Arturo Ramirez.

8        Q    Got it. And he -- you said he received the

9   complaint. I don't know if you can disclose who it was,

10  but complaint from a neighbor? From who?

11       A    From -- we do promise anonymity when we

12  receive complaints.

13       Q    You'll honor that?

14       A    It was a person who does -- has a business and

15  lives in the city of Maywood.

16       Q    Okay. And the complaint that they made was

17  what?

18       A    That it appeared to him that something was

19  wrong because he sees construction at 4027 52nd Street.

20  But it only goes on either at night or on weekends. And,

21  he just asked if we had -- you know, what does this

22  person have a permit for? And we didn't have any

23  construction permits. Well, there were some pending

24  permits, but that was for work that was electrical work,

25  not the work that was reported that there was drywall
```

Page 160

1    work and all other sorts of work going on at the

2    location.

3         Q    Okay. So, a neighbor or someone complained

4    that there was work being done on nights and weekends.

5    You then checked the file to see what permits were

6    there.

7         A    My inspector did. And he told me that we --

8    and I'm pretty familiar with all the cannabis cases.

9    There's no way the plans could have been submitted. They

10   go through me first. I'm also the principal planner. So,

11   I would have to verify that whatever was being done

12   there was consistent with what my planning commission

13   had approved.

14             This property had a conditional use permit.

15   And part of that process is the applicant has to submit

16   a drawing that shows what the different areas of the

17   building are going to be used for. We do parking

18   calculations. Any significant deviations from that plan,

19   I can't approve. They have to go back in front of the

20   planning commission.

21        Q    Fair enough. Thank you. So after you became

22   aware of this, what did you -- this being the complaint

23   by the citizen of Maywood about the potentially illegal

24   construction -- what did you do next?

25        A    We went to the location. It was locked. But

```
 1    there was evidence. The building is, it's an older

 2    industrial building that was built right on the public

 3    right of way. So the front of the building is maybe a

 4    few feet off the sidewalk. And there was just -- you

 5    could see construction debris, and the roll-up door had

 6    been -- things were going in and out of there.

 7            But we -- there was no access. It was during

 8    the, you know, Monday through Friday business hours.

 9    There's nobody there. So, I don't know if it was me

10    or -- I believe my inspector. I gave him contact

11    information, I think, of who I knew had applied for this

12    cannabis license. And we were given an appointment to

13    actually inspect the building. And it was sometime

14    later, and I don't know exactly.

15        Q    Okay, so just to get the chronology right,

16    after the complaint, you and Mr. Ramirez went to the

17    site.

18        A    Went to the site.

19        Q    It was locked?

20        A    Locked -- nobody there.

21        Q    You saw evidence of construction, so you

22    directed the owner to allow you access on an appointment

23    date.

24        A    Yes.

25        Q    And did that occur?
```

Page 162

1        A      Yes.

2        Q      Okay. And approximately how long after?

3        A      It was a week or two. It wasn't -- yeah, it

4   was longer than I thought was reasonable, but yeah.

5   Getting an inspection warrant is a lot of work and not

6   necessary.

7        Q      Okay. So about a week? By the way, do you

8   remember what time of the year 2018 this occurred?

9        A      It was in the summer. It was, I think, around

10  the beginning of August, early August.

11       Q      Okay. And so, when you got that appointment

12  and went in, what did you see?

13       A      A rather elaborate tenant improvement job that

14  had -- there were wall systems and ceiling systems and

15  electrical work. It was pretty impressive. They'd done a

16  lot of work and spent a lot of money in there. I was a

17  little amazed. I've never -- I don't know that I've ever

18  seen such an extent of work without a permit.

19       Q      Okay. And then after you saw that, did you

20  tell the workers there whether or not they could

21  continue with the work?

22       A      We issued a stop order immediately.

23       Q      Okay. And after that stop order, did you learn

24  anything further as to whether or not work was still

25  progressing?

Page 163

```
1            A     The person who claimed responsibility for
2      being the contractor on the job came in a few times and
3      tried to see what he could do to remove the stop order
4      and continue his work. And we just explained to him that
5      the condition use permit allowed for cultivation,
6      manufacturing, distribution I believe, and a small,
7      just, I think, a 450-square-foot dispensary.
8                  And when we went in to inspect, they had
9      turned a good portion of -- well, really all of the
10     office space on the first floor was turned into a
11     dispensary. That's a significant deviation from what the
12     planning commission approved, so there's no way we could
13     permit that work.
14           Q     So, if in fact the property -- the people in
15     possession of the property wanted to do that kind of
16     work, that would require not just applying for permits,
17     but applying to the planning commission for a change in
18     the conditions of the conditional use permit, correct?
19           A     Yes.
20           Q     Now, because you're also the head of the
21     planning department, you knew that one of the conditions
22     of the conditional use permit was that any illegal
23     construction without permits could be a violation of
24     that CUP, correct?
25           A     Yeah, yes. I think moreover it was apparent
```

Page 164

```
 1    that there was no way that I could -- even the planning
 2    commission would be able to approve it. The cultivation,
 3    those uses have their -- they generate very little
 4    parking demand. But retail, obviously we have now, we
 5    have the public coming.
 6                The parking ratio is 1 per 250 square feet for
 7    retail. Cultivation is way lower. Manufacturing, maybe 1
 8    per 1,000 square feet. Their parking was limited. It
 9    wasn't even really on site. It's sort of a satellite
10    lot. And I explained to the person who was trying to get
11    this thing approved that it's not even a CUP we could --
12    it would be a -- staff would not be able to recommend
13    that it be approved because the parking requirement
14    could not be met.
15         Q    Got it. So, basically, if they intended to
16    have that big a dispensary with that kind of retail
17    operation, the amount of parking that would be
18    necessitated just wasn't available?
19         A    Yes.
20         Q    That was your assessment?
21         A    Yes.
22         Q    And was the individual from the construction
23    that was coming and trying to get permits, was that a
24    Gentleman named Jose DaVila, do you know?
25         A    I don't remember.
```

Page 165

```
 1         Q     Fair enough.

 2         A     Could be.

 3         Q     Okay. Did you have any interactions with

 4   anyone after that on behalf of the owner or the

 5   operator? And I'll give you the names in a second. But

 6   do you recall having any further interactions where

 7   they're trying to ask you for permission to allow

 8   anything to happen on that property, the Maywood

 9   property?

10         A     Well, I do remember this contractor person.

11   There was also a man named Joseph. He works for an

12   attorney, I think.

13                MR. MURPHY:    Adeife?

14                MR. MANGO:    Yes, correct. That's the

15   correct name. He would accompany that person. And Joseph

16   came out on more than one occasion to see if he could

17   somehow get this thing going again.

18   BY MR. AFIFI:

19         Q     And the person who came on behalf of the

20   people trying to do construction, do you remember a

21   gentleman named Michael Requiza?

22         A     No.

23         Q     Do you recall a name of someone named Edwin

24   who accompanied -- who may have accompanied Joseph on

25   occasion?
```

Page 166

```
1          A    Not in that manner. Have a Heart called the

2    city in May of 2018, or called me, you know? Anybody

3    asks for cannabis, it's directly routed to me. And it

4    was a woman. I can't remember her name. But she

5    announced to me that she'd purchased a license to open a

6    dispensary in Maywood, and she's with Have a Heart. And

7    that's the first time I'd ever heard of them.

8               I explained to her that you couldn't have done

9    that because we don't -- you don't transfer licenses

10   that way. We don't allow the sale of licenses. And

11   furthermore, if you're wanting to apply, we can't even

12   accept your application anymore because there was a

13   moratorium on retail dispensaries.

14         Q    Yeah. So, we'll get to that because there are

15   some emails that you exchanged with that lady. We'll get

16   to that in a second. But I'm going further in time

17   now -- in other words, past that. After the complaint by

18   the citizen about the construction, and after you got

19   involved, do you recall telling Edwin ever -- did you

20   ever tell Edwin or anyone on behalf of Have a Heart that

21   Have a Heart will never do business there?

22         A    I don't remember that.

23         Q    Did you ever tell anyone that Mr. Shiber is

24   not going to get away with what he did before this

25   property?
```

Page 169

```
 1           A      I don't remember saying that.

 2           Q      To your knowledge, did Mr. Shiber ever do

 3    anything wrong at the city of Maywood to get either the

 4    CUP or any of the licenses?

 5           A      Wrong -- pardon?

 6           Q      Anything wrong? Did he violate any laws in

 7    getting either the CUP or Cana's licenses for the

 8    cannabis dispensary and operations?

 9                       ARBITRATOR:   You're talking about Mr.

10    Shiber?

11                       MR. AFIFI:   Mr. Shiber, yes.

12                       ARBITRATOR:   Yeah.

13                       MR. MANGO:   Well, if he controlled that

14    building and he had people doing illegal work there, I

15    guess he is in some way responsible for it, correct?

16                       ARBITRATOR:   Let me ask, when you all had

17    that meeting, what was Edwin doing there? I understand

18    that he has Cookies.

19                       MR. AFIFI:   Yes.

20                       ARBITRATOR:   Why was he there?

21                       MR. AFIFI:   He always identified himself

22    as a friend of Mr. Shiber. And he's always there. I

23    don't know.

24                       ARBITRATOR:   Okay.

25                       MR. MANGO:   I don't remember how it
```

Page 170

```
 1      that actually entered into development agreements with
 2      the city. And that, in essence, vested their rights.
 3           Q    Got you. Now, you described that when they
 4      came to you in summer or August, whatever it was, of
 5      2018, you advised them that, look, the parking issues
 6      are this, and the retail space should only have been
 7      this big, and so forth.
 8           A    Yes.
 9           Q    Remember that? In the beginning of 2018, if
10      someone would come to you about that property, would you
11      have advised them the same thing if they wanted to put a
12      big dispensary there?
13                     MR. MURPHY:  I'm sorry. Can you repeat
14      that question?
15                     ARBITRATOR:  He's just wondering about
16      what it would have been if it had been at the beginning
17      of 2018, right, rather than late 2018?
18                     MR. MANGO:  Yes, I would have, because
19      4027 52nd Street historically was a manufacturing-type
20      use, manufacturing, warehousing, something that cannabis
21      manufacturing or cultivation is compatible as far as
22      parking. Changing the entire building into retail is a
23      change of use. And when you change the use, then you
24      have to meet parking requirements.
25                     MR. AFIFI:  Got it.
```

Page 172

```
 1    BY MR. AFIFI:
 2         Q    And, by the way, you're aware, are you not,
 3    that there's a property down the street that the parking
 4    is tied to this building, correct?
 5         A    Yes.
 6         Q    So, even with that, the change of use would
 7    require further work including planning commission
 8    approval because it's not just a straight permit issue?
 9         A    Yes.
10         Q    Got it. Now, let me show you what's been
11    marked in this case as Exhibit 243.
12                   (Exhibit 243 was previously marked for
13                   identification and received into
14                   evidence.)
15         Q    And this is an email exchange with yourself
16    and Robyn Francisco, who are represented to you as from
17    Have a Heart, in May of 2018. And, let me just scroll
18    down. And, by the way, if you want to look yourself in
19    that white book, you can also, whichever is easier.
20         A    I could read this. This is good.
21         Q    Okay. So, going back, this is an email
22    exchange. If I go to the very bottom of it, it's an
23    email on -- right here -- May 11th on page 243-4. May
24    11, 2018, from Robyn Francisco to you, where she writes,
25    "Hi David, my name is Robyn Francisco." And she
```

Page 173

1    right?

2         A    I don't remember when, but yes.

3              MR. MURPHY:  May I ask a quick

4    clarification? I think he just gave you a yes answer.

5    But it actually -- I just want to make sure we have a

6    clear record.

7              MR. AFIFI:  Thank you. I got it. I

8    understand. Thank you, Mr. Murphy. Let me get the

9    question clear. I may have asked a negative in answer.

10   BY MR. AFIFI:

11        Q    Before any moratoriums were issued in the city

12   of Maywood, is it true that Cana and Have a Heart could

13   have applied legally for a transfer of the licenses?

14        A    Yes.

15        Q    Okay. And, then after the moratoria kicked in,

16   and I know there was a series of them, during that time,

17   there still could be application for transfers. But

18   there may have been delays. Is that correct?

19        A    If you read the transfer provision, it --

20   basically, if more than 51 percent of that license is

21   transferred, then it's treated as a new license. Have a

22   Heart would have to come and make application. And there

23   was a moratorium for license. So, we wouldn't even

24   accept applications during the moratorium period.

25        Q    But, if during the moratorium, if less than 51

Page 177

```
 1    percent of the license was being transferred, then that

 2    wouldn't be a violation?

 3         A    Yeah. That's not a transfer.

 4         Q    And they could have applied to do that?

 5         A    Change of principals, yeah.

 6         Q    Okay. All right, got it. I thank you. Oh, do

 7    you know what the current status of the Maywood property

 8    CUP is, from the perspective of the city of Maywood?

 9         A    4027 52nd Street? It's null and void.

10         Q    How about the current status of the four

11    cannabis licenses that were issued back in the end of

12    2017? What is the status of those? Do you know?

13         A    The requirement -- a license -- without a CUP,

14    you can't get a license. So, the license is no longer

15    valid unless you have a CUP.

16         Q    And, all four licenses are no longer valid?

17         A    Yes.

18              MR. AFIFI:   I have nothing further, and I

19    thank you for your time.

20              ARBITRATOR:   I just want to ask a couple

21    of questions. I've been listening, of course, to all the

22    evidence in this case. And one the things I've heard

23    quite a bit of testimony about was now that the building

24    has to be somehow put back to the original plans. So,

25    that would mean demolition of all those TIs that you
```

Page 178

1    said looked so good. And they do look good in pictures.

2    That would mean a demolition of all of that, and then

3    doing things like moving the stair to where it was in

4    the initial conditional use permit, changing the

5    bathrooms to match the original plans, that kind of

6    thing. Is that what's required?

7                    MR. MANGO:   When illegal work is

8    conducted, we don't inspect it. That is one option. You

9    know, it depends on the inspector. My inspector was

10   asking that the -- we had been in the building in

11   February or January or February of 2018. We saw what the

12   original condition of that space was. And then we walked

13   in and saw a lot of work that would have required plans

14   and maybe some engineering, some permits.

15                    And, that's usually the first position

16   we'll take on something like that, is we didn't get to

17   inspect it. It wasn't permitted. So, you have to remove

18   everything that was installed without permits.

19                    ARBITRATOR:   So you don't do anything

20   like make a hole in the wall and do some inspections so

21   that you don't -- you're not destroying all the TIs that

22   have been put in?

23                    MR. MANGO:   Well, sorry.

24                    ARBITRATOR:   Well, I just am trying to

25   understand. So, is there any other option other than

                                              Page 179

1    total destruction of what's inside?

2              MR. MANGO:   First place, there was no

3    proposal for why -- I think when we finally did get back

4    in there at one point with Mr. Shiber to see what he

5    might have to do to bring it back to, it was in a state

6    that was really no longer -- looked like a shiny new

7    store. Somebody had gone in and taken a lot of that

8    apart anyway.

9              You would have to propose why it is

10   you're doing this construction. Again, if you look at

11   Mr. Shiber's plan, it did not -- it was not what was

12   there. As I said, any significant alteration of what was

13   approved by my planning commission would have to go back

14   in front of them.

15             ARBITRATOR:   Right. So, I guess what was

16   going through my mind was it seems so wasteful to just

17   tear everything out. And I just wondered whether -- I

18   mean, I've seen now an estimate of over $400,000 to do

19   that work, to kind of tear it all out and rebuild to put

20   the stairs where they used to be or were supposed to be,

21   that kind of thing. To me, all of that, just in

22   commonsense terms, seemed pretty wasteful.

23             And I was just wondering whether you

24   offer any alternative other than just the complete

25   demolition of what was put up illegally. I mean, for

Page 180

1    example, spot-testing it to see that things were done

2    properly, that kind of thing.

3                   MR. MANGO:   Again, I don't -- if somebody

4    came with a proposal, and there was some good reason for

5    us to have to -- you know, I don't expect anyone to put

6    their name to anything I do that they don't see. So, I

7    find it odd that people think we should just all of a

8    sudden approve work that we never -- I can't warrant. No

9    matter what it looks like, who knows how it was done?

10                   And who knows if it -- the only thing

11    there that was -- that could be permitted was this floor

12    plan that was submitted with the CUP. And the way all

13    this stuff had been changed, that was not consistent

14    with what was approved by the city.

15                   MR. AFIFI:   Can I ask one follow-up, your

16    Honor, if you don't mind?

17                   ARBITRATOR:   Sure.

18    BY MR. AFIFI:

19        Q    Tell me if this is correct in general. There

20    are times when people do some unpermitted work at the

21    city of Maywood, correct?

22        A    Correct.

23        Q    And on those occasions --

24                   MR. MURPHY:   Just leading. I'm sorry. I

25    mean --

Page 181

```
 1              ARBITRATOR:  He can ask his question. Let

 2    him do it, and then you can do your examination.

 3    BY MR. AFIFI:

 4         Q     On those occasions, when the scope and the

 5    extent of the unpermitted work isn't large, there is

 6    more of a possibility of the property owner come in and

 7    ask for a post-construction inspection, maybe dig a

 8    hole, check the studs, check to see if you --

 9              ARBITRATOR:  Pay a fine.

10                 MR. AFIFI:  Certainly pay a fine, but

11    just to see some samples of the work.

12    BY MR. AFIFI:

13         Q     And then maybe you'd be in a position more

14    likely to approve it if it was a smaller scope of work.

15    Is that generally correct?

16         A     Well, if it was something that was consistent

17    with -- if it's in your single-family dwelling and

18    you've made some alterations, that doesn't -- see, I

19    have to look at that building when somebody changes it.

20    What's the new use? You know, what's being proposed

21    here?

22              So their planning can -- when somebody does

23    illegal work, we have to first make sure that it meets

24    all planning and zoning requirements. And then, yes,

25    depending upon the degree of work that's done, you know,
```

```
 1    regarding solutions. And, you had mentioned that no one
 2    had come to you with a proposal. Do you recall saying
 3    that, regarding how to fix this problem?
 4         A     Let's say that I -- if it were something other
 5    than what my planning commission approved, I wouldn't be
 6    able to approve it anyway.
 7         Q     So, but let me ask you this. If an application
 8    had been made for a new conditional use permit based
 9    upon new plans, and that was approved, and then the
10    holder of that CUP came to you with a proposal to
11    negotiate how to not have to destroy everything, is that
12    something you would consider?
13         A     I would consider putting it in front of my
14    planning commission, yes.
15         Q     Thank you. And, so we were talking just now
16    about the 2018 time period where you got this anonymous
17    complaint, and then you went and looked at the property.
18    Do you recall that?
19         A     Yes.
20         Q     And then there were a couple more meetings.
21    But I'd like to kind of think about that part of 2018,
22    from when you found out through the end of the year. At
23    no point did Elias Shiber come to you with a proposal,
24    did he?
25         A     I don't believe -- I don't have any idea. I
```

Page 184

```
 1    Usually, when a person is issued a CUP, they then submit
 2    plans to either construct -- do whatever it is that the
 3    CUP gives them right to do, and they start doing it.
 4         Q    But plans were submitted to you by Cana's
 5    attorney, correct?
 6         A    Where -- pardon?
 7         Q    Do we have any of those emails to the city
 8    of -- might want to just -- while I'm asking questions,
 9    maybe see if you can find them.
10                   ARBITRATOR:  You mean by Mr. Welch?
11                   MR. MURPHY:  Yeah, by Mr. Welch's firm.
12    BY MR. MURPHY:
13         Q    Do you remember -- you know David Welch's
14    firm?
15         A    I'm familiar, yeah.
16         Q    And you received plans from David Welch for
17    this building, correct?
18         A    Not plans. I received -- well, okay. Floor
19    plans and site plans, things that we use to, one, vet
20    the application. My consultant, HGL, would look at these
21    floor plans. And then, when I issue a CUP, I have to
22    have the floor plans to do a parking calculation.
23                   MR. MURPHY:  We do need Exhibit 1,
24    though, while you're doing that.
25                   MR. HSU:  Exhibit 1?
```

                                              Page 188

```
 1                    MR. MURPHY:   Yes, 1.
 2                    (Exhibit 1 was previously marked for
 3                    identification and received into
 4               evidence.)
 5               Mr. Hsu, would you please go to section
 6      2.2.1?
 7      BY MR. MURPHY:
 8          Q    I'm going to read some language for you.
 9      You've never seen this agreement before, so you're not
10      required to be familiar with it. But I'm going to read
11      some language for you and ask you about the Maywood
12      ordnance regarding cannabis, because you're pretty
13      familiar with it, right?
14          A    Yes.
15          Q    If Elias Shiber -- or, I'm sorry, Cana -- as
16      the holder of the rights for the four cannabis licenses,
17      had entered into agreement where it promised to provide
18      Have a Heart with approval and legal authority to
19      conduct the cannabis business described in the licenses,
20      does that -- do you -- would that require a -- trigger
21      the transfer section?
22          A    Yes.
23          Q    You're not hesitant at all about that.
24          A    Yes.
25          Q    You are hesitant or you're not hesitant?
```

Page 189

```
 1    densely-populated city west of the Mississippi River.

 2    actually, you'd have to go New York.

 3                    MR. MURPHY:   Wait, Maywood is?

 4                    MR. MANGO:   Maywood, yes.

 5                    MR. MURPHY:   That is a --

 6                    ARBITRATOR:   Who knew?

 7                    MR. MURPHY:   That's a great statistic.

 8    I'm actually -- I now can use that in that, you know --

 9                    MR. AFIFI:   It's a trivia question.

10                    MR. MURPHY:   Thank you very much, Mr.

11    Mango.

12                    ARBITRATOR:   Well, I was just trying to

13    get an idea of how many dispensaries and whether that

14    was an awful lot for a small city.

15                    MR. MANGO:   The county health has done a

16    pretty extensive study. They only advised something like

17    a maximum of one dispensary per 15,000 residents. So, by

18    that measure, we shouldn't have more than two. And that

19    was something I tried to advise the city council in the

20    beginning, that allowing dispensaries on every corner is

21    going to cause real problems. And that's what they got.

22    So they put on a moratorium, and they tried to -- it was

23    too late, though. We had a lot of them already.

24                    ARBITRATOR:   Thank you.

25                    MR. MURPHY:   Thank you very much.

                                             Page 192
```

```
 1    the imposition, we can't retroactively put moratoria on

 2    uses. So, the people who had already applied, there were

 3    a number that had applied before the moratorium was

 4    placed. They got to see their applications all the way

 5    through.

 6         Q    Got you. And Cana obviously was one of those?

 7         A    One of those, yes.

 8         Q    Okay. You mentioned that the -- we're talking

 9    about what it would take to kind of put this building

10    back to whatever condition. You said that it has to go

11    back to the original CUP conditions, correct,

12    conditional use permit conditions?

13         A    I can safely tell him that, yes, if the

14    building is brought back into the condition that we saw

15    it in January or February of 2018 -- this was before

16    anyone had done any construction in there -- that would

17    be something that would be legal. And if he wanted to --

18    whatever use, we would accept that as what was there

19    legally.

20         Q    And I think you said that, if they wanted to,

21    today or any time in the last 2019, someone wanted to

22    bring it back to a different condition than the

23    conditional use permit conditions, that would require

24    not just the permitting sectioned approval but the

25    planning commission to approve, correct?
```

Page 194

1        A      Not necessarily the planning commission. It
2    could be done on an administrative level. If it is a
3    permitted use, something that's recognized, you want to
4    put in a factory or something that is not cannabis,
5    there are only certain uses that require conditional use
6    permits.
7        Q      Okay. If it was going to be cannabis use in a
8    configuration other than the original conditional use
9    permit conditions, that would require planning
10   commission?
11       A      Yes.
12              MR. AFIFI:   And just so the arbitrator is
13   clear -- and you may already know this, your Honor. No
14   insult intended.
15              ARBITRATOR:   I won't be insulted, Mr.
16   Afifi. No way. Go ahead.
17              MR. AFIFI:   No, I'm just saying.
18   BY MR. AFIFI:
19       Q      Permits, getting a permit approved for an
20   existing condition that the planning commission has
21   approved, is a simpler process than going back to
22   planning commission to get their approval for a change
23   in the CUP conditions or CUP side plans, correct?
24       A      Yes. If you follow what it is you got
25   approved, yes.

Page 195

1              So, my understanding was he just wanted

2    to turn it back into the condition it was in January or

3    February of 2018. As far as the tenant improvement work

4    required for the conditional use permit, that was never

5    executed. Nobody ever tried to do that.

6              ARBITRATOR:  Right. But if they're doing

7    it now, if they were to do it today, I'm trying to

8    understand. If they were to spend the money, the half

9    million dollars or whatever it would be, to build the

10   interior to match the original plans attached to the

11   conditional use permit, I'm trying to figure out what

12   the point would be now because they couldn't use it for

13   cannabis. Am I right?

14             MR. MANGO:  You're correct.

15             MR. AFIFI:  But just to follow up on

16   that, if I may --

17             ARBITRATOR:  Yeah, please.

18   BY MR. AFIFI:

19        Q    But at this point, forget about cannabis

20   because you've told us that's not happening at this

21   property.

22        A    Yeah.

23        Q    At this point, for the owner of that property

24   to do anything with it, first the improvements have to

25   be removed, correct?

Page 198

1        A      Yes.

2        Q      Okay. And now, when you remove all of that,

3    then you have to either put it back to the condition in

4    the conditional use permit or apply for a new permit. Is

5    that correct?

6        A      No, no, no. you have to put it back into the

7    condition it was --

8        Q      Before the construction?

9        A      Before the construction.

10       Q      Which you were familiar with because in

11   February or January of 2018, you'd seen it?

12       A      Yes.

13       Q      So it has to be put back to that condition.

14   And then, after you do that, then you have to apply for

15   new permits for whatever you want to do.

16       A      Or you could have put it in some other

17   approved condition. Let's say you decided I don't even

18   want those offices and decided to demolish the whole

19   thing and make it into just one big giant warehouse. You

20   could do that. There are things you could do. Making it

21   into a cultivation and manufacturing facility for

22   cannabis, no.

23       Q      One last follow-up, if I may, and then we're

24   done. I'm done, certainly. You mentioned that -- Counsel

25   showed you that section 2.2.1 of the agreement. And you

1   said that that would constitute, as far as you're

2   concerned, a transfer of the city of Maywood, right?

3        A    You cannot assign a license without making

4   application for that. And, if you go on to read the

5   ordnance, it basically says that you then have to -- the

6   new entity has to get vetted by my consultants. So,

7   that's not really an assignment to me. That sounds

8   like --

9                    ARBITRATOR:  It's starting all over

10  again.

11                   MR. MANGO:  It's starting all over again.

12  BY MR. AFIFI:

13       Q    Okay. Now, if it's less than 51 percent, that

14  wouldn't be the case. We talked about that already.

15       A    Yeah, that wouldn't be the case.

16       Q    And the other option is, if in fact you're not

17  going to assign it to a new entity, but simply the

18  ownership of Cana is being acquired, just someone buying

19  shares of Cana, the license can still stay in Cana's

20  name, correct?

21       A    I'll have to admit, I don't -- this ownership

22  section, I don't really understand as far as selling. We

23  have LLCs. We have Incs. We have -- it's -- we never --

24  not a single license was ever transferred. So, I don't

25  even have really practical experience with that

1    call it, generally?

2         A    Yes, since 2010 it's been primary area of my

3    expertise.

4         Q    Okay. Would you describe for the court

5    generally what kind of work you've done in a legal

6    capacity in the cannabis space since 2010?

7         A    I've done a lot of regulatory work, licensing,

8    general, you know, regulatory compliance, some business

9    transactions involving cannabis businesses, various

10   jurisdictions, big focus in the city of Los Angeles but

11   also a lot of surrounding LA County jurisdictions, some

12   up north, and basically a lot of California.

13        Q    Okay. Did you have any involvement in the

14   drafting of ordnances, both city of Los Angeles and

15   related areas?

16        A    Yes. We were involved through a trade

17   association when the city of Los Angeles was

18   implementing its regulations. We essentially worked with

19   the city on a -- we were part of a stakeholder's group

20   and helped the city sort of, you know, shape the

21   regulations based on the structure of businesses that

22   were in existence in the city of Los Angeles at that

23   time.

24        Q    Okay. And, so roughly in the last nine years,

25   your practice has been exclusively devoted to the

Page 206

```
 1      cannabis space in the areas you've just described?

 2          A    Correct.

 3          Q    Is that fair to say? And, during the time that

 4      you've been working in the cannabis space, have you had

 5      any interaction in dealing with municipalities like

 6      cities, as far as their regulations for what was medical

 7      marijuana back before rec legalization and then

 8      recreational?

 9          A    Yes, frequently.

10          Q    Both?

11          A    Both.

12          Q    Have you had any -- once -- well, have you had

13      any dealings with the state of California, again, both

14      during the medical marijuana days as well as after the

15      recreational legality days?

16          A    After the recreational legality days, less so

17      in the medical days.

18          Q    Okay. Medical days --

19          A    Because there was nothing the state was doing

20      in the medical days.

21          Q    Yeah. Medical days, it was just state legal

22      for medical use. But municipalities regulated it.

23          A    Correct.

24          Q    And then, after recreational legality in

25      January of 2018, then you dealt with the state?
```

Page 207

1      A      Yes.

2      Q      And, just tell me from, like, from the A to Z

3   of dealing with municipalities and with the state, what

4   aspects of those dealings have you been involved with?

5      A      We were involved in the lobbying regulations

6   back from, I would say, early 2016 and on when all the

7   departments were being formed. And we were part of a

8   trade association here in Los Angeles made up of

9   retailers that participated in making public comment.

10  And then, of course, when the regulatory framework was

11  enacted, all our clients had to apply for state

12  licenses. So, we assisted our clients with state license

13  applications, and then since January 1st have been

14  navigating the very confusing structure of what is the

15  state regulatory system.

16     Q      Okay. So, in your capacity as an attorney,

17  you've assisted clients in applying for licenses in

18  municipalities. That's one of the things you've done.

19     A      And regulatory compliance with respect to

20  operating businesses.

21     Q      And then, for those who got the licenses, you

22  helped them to comply with the rules that they have to

23  comply with.

24     A      Right.

25     Q      You also helped them apply for state

Page  208

Veritext Legal Solutions
866 299-5127

```
1    regulations.
2         A    Corrections.
3         Q    And for regulatory compliance for the state as
4    well?
5         A    Right, first the city and then the state.
6         Q    Okay. And then, have you ever dealt with any
7    of your clients when they either purchased or sold
8    rights or interests in cannabis licenses, dispensaries,
9    businesses?
10        A    Yes, frequently.
11        Q    Okay. And approximately how many transactions
12   do you think you've been involved in -- purchase/sale of
13   licenses, the business, operations, management?
14        A    Over the last ten years?
15        Q    Yes.
16             ARBITRATOR:  Probably a lot, right?
17             MS. KATCHKO:  Yeah. I mean, 40 maybe, 30,
18   40 -- depends. Some of the -- you know, about 30 to 40,
19   at least.
20             MR. AFIFI:  Okay. It's going to happen.
21             MR. MURPHY:  I just said to my client,
22   you should have hired her.
23             ARBITRATOR:  I actually had the same
24   thought, I've got to confess. Why didn't you hire --
25   you'd better write down this name.
```

Page 209

1              MR. MURPHY:  Wait a minute. Did we just

2    lose a client?

3              MR. AFIFI:  She is the antithesis of

4    David Welch.

5              ARBITRATOR:  I can tell that.

6              MS. KATCHKO:  But I know David.

7              ARBITRATOR:  I can tell that just after

8    the first few sentences that have come out of her mouth.

9              MR. HSU:  Such a departure from Lynch.

10             ARBITRATOR:  You just don't know where

11   we've been.

12             MR. MURPHY:  No, we've been down a

13   different road with no one in here.

14   BY MR. AFIFI:

15        Q    Just for giggles, do you know David Welch?

16        A    Yes, I do know David. I know -- you have to

17   realize that the regulatory world of cannabis was very

18   small in 2010 because not many law firms like your law

19   firms were willing to participate in anything that's

20   cannabis related. So, yeah, David, and there's another

21   small pool of attorneys.

22             ARBITRATOR:  Well, don't quote us on him.

23             MS. KATCHKO:  It's all confidential here,

24   so I wouldn't.

25             MR. MURPHY:  There's already something on

1    through a nonprofit corporation, correct?

2         A    Correct.

3         Q    And, obviously post-January 1, 2018,

4    recreational allowed for-profit migration, correct?

5         A    To convert, correct.

6         Q    Have you ever dealt with the city of Maywood

7    on any of the times that you've been dealing with your

8    clients?

9         A    In late 2018, I had a client that was

10   investing in an entity in Maywood, and I had to check

11   with the city as to what essentially the transfer,

12   applicable transfer restrictions were. My client was a

13   very small percentage investor, so it just required

14   notice to the city. But that's the extent of involvement

15   I had is checking the ordnance and then speaking to the

16   city.

17        Q    So you checked the ordnance back in 2018 when

18   this transaction was happening?

19        A    Correct.

20        Q    So you became familiar with what the ordnance

21   in the city of Maywood was concerning cannabis back

22   then?

23        A    Just that specific issue, not the whole

24   ordnance. But yes, I looked at that specific issue.

25        Q    By the way, have you ever heard of Mr. David

                                                    Page  212

1    Mango who just testified a little bit earlier?

2         A    Yes, of course.

3         Q    Have you ever dealt with him?

4         A    One conversation, yes.

5         Q    Okay. And was that for that same client?

6         A    Correct.

7         Q    Okay. In the last year, how many different

8    transactions have you been involved with where there was

9    a change in control of a cannabis license taking place?

10        A    Probably about nine or ten in the last year.

11        Q    Okay. And, are you familiar with whether or

12   not cannabis licenses, when they're issued by

13   municipalities, have a finite period allocated to them?

14        A    Yes.

15        Q    Typically, what is that?

16        A    You mean expiration period?

17        Q    Yes.

18        A    Yes. It's about a year. Usually, it's a year.

19   It's a year in the city level and the state level.

20        Q    Okay. Actually, I want to ask that separately.

21   So, the municipalities that you've dealt with have had

22   one-year expirations on the city licenses.

23        A    Correct.

24        Q    And, you're saying now the state level,

25   regardless of what the cities do, any state license also

Page 213

```
1    has a one-year expiration, correct?

2         A    Correct. It has to be renewed.

3         Q    Okay. Now, let's just clarify what that

4    expiration means. Does that mean you get a license for a

5    year, and at the end of the year you're out, and now you

6    have to reapply for license?

7         A    No. you just usually have to file a form and

8    pay fees. It's basically a way for the city to collect

9    fees every year and make sure that you're compliant and

10   all that.

11        Q    And the same thing with the state?

12        A    Correct.

13        Q    Okay. So as long as you're compliant with what

14   the laws are and regulations, you'll get renewed?

15        A    Correct, and pay. As long as you pay.

16        Q    And pay. No one forgets that. have you ever

17   encountered in your experience conditional use permits

18   being issued as the mechanism for the operation of

19   license or the giving of licenses to any entities?

20        A    Yes. Some jurisdictions have a dual process

21   where they have a CUP and a regulatory permit for a

22   business license, not all, but some.

23        Q    Okay. And you've dealt with jurisdictions such

24   as the city of LA? Has that ever occurred?

25        A    City of LA doesn't have CUPs. It's just, I
```

Page 214

1    don't even want to explain what the city of LA has. It's

2    a temporary approval that will someday be a final

3    license.

4        Q    So, in the cannabis space, CUPs are not ever

5    used in the city of LA yet?

6        A    City of LA is not a CUP process. They'll never

7    have it.

8        Q    Could you give me a few examples of cities

9    that you have dealt with that have CUPs set up for

10   licenses?

11       A    Desert Hot Springs, Atwater, Monterey

12   County -- those are the ones that come to mind. Of

13   course, you know, I know Maywood has a CUP process.

14   Lynwood does as well.

15       Q    Okay. Now, in this case, were you given some

16   documents to review?

17       A    Yes.

18       Q    Okay. So, first of all, there were some

19   agreements between Have a Heart and Mr. Shiber. And I'll

20   refer to them because they're already in evidence. So

21   we're not going to bore you with them. But just, I want

22   to ask you whether you've reviewed all these -- a

23   license assignment agreement, a lease agreement, and

24   personal guarantees associated with those. Have you

25   reviewed those?

Page  215

```
 1          A      Yes.

 2          Q      Have you reviewed the addendum to the license

 3    assignment agreement that went with it?

 4          A      Yes.

 5          Q      And have you reviewed the CUP, the conditional

 6    use permit issued to Cana -- we found out today it's

 7    Cana --

 8          A      Yeah, I saw the little thing on the N.

 9          Q      I found out today -- for the Maywood property?

10          A      Yes.

11          Q      Okay. And, did you also review the city of

12    Maywood ordnances that have been issued in this cannabis

13    space?

14          A      Yes.

15          Q      Okay. And, any other documents you reviewed

16    besides those?

17          A      Some correspondence from between David Welch

18    and the city.

19          Q      Okay. And that would have been correspondence

20    from David Welch in October 24, 2018 and the response

21    from the city November 7, 2018?

22          A      Correct.

23          Q      Is that correct?

24          A      Yes.

25          Q      Okay. These are all in evidence already, and
```

Page  216

```
 1    later. I don't have the exact date of conversion, but --
 2         Q    Okay. So, because it was a nonprofit, that
 3    means it didn't have any shares yet, right?
 4         A    Correct.
 5         Q    What would be the mechanism for that
 6    nonprofit, Have a Heart being your client, to move
 7    forward with those agreements to start eventually
 8    operating a dispensary?
 9         A    It would be essentially allowing somebody the
10    right of use of those licenses. Essentially, it's a
11    management structure. This assignment reads to me as a
12    management structure. And, as long as the directors of
13    the, you know, entity remain the same, then a third
14    party would be able to still utilize the use of those
15    licenses.
16         Q    Okay. So, you said a couple of things. Let me
17    break them down. First of all, you look at the
18    assignment agreement. That reads like a management
19    structure?
20         A    Correct.
21         Q    Explain what that means to you.
22         A    Sure. So, to me, a management structure is
23    when the owners of the license remain the same, which
24    is, by the way, something that's frequently done in this
25    space because some people are lucky enough to get the
```

Page  221

1   licenses. But they don't necessarily have the operating

2   expertise. So they will hire somebody to essentially --

3   or, you know, enter into a contract with somebody to

4   manage the operations of the business.

5           And, it would be you'd retain the ownership.

6   You'd still be controlling the entity. But you have

7   somebody operating it on a day-to-day and running,

8   essentially, the business operations.

9       Q    And the financial terms as between the

10  management company and the owners are fully negotiable,

11  correct?

12      A    Sure.

13      Q    There's nothing set by law as to what those

14  financial terms must be?

15      A    There are some reporting requirements in the

16  state level, meaning that, you know, if you hit a

17  certain threshold of sharing in revenue you would have

18  to be reported in an owner category versus a financial

19  interest category. But it's a disclosure standard on the

20  state level. It's not -- there's no requirement of one

21  or the other. But, you know, if you're receiving more

22  than 20 percent of the revenue, then you fall into the

23  owner category and have to do some specific things in

24  the state level. If it's less than 20 percent, then

25  you're a financial interest holder.

1          Q     Okay. So, again, assuming that Have a Heart

2    has come to you and said, hey, put this in place. We

3    want to operate the dispensary. And other than the fees

4    we're paying Mr. Shiber under the agreements, we're

5    going to keep all the revenues, how would you structure

6    that?

7          A     I would create a management agreement, and I

8    would have to file the proper disclosures to the state

9    and, you know, provide notice to the city and list them

10   as an owner. And then, you know, the principals of that

11   entity would also have to complete live scans on the

12   state level and owner submittal on the state level.

13         Q     Okay. So, live scans on the state level?

14   Notify the state of what the ownership percentage is?

15         A     Correct -- not the ownership percentage. So,

16   the state doesn't distinguish controlling owners and

17   equity owners. So, the state just has one owner

18   category. But that encompasses any controlling owners

19   and equity owners. So, and it's confusing and makes

20   people uncomfortable to be called an owner. But you're

21   an entity that's receiving more than 20 percent of the

22   profits, you are in that owner category even though

23   you're not necessarily an equity owner.

24         Q     Okay. Just so we're clear, that would be after

25   you convert it for profit, correct?

Page 223

```
 1    whether the manager is Have a Heart or Mr. Kunkel, for

 2    example, individually, Mr. Kunkel's name as the

 3    principal of Have a Heart would be disclosed to the

 4    state of California?

 5         A    Correct.

 6         Q    Okay. Have you done that before?

 7         A    Yes.

 8         Q    Okay. Has the state rejected that, assuming

 9    everything else was compliant?

10         A    No.

11         Q    Okay. So, the state just wants to know who's

12    managing and operating?

13         A    Disclosures, yes.

14         Q    And they want to make sure they have a live

15    scan so there's no criminal background?

16         A    Correct. They want to make sure that nobody

17    with a felony was disqualified from having the licenses

18    and control of the license.

19         Q    And you've got to pay a fee?

20         A    There's actually no -- there's a fee for the

21    live scans, but you don't have to pay for the ownership

22    update.

23         Q    Okay.

24         A    They do that for free.

25         Q    Okay. Now, so we talked about the state. Now,
```

Page  225

1    let's talk about the city of Maywood. You mentioned that

2    you would notify the city of Maywood -- now, back to the

3    city level. You mentioned it for the city of Maywood,

4    having read the ordnances. You created this management

5    structure. You would notify the city that there's a

6    change in the controlling entity of the license.

7         A    Well, not a change in the controlling entity

8    because the controlling entity is still staying as Cana.

9    But, that there would be an additional manager involved

10   or an additional person involved in a management.

11        Q    And that manager could be Have a Heart, Inc.

12   if that's what the choice was?

13        A    Or the individuals, yeah.

14        Q    Or the individuals, got it. And, once you

15   notified the city of that -- again, I'm referring to the

16   conditional use permit and the licenses as they stood in

17   January and February of 2018, okay?

18        A    Mm-hmm.

19        Q    At that time, if you notified the city, was

20   there any prohibition that you saw in any of the

21   ordnances which would prohibit them granting or, once

22   they're notified, allowing that to proceed?

23        A    No.

24        Q    Okay. Have you done that before in other

25   cities similar to Maywood where there was a conditional

                                              Page 226

1    use permit, licenses and required notice of any change

2    in the management or control?

3         A    In other cities, yes.

4         Q    And has that ever been rejected when you've

5    been compliant, when your clients have been compliant

6    with the requirements?

7         A    No, as long as the clients pass the live scans

8    and provide all the requested information.

9         Q    Okay. Now, with respect to the moratoria, I'll

10   represent to you Mr. Mango did testify about this

11   already partially. So I'm not going to belabor it. But,

12   since you're here, I want to make sure I cover it with

13   you.

14             Once the moratoria that you read were enacted,

15   assuming the conditional use permit was still valid in

16   that time, and that's May of 2018, and assuming that the

17   licenses were still valid as of then, and assuming

18   you've already notified the city of any transfers, was

19   there anything you saw in the moratoria that would

20   prohibit the state, or the city of Maywood -- I'm

21   sorry -- from following through with the management

22   control being given to Have a Heart, for example?

23        A    No, because all of that would have been

24   submitted before the effective date of the moratorium.

25   And the moratorium specifically says that any

                                             Page  227

```
 1   applications that are submitted and exist before the
 2   effective date would still be allowed to operate, non-
 3   conforming use, essentially.
 4        Q    Okay. Now, I'll represent to you there was
 5   some email exchanges in February of 2014 -- I'm sorry,
 6   February 14th of 2018 -- whereby the Welch firm had
 7   requested some information from Mr. Kunkel, okay? Just
 8   keeping that date in mind, if your firm was the firm who
 9   was going to handle this, and you got some information
10   from Mr. Kunkel to either prepare the management
11   agreement or to put Mr. Kunkel's name on whatever
12   applications or notices you need to do, from February
13   14,2018 until before the moratoria kicked in in May,
14   would that have been enough time for you to submit the
15   change notices to the city of Maywood?
16        A    Yeah, absolutely.
17        Q    How long would it have taken you to do that,
18   approximately, assuming you got your information on time
19   from Mr. Kunkel?
20        A    I mean, it would just be a matter of putting
21   together the application that the city requires. So, it
22   would probably take a couple of days to get all that
23   information to them.
24        Q    Certainly by the end of February or March, you
25   could have easily done that?
```

1      A      Sure. I don't know how long it would take the

2  city to process it, but the documentation would have

3  been submitted. And I believe that the ordnance says as

4  long as the application is submitted. Plus, the

5  operative words in the ordnance is that it's an

6  amendment to the license. It's not considered a new

7  application.

8      Q      Okay, that was my next question. First of all,

9  the moratoria only affected what types of licenses?

10     A      Dispensaries.

11     Q      And you understand that there's four licenses

12 that are at issue here, correct?

13     A      Correct.

14     Q      So the moratoria which affected only

15 dispensaries, they only affected dispensaries unless

16 they were talking about an amendment to an existing

17 license which gets the moratoria unblocked.

18     A      Unless existing non-conforming uses, which

19 would qualify this license because it would just be an

20 amended license, not a new license.

21     Q      Got it. So, in other words, even if, is it

22 your testimony that even if you submitted the

23 application after the moratoria in May for the change in

24 control, Mr. Kunkel or Have a Heart or whatever, that

25 the moratoria wouldn't have affected that?

Page  229

1          A       Correct, because it would be before the

2     effective date.

3          Q       Okay. Did you notice when you reviewed the

4     conditional use permit that one of the conditions was

5     that any construction must be done with proper permits

6     according to building and safety?

7          A       Yes. That's standard condition.

8          Q       That was my next question. That's a pretty

9     standard condition in conditional use permits?

10         A       Yes, unless you're in Los Angeles and you

11     don't have a conditional permit.

12         Q       Where there are --

13         A       I'm kidding.

14         Q       Yes, where there are. Okay. Now, after that,

15     I'm going to let you know that at some point there was

16     some construction that was done without permits on the

17     property. And the city of Maywood came, but this is

18     before the December 2018 date. The reason I bring that

19     up is that's the one-year anniversary, okay?

20              So, accept as a hypothetical for now, that

21     before December of 2018, the city of Maywood finds out

22     about illegal construction being done on the property,

23     okay? First of all, did you notice the conditional use

24     permit had a certain site plan that went with it?

25         A       Yes.

Page  230

1          Q      Okay. Have you ever had any clients who did

2     illegal construction without permits and had to deal

3     with the city or the CUPs that would have been affected

4     by that?

5          A      Yes.

6          Q      Okay. What, if anything, have you done with

7     respect to those clients to try to rectify or remedy the

8     situation?

9          A      I don't personally handle it myself. But we

10    would send them to an expediter with, you know, say, for

11    example, it if was in LA or another city to somebody who

12    could assist them with the planning or the building

13    departments in those cities. And they would cure those

14    violations, pay fines, penalties, whatever the city

15    required to essentially put them in good standing.

16         Q      Okay. So, you don't handle the building safety

17    aspect of things, correct? So, once that's -- whatever

18    they had to do with respect to the city building and

19    safety to correct the improper construction issues, once

20    that was corrected, did you then deal with the city to

21    make sure that the licenses were preserved or allowed to

22    go forward?

23         A      To make sure they're in good standing, yeah.

24    But I do not deal with the, you know, land use, planning

25    and building and safety portion of it.

Veritext Legal Solutions
866 299-5127

1    would still -- the notice requirement is the most

2    important part, essentially, of their requirement.

3         Q    To the city of Maywood?

4         A    Correct.

5         Q    And the notice would be the same whether

6    you're nonprofit or for-profit?

7         A    Yes, exactly, because here it's not a change

8    of ownership we're talking about. We're talking about a

9    control issue.

10        Q    Okay. Now, down the road, assuming Have a

11   Heart wanted to exercise that option that you saw in the

12   agreement --

13        A    Correct.

14        Q    If they chose to exercise it, and this is a

15   for-profit, what would be the mechanism where they would

16   then take complete ownership and control of the

17   licenses?

18        A    Well, they would have to buy the equity, Cana.

19   And then they would have to -- well, they would have to

20   report to the city because now, I believe, the current

21   ordnance requires anything over 51 percent of equity is

22   considered an ownership change. And they have to submit

23   a new application to the city and have to go through

24   approval process, background checks, to then be approved

25   by the city as the new owner.

1        Q      Okay.

2        A      But the entity wouldn't change. They would

3    have to -- I mean, I would recommend that they would buy

4    the equity in Cana.

5        Q      So, Have a Heart, Inc., could be the equity

6    owner meaning own all the stock of Cana.

7        A      Sure, 100 percent, yeah, owner of Cana.

8        Q      Okay. Meantime, that doesn't affect the

9    management and operation control that they were given if

10   you did what you were supposed to do?

11       A      Right, as long as they had been approved,

12   because they're -- yeah, they are all -- and if it's the

13   same person that's on Have a Heart and that's already in

14   the management agreement, then essentially, I guess it

15   would be the same application that would be submitted to

16   the city.

17       Q      There's nothing new to disclose to the city?

18       A      Right.

19       Q      And there wouldn't be anything new to disclose

20   to the state either at that point other than the

21   ownership percentage?

22       A      The changes, yeah. You would have to still

23   notify the state of any equity changes.

24       Q      Okay, perfect.

25              MR. AFIFI:   Okay. I have nothing further.

Page  236

1    Thank you for your time.

2              ARBITRATOR:  Okay.

3              MR. MURPHY:  I just heard an hour of

4    expert testimony that was never presented to me in an

5    expert report. And so, if I could have just a little

6    time to talk with my client?

7              ARBITRATOR:  Sure. How much time do you

8    want, like 15 minutes?

9              MR. MURPHY:  Yeah, I think that would be

10   great. I would appreciate that. It would be helpful for

11   me.

12             ARBITRATOR:  Sure. You're okay to --

13             MR. MURPHY:  We had a very intelligent

14   presentation just now, and I'd like to be able to just

15   talk to my client.

16             ARBITRATOR:  Of course. All right. Let's

17   take 15 minutes, and then we'll come back and have your

18   cross-examination. Thank you.

19             COURT REPORTER:  This marks the end of

20   media number 6. The time is 3:29 p.m. We are off the

21   record.

22             (Off the record.)

23             (End Media 6.)

24             (Begin Media 7.)

25             COURT REPORTER:  This marks the beginning

Page 237

```
 1    of media number 7. The time is 3:48 p.m. We are on the

 2    record.

 3                        CROSS-EXAMINATION

 4    BY MR. MURPHY:

 5         Q    Ms. Katchko, thank you for your time. I don't

 6    have a ton to ask, but I just wanted to explore a couple

 7    of topics with you.

 8              I represent Have a Heart Compassion Care and

 9    Ryan Kunkel, who's sitting to -- down the table. You

10    never met Ryan Kunkel before. You've never met Have a

11    Heart before?

12         A    No.

13         Q    And we've never met before?

14         A    Correct.

15         Q    Very nice to make your acquaintance.

16         A    Nice to meet you, too.

17         Q    So, I want to take us to this hypothetical

18    relationship between you as an attorney and Have a

19    Heart.

20         A    Okay.

21         Q    Don't steal my client.

22         A    Hypothetical.

23         Q    Hypothetical. Do not steal my client.

24              ARBITRATOR:  It may happen.

25              MS. KATCHKO:  I do not represent anybody
```

Page 238

1        Q     Were you dyslexic then?

2        A     Yes, sir.

3        Q     Okay. Did you obtain or receive any assistance

4    during your college career in performing the tasks that

5    were necessary to help you get your degree?

6        A     Yes, sir. At the university, they were making

7    a special arrangement for me to take the tests.

8        Q     And what was the special arrangement?

9               ARBITRATOR:  I think we've heard -- I've

10   heard quite a bit about this. I mean, I'm clear on this.

11   We talked about it before.

12              MR. AFIFI:  I said an opening statement.

13   But I don't know if you have testimony on it.

14              ARBITRATOR:  No, I think we did have some

15   testimony on it. I don't think we have to say a lot. I

16   mean, I understand the point about it.

17              MR. AFIFI:  Okay. That's fine. If you

18   did, that's fair enough. I just don't want you there to

19   be an absence of evidence.

20              ARBITRATOR:  No, it's fine.

21              MR. AFIFI:  Thank you.

22   BY MR. AFIFI:

23       Q     Just tell me something. Your dyslexia, how

24   does it affect you in terms of your ability to read or

25   comprehend?

1        A        I usually, like, read one sentence, two

2    sentence. And when I read, I see the letters and numbers

3    kind of mushed together, you know?

4        Q        Like jumbled?

5        A        Jumbled.

6        Q        Okay. That's been the case through today?

7        A        Yes.

8        Q        Okay. Now, at some point, you started to --

9    well, first of all, what did you do after college?

10       A        I went -- I was working a handler for FedEx.

11       Q        As a handler?

12       A        Yes, sir, during my college.

13       Q        Through college? And what did you do after

14   that?

15       A        As soon as I finished, I was hired as an

16   associate engineer for FedEx?

17       Q        As associated engineer?

18       A        Yes.

19       Q        Okay. Generally, just what did you do?

20       A        Just monitoring the package flows, you know,

21   drawing diagram of the operations, stuff like that.

22       Q        Okay. And what was the next area of work that

23   you did after that?

24       A        I stayed with FedEx for 17 years.

25       Q        Then after that?

**EXHIBIT "10"**



D|R WELCH
*Attorneys at Law*

500 SOUTH GRAND AVENUE, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90071
A PROFESSIONAL CORPORATION
PHONE (213) 596-9008
FAX (213) 536-4589
WWW.DRWELCHLAW.COM

## CONFIDENTIAL: SUBJECT TO ATTORNEY-CLIENT AND WORK-PRODUCT PRIVILEGES

January 18, 2018

Have a Heart
3958 6th Ave. NW
Seattle, Washington 98107
Attn: Ryan Kunkel

Caña
4027 E 52nd Street
Maywood, California 90270
Attn: Elias Shiber
Attn: Rafael Quinonez

     Re:    Potential and Actual Conflicts of Interest in representing Have a Heart and Caña

Dear Have a Heart and Caña:

This letter follows-up on our discussions regarding the conflicted representation of Have a Heart (hereinafter "HAH") and Caña by D|R Welch Attorneys at Law, P.C. (hereinafter the "Firm"). The potential of conflict exists in that the Firm has previously represented Caña and will represent HAH in the current matter. As your attorney, it is our ethical duty to inform you of all potential and actual conflicts which may occur in representing your interests. Here, there is an actual conflict in simultaneously representing HAH's and Caña's interests in negotiating and preparing a letter of intent, lease agreement, and any other necessary ancillary documents thereto regarding the business operating at 4027 E 52nd Street, Maywood, California 90270. Here, the interests of all of our clients conflict with one another. For example, in each such contemplated agreement, HAH and Caña will each generally seek to maximize their respective benefits while minimizing their respective liabilities and obligations.

Professional Rules & Responsibility, Rule 3-310(B) states that "A member shall not accept or continue representation of a client without providing written disclosure to the client where the member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter." With this matter, the Firm has a financial relationship with Caña in that the Firm will be compensated for the work it does. Because the interests of the parties conflict, the Firm will need you to execute the waiver below before we represent or continue representation of anyone on this matter.

Additionally, Professional Rules & Responsibility, Rule 3-310(C) states that "[a] member [of the California State Bar] shall not, without the informed written consent of each client:(2) Accept representation of more

**HAH000038**
## ARBITRATION EX. 8.1

than one client in a matter in which the interests of the clients actually conflict." As the interests of HAH and Caña may conflict, the Firm will need you to execute the waiver below before we represent any of the parties in this matter.

You may, and I advise that you do, contact independent legal counsel regarding our concurrent representation of your interests, the issues arising from that representation, and/or the waiver of the potential conflicts of interest. Please note that in the event there is litigation between any of the aforementioned individuals or entities, our firm will represent HAH, unless the firm is otherwise disqualified from engaging in such representation or future circumstances otherwise compel the Firm to cease such representation.

By executing this letter where indicated below, you confirm that you have been fully informed as to the nature of the actual and potential conflicts which could arise as a result of our concurrent representation of the parties; that you have been provided a reasonable opportunity to seek the advice of independent counsel of your choice regarding these potential conflicts and waiver thereof; and you understand that a conflict may arise in the future which may require an additional disclosure and waiver by you.

Assuming the foregoing disclosure is acceptable, please execute and return to me the waiver form appended hereto. Of course, if you have any questions, please feel free to give me a call.

Sincerely,

D | R WELCH ATTORNEYS AT LAW

David Ryan Welch
Attorney at Law

HAH000039
**ARBITRATION EX. 8.2**

By executing this letter, I hereby acknowledge that I have carefully read the foregoing letter, informing me that a conflict exists and potential conflicts may arise in connection with D|R Welch Attorneys at Law's representation of my interests. I further expressly acknowledge that I have been advised that I have the right to seek independent legal counsel in connection with these conflicts and the advisability of waiving said conflicts, and that I have had a reasonable opportunity to do so.  I further acknowledge that a conflict may arise in the future which may require an additional disclosure and waiver, or, alternatively, withdrawal by this firm of representation of one or more parties in connection with my matter.

Date: 1/25/18

**Have a Heart**

By: _Ryan Kunkel_

Name: Ryan Kunkel
Title: CEO

By executing this letter, I hereby acknowledge that I have carefully read the foregoing letter, informing me that a conflict exists and potential conflicts may arise in connection with D|R Welch Attorneys at Law's representation of my interests. I further expressly acknowledge that I have been advised that I have the right to seek independent legal counsel in connection with these conflicts and the advisability of waiving said conflicts, and that I have had a reasonable opportunity to do so.  I further acknowledge that a conflict may arise in the future which may require an additional disclosure and waiver, or, alternatively, withdrawal by this firm of representation of one or more parties in connection with my matter.

Date: _____

**Caña**

By: _____

Name: Rafael Quinonez
Title: President

HAH000040
**ARBITRATION EX. 8.3**

**EXHIBIT "11"**

# Cannabis License Agreement - <u>ADDENDUM</u>
# By and between Elias Shiber and "Have a Heart Compassion Care, Inc."

This **Cannabis License Agreement – ADDENDUM** (hereinafter this "License ADDENDUM") is effective on the Effective Date as defined below, and shall remain in continuous full force and effect subject to the terms contained in this Licesne ADDENDUM. This License ADDENDUM is made by and between **ELIAS SHIBER**, a natural person ("Assignor") and **HAVE A HEART COMPASSION CARE, INC.**, a State of Washington corporation ("Assignee").

## <u>RECITALS</u>

A.     The Parties signed an Assignment Agreement ("Assignment") regarding cannabis licenses in or about January 2018 or early February 2018 and such licenses are associated with the commercial real property located at 4027 E. 52nd Street, Maywood, CA  90270 ("Premises").

B.     The Parties wish to amend and modify the terms of the Assignment which amendment and modifications shall be effective as of the effective date of the Assignment.

C.     The Parties agree that based on mutual consideration and exchange of mutual promises they have agreed to the terms of this Addendum.

## 1.     MODIFICATIONS FOR LEASE.

**1.1.     Assignor provides Assignee Free User Fee for 3 Months, Commencing Feb. 1.**
The Parties agree that Assignor shall provide Tenant with <u>free User Fee for the Licenses for the period February 1 through April 30, 2018.</u> Accordingly, during the period February 1 through April 30, 2018, Assignee shall not be required to pay any User Fee to Assignor or any person for any reason, and Assignee shall be entitled to occupy the Premises and use the Licenses as if the Assignee is paying User Fee, and Assignee shall also be able to provide and perform improvements and modifications to the Premises during the free User Fee period.

**1.2     User Fee Payments Commence on May 1, 2018 with 10-Day Grace Period.**
Following the 3-month period of free User Fee for the Licenses, Assignee shall begin paying the User Fee on a monthly basis beginning <u>**May 2018**</u> as specified in the original Lease, **BUT SUBJECT TO** the Parties' further Agreement that Tenant shall have a <u>**grace period of ten (10) days**</u> within which to pay User Fee each month, and the grace period shall expire on the tenth (10th) day of each month. Accordingly, User Fee for the Licenses will be due on or before the 10th day of each month.

**1.3     Recitals.**
The Recitals appearing at the beginning of this Lease ADDENDUM are incorporated in full into this License ADDENDUM, and shall be considered and used in interpreting this License ADDENDUM.

**1.4     Authority**.
Each Party is duly authorized and holds the legal right to enter into this License ADDENDUM.

**Commercial Prop. Lease ADDENDUM   ELIAS SHIBER & RYAN KUNKEL, Have a Heart CC     Page 1 of 2**

**ARBITRATION EX. 5.1**

### 1.5      Mutual Promises and Consideration.

By executing and signing this License ADDENDUM, each Party expressly acknowledges that this
License ADDENDUM and its contents were carefully considered for and bargained for between the
parties hereto, and each party has carefully considered and approved the terms of this License
ADDENDUM.

IN WITNESS WHEREOF, the Parties hereto have caused this License ADDENDUM to be duly
executed as of the day and year written below.

Date: February _____, 2018          **Have a Heart Compassion Care, Inc.**

                                              By: _____
                                                  Ryan Kunkel
                                                  Owner, Officer, Corporate Governor

Date: February _____, 2018          _____
                                              **Elias Shiber**

**ARBITRATION EX. 5.2**

**EXHIBIT "12"**

**NUMERICA**
CREDIT UNION

9/23/2019 1:16 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1010

28-8269/3251
BRCH05

4/18/ 20 18

Pay to the
Order of     Elias Shiber                    $ 950.00

Nine hundred fifty    00/100    Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For    Com charges

⑈325182690⑈ 100887322 00105⑈ 1010

**Amount:** -950.00
**Description:** Draft 1010
**Check Number:** 1010
**Posted Date:** 5/7/2018
**Transaction Type:** History

HAH000295

**ARBITRATION EX. 10.1**

**NUMERICA**
CREDIT UNION

9/23/2019 1:15 PM

FREE BUSINESS CHECKING
S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1014

28-8269/3251
BRCH05

CHECK

May 1ˢᵗ 20 18

Pay to the Order of   Elias Shiber                        $ 25,000ᵗᵐ

Twenty five thousand 0%/₁₀₀                          Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For   Rent

⑆325182690⑆ 1008873 2200 105⑈ 1014

CREDITED TO THE ACCOUNT
WITHIN NAMED PAYEE.

ENDORSE HERE

**Amount:** -25000.00
**Description:** Draft 1014
**Check Number:** 1014
**Posted Date:** 5/4/2018
**Transaction Type:** History

HAH000296

**ARBITRATION EX. 10.2**

**NUMERICA**
CREDIT UNION

9/23/2019 1:15 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1015

28-8269/3251
BRCH05

May 1st 20 18

Pay to the Order of _Elias Sklbar_  $ 25,000

Twenty five Thousand  Dollars

**NUMERICA**
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For _License Lease_

⑈325182690⑈ ⑈100887322004105⑈ 1015

**Amount:** -25000.00
**Description:** Draft 1015
**Check Number:** 1015
**Posted Date:** 5/4/2018
**Transaction Type:** History

HAH000297

**ARBITRATION EX. 10.3**

**NUMERICA**
CREDIT UNION

9/23/2019 1:18 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1030
28-8269/3251
BRCH05

May 29th 20 18

Pay to the
Order of    Elias Shiber                    $ 2,114.53

Two thousand one hundred fourteen $3/100    Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For   May

⑆325182690⑆ 100887322 00 105⑈ 1030

**Amount:** -2114.53
**Description:** Draft 1030
**Check Number:** 1030
**Posted Date:** 6/6/2018
**Transaction Type:** History

HAH000298

**ARBITRATION EX. 10.4**

**NUMERICA**
CREDIT UNION

9/23/2019 1:18 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1039

28-8269/3251
BRCH05

6/10 20 18

Pay to the
Order of   Elias Shiber                                    $ 25,000.00

Twenty five thousand °°/100                    Dollars

**NUMERICA**
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For   Rent

⑆3 2518 2690⑆ ⑈100887322 00105⑈ 1039

**Amount:** -25000.00
**Description:** Draft 1039
**Check Number:** 1039
**Posted Date:** 6/14/2018
**Transaction Type:** History

HAH000299

**ARBITRATION EX. 10.5**

9/23/2019 1:19 PM

FREE BUSINESS CHECKING

S10



**Amount:** -25000.00
**Description:** Draft 1040
**Check Number:** 1040
**Posted Date:** 6/14/2018
**Transaction Type:** History

HAH000300

**ARBITRATION EX. 10.6**



9/23/2019 1:20 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1065

28-8269/3251
BRCH05

6/20 20 18

Pay to the
Order of   *Elias Shiber*   $1,950. 00

*One thousand nine hundred fifty* 00/100 Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For *June CAM + $1,000 Short on rent*

⑆325182690⑆ ⑈0088732200105⑈ 1065

**Amount:** -1950.00
**Description:** Draft 1065
**Check Number:** 1065
**Posted Date:** 7/3/2018
**Transaction Type:** History

HAH000301

**ARBITRATION EX. 10.7**

**NUMERICA**
CREDIT UNION

9/23/2019 1:21 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1078

28-8269/3251
BRCH05

CHECK ARMOR

7/2    20  18

Pay to the
Order of    Elias Shiber                    $ 26,950.00

Twenty six thousand nine hundred fifty 00/100 Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For    July Rent + CAM

⑆325182690⑆ ⑈0088732200105⑈ 1078

**Amount:** -26950.00
**Description:** Draft 1078
**Check Number:** 1078
**Posted Date:** 7/5/2018
**Transaction Type:** History

HAH000302

**ARBITRATION EX. 10.8**

9/23/2019 1:20 PM

**FREE BUSINESS CHECKING**

S10



**Amount:** -25000.00
**Description:** Draft 1079
**Check Number:** 1079
**Posted Date:** 7/5/2018
**Transaction Type:** History

HAH000303

**ARBITRATION EX. 10.9**



9/23/2019 1:25 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1156
28-8269/3251
BRCH05

7/31 20 18

Pay to the
Order of    Elias Shiber                    $ 26,950.00

Twenty six thousand nine hundred 00/100 Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For    Aug Rent

⑆325182690⑆ 1008873220010 5⑈ 1156

**Amount:** -26950.00
**Description:** Draft 1156
**Check Number:** 1156
**Posted Date:** 8/7/2018
**Transaction Type:** History

HAH000304

ARBITRATION EX. 10.10

NUMERICA CREDIT UNION

9/23/2019 1:26 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1165

29-8269/3251
BRCH05

7/31 20 18

Pay to the Order of Elias Shiber $ 25,000.00

Twenty five thousand 00/100 Dollars

NUMERICA CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For License Fee

⑆325182690⑆10088732200105⑈1165

**Amount:** -25000.00
**Description:** Draft 1165
**Check Number:** 1165
**Posted Date:** 8/9/2018
**Transaction Type:** History

HAH000305

**ARBITRATION EX. 10.11**



9/23/2019 1:31 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1397

28-8269/3251
BRCH05

9/26 20 18

Pay to the
Order of    Elias Shiber                    $ 26,950.00

Twenty six thousand nine hundred fifty 00/100 Dollars

NUMERICA
PO Box 4000
Spokane Valley, WA 99217

For  H&H  Rent + CAM

⑂325182690⑂100887322001051⑂1397

**Amount:** -26950.00
**Description:** Draft 1397
**Check Number:** 1397
**Posted Date:** 10/2/2018
**Transaction Type:** History

HAH000306
ARBITRATION EX. 10.12

**NUMERICA**
CREDIT UNION

9/23/2019 1:34 PM

FREE BUSINESS CHECKING

S10



**Amount:** -25000.00

**Description:** Draft 1398

**Check Number:** 1398

**Posted Date:** 10/2/2018

**Transaction Type:** History

HAH000307

**ARBITRATION EX. 10.13**

**NUMERICA**
CREDIT UNION

9/23/2019 1:37 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3958 0TH AVE NW STE 3
SEATTLE, WA 98107-5058

1504

28-8269/3251
BRCH05

10/29 20 18

Pay to the
Order of _ Elias Shiber                          $ 25,000.⁰⁰

Twenty five thousand ⁰⁰/₁₀₀ ———          Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

Have a Heart

For   License Fee

⑆325182690⑆ ⑈00887322001005⑉ 1504

**Amount:** -25000.00
**Description:** Draft 1504
**Check Number:** 1504
**Posted Date:** 11/6/2018
**Transaction Type:** History

**NUMERICA**
CREDIT UNION

9/23/2019 1:35 PM

FREE BUSINESS CHECKING

S10

INTERURBAN CAPITAL GROUP, INC
3058 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1505

28-8269/3251
BRCH05

10/29  20 18

Pay to the
Order of   Elias Shiber                           $ 26,950.00

Twenty six thousand nine hundred fifty 00/00   Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

Have a Heart

For   Rent + CAM

⑈325182690⑈100887322001051⑈1505

ENDORSE HERE

**Amount:** -26950.00
**Description:** Draft 1505
**Check Number:** 1505
**Posted Date:** 11/6/2018
**Transaction Type:** History

HAH000309

**ARBITRATION EX. 10.15**

**NUMERICA** CREDIT UNION

9/23/2019 1:31 PM

FREE BUSINESS CHECKING

S10



INTERURBAN CAPITAL GROUP, INC
3958 6TH AVE NW STE 3
SEATTLE, WA 98107-5058

1653

28-8269/3251
BRCH05

8/29 20 18

Pay to the
Order of ___ Elias Shiber ___ $ 25,000.00

Twenty five thousand 00/100 ___ Dollars

NUMERICA
CREDIT UNION
PO Box 4000
Spokane Valley, WA 99037

For ___ License Fee

⑆325182690⑆ ⑈008873220010 5⑈ 1653

**Amount:** -25000.00
**Description:** Draft 1653
**Check Number:** 1653
**Posted Date:** 9/5/2018
**Transaction Type:** History

HAH000310

ARBITRATION EX. 10.16

FREE BUSINESS CHECKING

S10

9/23/2019 1:30 PM





**Amount:** -26950.00

**Description:** Draft 1654

**Check Number:** 1654

**Posted Date:** 9/5/2018

**Transaction Type:** History

**ARBITRATION EX. 10.17**

# EXHIBIT C

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| FARYAN ANDREW AFIFI, ESQ.                    SBN:  167344<br>AFIFI LAW GROUP<br>1801 CENTURY PARK EAST, SUITE 1100<br>LOS ANGELES, CA 90067<br>TELEPHONE NO. (310) 407-3000        FAX NO. *(Optional)* (310) 407-3004<br>E-MAIL ADDRESS *(Optional):* farvan@afifilaw.com<br>ATTORNEY FOR *(Name):* Petitioners SHIBER and CANA Inc. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse on Hill St.

PLAINTIFF/PETITIONER:  ELIAS SHIBER and CANA, Inc.

DEFENDANT/RESPONDENT: Have a Heart Compassion Care Inc., and Ryan Kunkel

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>20 STCP 01632 |
|---|---|

TO *(insert name of party being served):* RYAN KUNKEL, an individual

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: May 21, 2020

Faryan Andrew Afifi
(TYPE OR PRINT NAME)

▶  *Faryan Andrew Afifi*
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [x]  A copy of the summons and of the complaint.
2. [x]  Other *(specify):*
   Petition to Vacate Arbitration Award; Civil Case Cover Sheet and Addendum
   Notice of Case Assignment;
   ADR Information.  General Order.  IDC Notice.
   Notice of Motion and Motion to Vacate, Declarations of Shiber and Afifi, Memo of Ps and As ISO

*(To be completed by recipient):*

Date this form is signed: 6 — 10 — 20

Michael Murphy
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

for Ryan Kunkel

▶  (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>FARYAN ANDREW AFIFI, ESQ.    SBN: 167344<br>AFIFI LAW GROUP<br>1801 CENTURY PARK EAST, SUITE 1100<br>LOS ANGELES, CA 90067<br>    TELEPHONE NO.: (310) 407-3000    FAX NO. *(Optional)*: (310) 407-3004<br>E-MAIL ADDRESS *(Optional)*:<br>    ATTORNEY FOR *(Name)*: Petitioners SHIBER and CANA Inc. | FOR COURT USE ONLY |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
  STREET ADDRESS: 111 North Hill Street
  MAILING ADDRESS: 111 North Hill Street
  CITY AND ZIP CODE: Los Angeles, 90012
  BRANCH NAME: Stanley Mosk Courthouse on Hill St.

PLAINTIFF/PETITIONER: ELIAS SHIBER and CANA, Inc.

DEFENDANT/RESPONDENT: Have a Heart Compassion Care Inc., and Ryan Kunkel

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>20 STCP 01632 |

TO *(insert name of party being served)*: HAVE A HEART COMPASSION CARE INC., A Washington Corporation

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  May 21, 2020

Faryan Andrew Afifi                                    ▶    *Faryan Andrew Afifi*
_____                      _____
(TYPE OR PRINT NAME)                                  (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. ☒  A copy of the summons and of the complaint.
2. ☒  Other *(specify)*:
    Petition to Vacate Arbitration Award; Civil Case Cover Sheet and Addendum
    Notice of Case Assignment;
    ADR Information.  General Order.  IDC Notice.
    Notice of Motion and Motion to Vacate, Declarations of Shiber and Afifi, Memo of Ps and As ISO
*(To be completed by recipient):*

Date this form is signed: 6 - 10 - 20
Michael Murphy for
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)
Have A Heart

▶    _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 49

20STCP01632
**ELIAS SHIBER, et al. vs HAVE A HEART COMPASSION CARE INC., et al.**

May 19, 2020
3:17 PM

| | |
|---|---|
| Judge: Honorable Stuart M. Rice | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: None | Deputy Sheriff: None |

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order

Based on current conditions, including, but not limited to, the spread of Covid-19, the need for social distancing, and the states of emergency having been declared by Governor Gavin Newsom and President Donald Trump, the General Orders issued by the Presiding Judge and Statewide Orders issued by the Chief Justice, the court finds good cause to calendar/continue this matter.

Hearing on Motion to Vacate Arbitration Award (filed 5/18/20) is scheduled for 09/29/2020 at 02:00 PM in Department 49 at Stanley Mosk Courthouse.

On the Court's own motion, the Case Management Conference scheduled for 09/09/2020 is advanced to this date and continued to 09/29/2020 at 02:00 PM in Department 49 at Stanley Mosk Courthouse.

In order to implement physical distancing going forward and until further notice, counsel and/or parties are strongly encouraged to appear telephonically for Non-Trial and Non-Evidentiary Matters.

Petitioner to give notice: Notice is further given that Petitioner in propria persona or counsel for the Petitioner is ordered to give notice of this continuance to all parties to this action within 10 days of service of this notice by the court, and file proof of service thereof within 12 days of this notice.

Certificate of Mailing is attached.

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

| | |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>05/19/2020 |
| PLAINTIFF/PETITIONER:<br>Elias Shiber  et al | Sherri R. Carter, Executive Officer / Clerk of Court<br>By:        K. Sandoval         Deputy |
| DEFENDANT/RESPONDENT:<br>Have a Heart Compassion Care Inc. et al | |

| | |
|---|---|
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>20STCP01632 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order) of 05/19/2020  upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.


Faryan Andrew Afifi
AFIFI Law Group
1801 Century Park E, Suite 1100
Los Angeles, CA  90067


Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 05/20/2020                    By:  K. Sandoval
                                          Deputy Clerk


CERTIFICATE OF MAILING

| | SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|---|

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

**NOTICE OF CASE ASSIGNMENT**

**UNLIMITED CIVIL CASE**

**FILED**
Superior Court of California
County of Los Angeles
05/11/2020
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ N. Alvarez _____ Deputy

Your case is assigned for all purposes to the judicial officer indicated below.

CASE NUMBER:
20STCP01632

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Stuart M. Rice | 49 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 05/11/2020
   (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By N. Alvarez _____ , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

05/11/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ C. Gomez _____ Deputy

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: | Time: | Dept.: |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: _____

_____ Stuart M. Rice / Judge _____
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☐ by depositing in the United States mail at the courthouse in _____, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Dated: _____

By _____
Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

## NOTICE OF
## CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter V@^^

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| FARYAN ANDREW AFIFI          SBN: 167344<br>AFIFI LAW GROUP<br>1801 CENTURY PARK EAST, SUITE 1100, LOS ANGELES, CA 90067<br>TELEPHONE NO.: 310.407.3000      FAX NO.: 310.407.3004<br>ATTORNEY FOR *(Name)*: Petitioner, ELIAS SHIBER and CANA, INC. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: ELIAS SHIBER and CANA, INC.

| **CIVIL CASE COVER SHEET**<br>[X] Unlimited     [ ] Limited<br>(Amount        (Amount<br>demanded       demanded is<br>exceeds $25,000)  $25,000 or less) | **Complex Case Designation**<br>[ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>20STCP01632<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort**<br>[ ] Auto (22)<br>[ ] Uninsured motorist (46)<br>**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23)<br>**Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35)<br>**Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | **Contract**<br>[ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37)<br>**Real Property**<br>[ ] Eminent domain/Inverse condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26)<br>**Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[X] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**<br>[ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |
|---|---|---|

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify)*: 1 - Petition to Vacate Award
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 8, 2020

FARYAN ANDREW AFIFI                                    //s//
_____                        _____
(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*
Westlaw Doc & Form Builder™

Case 2:20-cv-05441-SVW-SHK Document 1-1 Filed 06/18/20 Page 351 of 355 Page ID
#:358
INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)—Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice—
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach—Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Item I**.  Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL?  YES      CLASS ACTION?  YES   LIMITED CASE?  YES   TIME ESTIMATED FOR TRIAL   2    ×HOURS/  DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked.  For any exception to the court location, see Local Rule 2.3.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office
11. Mandatory Filing Location (Hub Case)

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|
| **Auto Tort** Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev 3/15)

LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3

Page 2 of 4

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☒ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

| SHORT TITLE: SHIBER et al. V. HAVE A HEART et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>⎺ 1. ☒ 2. ⎺ 3. ⎺ 4. ⎺ 5. ⎺ 6. ⎺ 7. ⎺ 8.   9.   10.   11. | ADDRESS:<br><br>111 N. Hill Street |
|---|---|

| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90012 |
|---|---|---|

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.3, subd.(a).

Dated: May 8, 2020

//s//

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/15).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.